# EXHIBIT 2

# UNITED STATES
# SECURITIES AND EXCHANGE COMMISSION
### Washington, D.C. 20549

## FORM 10-K

☒　　**ANNUAL REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934**
**For the fiscal year ended December 31, 2016.**

**OR**

☐　　**TRANSITION REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934**
**For the Transition Period from to .**

**Commission file number 001-36859**

# PayPal Holdings, Inc.

**(Exact Name of Registrant as Specified in Its Charter)**

| | |
|---|---|
| **Delaware** | **47-2989869** |
| **(State or Other Jurisdiction of Incorporation or Organization)** | **(I.R.S. Employer Identification No.)** |
| **2211 North First Street San Jose, California** | **95131** |
| **(Address of Principal Executive Offices)** | **(Zip Code)** |

**(408) 967-1000**

**(Registrant's telephone number, including area code)**

**Securities registered pursuant to Section 12(b) of the Act:**

| **Title of each class** | **Name of each exchange on which registered** |
|---|---|
| Common Stock, $0.0001 par value per share | The NASDAQ Stock Market LLC |

**Securities registered pursuant to Section 12(g) of the Securities Exchange Act of 1934:**
**None**

Indicate by check mark if the registrant is a well-known seasoned issuer, as defined in Rule 405 of the Securities Act. Yes [x] No [ ]

Indicate by check mark if the registrant is not required to file reports pursuant to Section 13 or Section 15(d) of the Exchange Act. Yes [ ] No [x]

Indicate by check mark whether the registrant (1) has filed all reports required to be filed by Section 13 or 15(d) of the Exchange Act during the preceding 12 months (or for such shorter period that the registrant was required to file such reports), and (2) has been subject to such filing requirements for the past 90 days. Yes [x] No [ ]

Indicate by check mark whether the registrant has submitted electronically and posted on its corporate Web site, if any, every Interactive Data File required to be submitted and posted pursuant to Rule 405 of Regulation S-T (§ 232.405 of this chapter)

during the preceding 12 months (or for such shorter period that the registrant was required to submit and post such files). Yes [x] No [ ]

Indicate by check mark whether the registrant is a large accelerated filer, an accelerated filer, a non-accelerated filer, or a smaller reporting company. See the definitions of "large accelerated filer," "accelerated filer" and "smaller reporting company" in Rule 12b-2 of the Exchange Act. (Check one):

| | | | |
|---|---|---|---|
| Large accelerated filer | ☒ | Accelerated filer | ☐ |
| Non-accelerated filer | ☐ (Do not check if a smaller reporting company) | Smaller reporting company | ☐ |

Indicate by check mark whether the registrant is a shell company (as defined in Rule 12b-2 of the Exchange Act). Yes [ ] No [x]

As of June 30, 2016, the aggregate market value of the registrant's common stock held by non-affiliates of the registrant was approximately $41.0 billion based on the closing sale price as reported on The NASDAQ Global Select Market.

As of February 2, 2017, there were 1,207,583,234 shares of common stock outstanding.

**DOCUMENTS INCORPORATED BY REFERENCE**

Part III incorporates information by reference from the definitive proxy statement for the registrant's Annual Meeting of Stockholders expected to be held in May 2017.

Table of Contents

**TABLE OF CONTENTS**

|  |  | Page |
|---|---|---|
| **Part I** | | |
| Item 1. | Business | 4 |
| Item 1A. | Risk Factors | 12 |
| Item 1B. | Unresolved Staff Comments | 34 |
| Item 2. | Properties | 34 |
| Item 3. | Legal Proceedings | 34 |
| Item 4. | Mine Safety Disclosures | 34 |
| **Part II** | | |
| Item 5. | Market for Registrant's Common Equity, Related Stockholder Matters and Issuer Purchases of Equity Securities | 35 |
| Item 6. | Selected Financial Data | 36 |
| Item 7. | Management's Discussion and Analysis of Financial Condition and Results of Operations | 37 |
| Item 7A. | Quantitative and Qualitative Disclosures About Market Risk | 57 |
| Item 8. | Financial Statements and Supplementary Data | 58 |
| Item 9. | Changes in and Disagreements With Accountants on Accounting and Financial Disclosure | 58 |
| Item 9A. | Controls and Procedures | 58 |
| Item 9B. | Other Information | 59 |
| **Part III** | | |
| Item 10. | Directors, Executive Officers and Corporate Governance | 59 |
| Item 11. | Executive Compensation | 59 |
| Item 12. | Security Ownership of Certain Beneficial Owners and Management and Related Stockholder Matters | 59 |
| Item 13. | Certain Relationships and Related Transactions and Director Independence | 59 |
| Item 14. | Principal Accounting Fees and Services | 59 |
| **Part IV** | | |
| Item 15. | Exhibits and Financial Statement Schedules | 60 |

**Presentation of Information**

On July 17, 2015, PayPal Holdings, Inc. ("PayPal Holdings") became an independent publicly traded company through the pro rata distribution by eBay Inc. ("eBay") of 100% of the outstanding common stock of PayPal Holdings to eBay's stockholders (which we refer to as the "separation" or the "distribution"). For additional information, see "Business-Separation from eBay Inc." To accomplish this separation, in January 2015, eBay incorporated PayPal Holdings, Inc., which ultimately became the parent of PayPal, Inc. and holds directly or indirectly all of the assets and liabilities associated with PayPal, Inc. Unless otherwise expressly stated or the context otherwise requires, references to "we," "our," "us," "the Company" or "PayPal" refer to PayPal Holdings, Inc. and its consolidated subsidiaries or, in the case of information as of dates or for periods prior to our separation from eBay, the consolidated entities of the payments business of eBay, including PayPal, Inc. and certain other assets and liabilities that were historically held at the eBay corporate level, but were specifically identifiable and attributable to the payments business, and references to our "Payments Platform" mean our combined payment solution capabilities, including our PayPal, PayPal Credit, Braintree, Venmo, Xoom, and Paydiant products.

References in this Annual Report on Form 10-K to "eBay" refer to eBay Inc., a Delaware corporation, and its consolidated subsidiaries, which prior to the separation and distribution, but not after such date, included the business and operations of PayPal.

**Trademarks, Trade Names and Service Marks**

PayPal owns or has rights to use the trademarks, service marks and trade names that it uses in conjunction with the operation of its business. Some of the more important trademarks that PayPal owns or has rights to use that appear in this Annual Report on Form 10-K include: PayPal®, PayPal Credit®, Braintree, Venmo and Xoom, which may be registered or trademarked in the United States and other jurisdictions. PayPal's rights to some of these trademarks may be limited to select markets. Each trademark, trade name or service mark of any other company appearing in this Annual Report on Form 10-K is, to PayPal's knowledge, owned by such other company.

**Competition**

The global payments industry is highly competitive. We compete against a wide range of businesses, including banks, credit card providers, technology and ecommerce companies and traditional retailers, many of which are larger than we are, have a dominant and secure position, or offer other products and services to consumers and merchants which we do not offer. We compete against all forms of payments, including credit and debit cards; automated clearing house and bank transfers; other online payment services; mobile payments; and offline payment methods, including cash and check.

We compete primarily on the basis of the following:

- ability to attract, retain and engage both merchants and consumers with our two-sided platform;

- ability to show that merchants may achieve incremental sales by offering our end-to-end services;

- consumer confidence in safety and security of transactions on our Payments Platform, including the ability for consumers to use our products and services without sharing their financial information with the merchant or the party they are paying;

- simplicity of our fee structure;

- ability to develop products and services across multiple commerce channels, including mobile payments and payments at the retail point of sale;

- trust in our dispute resolution and buyer and seller protection programs;

- customer service;

- brand recognition;

- website, mobile platform and application onboarding, ease-of-use and accessibility;

- the technology- and payment-agnostic nature of our Payments Platform;

- system reliability and data security;

- ease and quality of integration into third-party mobile applications and operating systems; and

- quality of developer tools such as our application programming interfaces and software development kits.

In addition to the discussion in this section, see "Item 1A. Risk Factors" under the caption "Substantial and increasingly intense competition worldwide in the global payments industry may harm our business" for further discussion of the potential impact of competition on our business.

**Research and Development**

Total research and development expense was $834 million , $792 million and $747 million in 2016 , 2015 and 2014 , respectively.

**Intellectual Property**

The protection of our intellectual property, including our trademarks (particularly those covering the PayPal name), patents, copyrights, domain names, trade dress and trade secrets is important to the success of our business. We protect our intellectual property rights by relying on applicable laws and regulations in the U.S. and internationally, as well as a variety of administrative procedures. We also rely on contractual restrictions to protect our proprietary rights in products and services. We have routinely entered into confidentiality and invention assignment agreements with our employees and contractors and nondisclosure agreements with parties with whom we conduct business to control access to and limit disclosure of our proprietary information.

We pursue the registration of our domain names, trademarks and service marks in the U.S. and internationally. Additionally, we have filed U.S. and international patent applications covering certain aspects of our proprietary technology. We have registered our core brands as trademarks and domain names in the U.S. and a large number of other jurisdictions and have in place an active program to continue to secure trademarks and domain names that correspond to our brands in markets of interest.

For additional information regarding some of the risks relating to our intellectual property, including costs of protecting our intellectual property, see the information in "Item 1A. Risk Factors" under the captions "We are subject to patent litigation" and

9

Table of Contents

"We may be unable to adequately protect or enforce our intellectual property rights, or third parties may allege that we are infringing their intellectual property rights."

**Government Regulation**

We operate globally and in a rapidly evolving regulatory environment characterized by a heightened regulatory focus on all aspects of the payments industry. That focus continues to become even more heightened as regulators on a global basis focus on such important issues as countering terrorist financing, anti-money laundering, privacy and consumer protection. Some of the laws and regulations to which we are subject were enacted recently and the laws and regulations applicable to us, including those enacted prior to the advent of digital and mobile payments, are continuing to evolve through legislative and regulatory action and judicial interpretation. Non-compliance with laws and regulations, increased penalties and enforcement actions related to non-compliance, changes in laws and regulations or their interpretation, and the enactment of new laws and regulations applicable to us could have a material adverse impact on our business, results of operations and financial condition. Therefore, we monitor these areas closely to design compliant solutions for our customers who depend on us.

Government regulation impacts key aspects of our business. We are subject to regulations that affect the payments industry in the markets we operate.

*Payments Regulation.* Various laws and regulations govern the payments industry in the U.S. and globally. In the U.S., PayPal, Inc. holds licenses to operate as a money transmitter (or its equivalent), which, among other things, subjects PayPal, Inc. to reporting requirements, bonding requirements, limitations on the investment of customer funds and inspection by state regulatory agencies. Outside the U.S., we provide localized versions of our service to customers through various foreign subsidiaries. The activities of those non-U.S. entities are, or may, be supervised by a financial regulatory authority in the jurisdictions in which they operate. Among other regulatory authorities, the Luxembourg Commission de Surveillance du Secteur Financier (the "CSSF"), the Australian Securities and Investment Commission, the Monetary Authority of Singapore, the Reserve Bank of India, and the Central Bank of Russia have asserted jurisdiction over some or all of our activities in country. This list is not exhaustive, as there are numerous other regulatory agencies that have or may assert jurisdiction over our activities. The laws and regulations applicable to the payments industry in any given jurisdiction are subject to interpretation and change.

*Banking Agency Supervision* . We serve our customers in the European Union through PayPal (Europe) S.à.r.l. et Cie, SCA, a wholly-owned subsidiary that is licensed and subject to regulation as a bank in Luxembourg by the CSSF. Consequently, we must comply with rules and regulations of the banking industry, including those related to capitalization, funds management, corporate governance, anti-money laundering, disclosure, reporting and inspection. We also are, or may be, subject to banking-related regulations in other countries now or in the future related to our role in the financial industry. In addition, based on our relationships with our partner financial institutions in the U.S., we are subject to indirect regulation and examination by these financial institutions' regulators.

*Consumer Financial Protection Bureau* . The Consumer Financial Protection Bureau (the "CFPB") has significant authority to regulate consumer financial products in the United States, including consumer credit, deposit, payment, and similar products. As a large market participant of remittance transfers, the CFPB has direct supervisory authority over our business. The CFPB and other similar regulatory agencies in other jurisdictions may have broad consumer protection mandates that could result in the promulgation and interpretation of rules and regulations that may affect our business.

*Anti-Money Laundering and Counter-Terrorist Financing.* PayPal is subject to anti-money laundering ("AML") laws and regulations in the U.S. and other jurisdictions, as well as laws designed to prevent the use of the financial systems to facilitate terrorist activities. We have implemented a comprehensive AML program designed to prevent our payment network from being used to facilitate money laundering, terrorist financing, and other illicit activities, or to do business in countries or with persons and entities included on designated country or person lists promulgated by the U.S. Department of the Treasury's Office of Foreign Assets Controls ("OFAC") and equivalent authorities in other countries. Our AML compliance program, overseen by our compliance officer, is composed of policies, procedures and internal controls, and is designed to address these legal and regulatory requirements and assist in managing money laundering and terrorist financing risks.

*Interchange Fees.* Interchange fees associated with four-party payments systems are being reviewed or challenged in various jurisdictions. For example, in the European Union, the Multilateral Interchange Fee ("MIF") Regulation (which became effective in December 2015) caps credit and debit interchange fees for cards payments and provides for business rules to be complied with by any company dealing with card transactions, including PayPal. As a result, the fees that we collect in certain jurisdictions may become the subject of regulatory challenge.

10

*Data Protection and Information Security.* Aspects of our operations or business are subject to privacy and data protection regulation in the United States, the European Union and elsewhere. For example, in the United States, we are subject to information safeguarding requirements under the Gramm-Leach-Bliley Act that require the maintenance of a written, comprehensive information security program and in Europe, the operations of our Luxembourg bank are subject to information safeguarding requirements under the Luxembourg Banking Act, among other laws. Regulatory authorities around the world are considering numerous legislative and regulatory proposals concerning privacy and data protection. In addition, the interpretation and application of these privacy and data protection laws in the United States, Europe and elsewhere are often uncertain and in a state of flux.

*Anti-Corruption.* PayPal is subject to applicable anti-corruption laws, such as the U.S. Foreign Corrupt Practices Act and the U.K. Bribery Act, and similar anti-corruption laws in the jurisdictions in which it operates. Anti-corruption laws generally prohibit offering, promising, giving, or authorizing others to provide anything of value, either directly or indirectly, to a government official or private party in order to influence official action or otherwise gain an unfair business advantage, such as to obtain or retain business. We have implemented policies, procedures, and internal controls that are designed to comply with these laws and regulations.

*Additional Regulatory Developments.* Various regulatory agencies continue to examine a wide variety of issues, including virtual currencies, identity theft, account management guidelines, privacy, disclosure rules, security and marketing that may impact PayPal's business.

For an additional discussion on governmental regulation affecting our business, please see the risk factors related to regulation of our payments business and regulation in the areas of consumer privacy, data use and/or security in "Item 1A. Risk Factors " under the caption "Risk Factors That May Affect Our Business, Results of Operations and Financial Condition" and "Item 3. Legal Proceedings" included elsewhere in this Annual Report on Form 10-K.

### Seasonality

The Company does not experience meaningful seasonality with respect to net revenues. No individual quarter in 2016 , 2015 or 2014 accounted for more than 30% of annual net revenue.

### Financial Information About Segments

We operate in one business segment and have one reportable segment. See "Note 11 — Segment and Geographical Information" to the consolidated financial statements included elsewhere in this Annual Report on Form 10-K for additional information including certain financial information about our operations in the U.S. and abroad. Additionally, please see the information in "Item 1A. Risk Factors" under the caption "Our international operations are subject to increased risks, which could harm our business," which describes risks associated with our foreign operations.

### Employees

As of December 31, 2016, we employed approximately 18,100 people globally, of whom approximately 10,180 were located in the U.S. We consider our relationship with our employees to be good.

### Separation from eBay Inc.

PayPal Holdings, Inc. was incorporated in Delaware in January 2015 for the purpose of owning and operating eBay's Payments business in connection with the separation and distribution described below. Prior to the contribution of this business to PayPal Holdings, Inc., which occurred prior to the distribution in July 2015, PayPal Holdings, Inc. had no operations. On July 17, 2015 (the "distribution date"), PayPal became an independent publicly traded company through the pro rata distribution by eBay of 100% of the outstanding common stock of PayPal to eBay stockholders (which we refer to as the "separation" or the "distribution"). Each eBay stockholder of record as of the close of business on July 8, 2015 received one share of PayPal common stock for every share of eBay common stock held on the record date. Approximately 1.2 billion shares of PayPal common stock were distributed on July 17, 2015 to eBay stockholders. PayPal's common stock began "regular way" trading under the ticker symbol "PYPL" on The NASDAQ Stock Market on July 20, 2015. Prior to the separation, eBay transferred substantially all of the assets and liabilities and operations of eBay's payments business to PayPal, which was completed in June 2015.

Violations of the complex foreign and U.S. laws, rules and regulations that apply to our international operations may result in fines, criminal actions, or sanctions against us, our officers, or our employees; prohibitions on the conduct of our business; and damage to our reputation. Although we have implemented policies and procedures designed to promote compliance with these laws, violations by our employees, contractors, or agents could nevertheless occur. These risks are inherent in our international operations and expansion, may increase our costs of doing business internationally, and could harm our business.

*We are exposed to fluctuations in interest rates.*

We are exposed to interest rate risk from our investment portfolio and from interest-rate sensitive assets underlying the customer balances we hold on our balance sheet as customer accounts. A low interest rate environment or reductions in interest rates may negatively impact our investment income and our net income.  In addition, fluctuations in interest rates may adversely impact our customers' spending levels and ability and willingness to pay outstanding amounts owed to us. Higher interest rates often lead to higher payment obligations by customers to us and other lenders under mortgage, credit card and other consumer loans, which may reduce our customers' ability to remain current on their obligations to us and therefore lead to increased delinquencies, charge-offs and allowance for loan and interest receivable which could have an adverse effect on our net income.

In July 2015, we entered into a revolving credit facility. As a result, to the extent of our borrowings under the facility, which bear interest at a floating rate, we will be exposed to interest rate fluctuations.

*Use of our payments services for illegal purposes could harm our business.*

Our payment system is susceptible to potentially illegal or improper uses, including money laundering, terrorist financing, illegal online gambling, fraudulent sales of goods or services, illicit sales of prescription medications or controlled substances, piracy of software, movies, music, and other copyrighted or trademarked goods (in particular, digital goods), money laundering, bank fraud, child pornography trafficking, prohibited sales of alcoholic beverages or tobacco products, online securities fraud, or to facilitate other illegal activity. Certain activity that may be legal in one country may be illegal in another country, and a merchant may intentionally or inadvertently be found responsible for importing or exporting illegal goods, resulting in liability for us. Changes in law have increased the penalties for intermediaries providing payment services for certain illegal activities and additional payments-related proposals are under active consideration by government authorities. Intellectual property rights owners or government authorities may seek to bring legal action against providers of payments solutions, including PayPal, that are peripherally involved in the sale of infringing items. Any threatened or resulting claims could result in reputational harm, and any resulting liabilities, loss of transaction volume or increased costs could harm our business.

*Our failure to manage our customer funds and the assets underlying our customer funds properly could harm our business.*

We hold a substantial amount of funds belonging to our customers, including deposits in customer accounts and funds being remitted to sellers of goods and services. Our ability to manage and account accurately for the assets underlying our customer funds requires a high level of internal controls. As our business continues to grow and we expand our product offerings, we must continue to strengthen our associated internal controls. For example, in March 2016, as approved by the Supervisory Board of PayPal (Europe) and as permitted by the CSSF, certain European customer balances held in our Luxembourg banking subsidiary are being used to extend credit to our European customers. Our success requires significant public confidence in our ability to properly manage our customers' balances and handle large and growing transaction volumes and amounts of customer funds. Any failure to maintain the necessary controls or to manage our customer funds and the assets underlying our customer funds accurately could result in reputational harm, lead customers to discontinue or reduce their use of our products and result in significant penalties and fines, which could materially harm our business.

*We are subject to regulatory activity and antitrust litigation under competition laws.*

We are subject to scrutiny by various government agencies under U.S. and foreign laws and regulations, including antitrust and competition laws. An increasing number of jurisdictions also provide private rights of action for competitors or consumers to assert claims of anti-competitive conduct. Other companies and government agencies have in the past and may in the future allege that our actions violate the antitrust or competition laws of the U.S., individual states, other countries, or the European Commission, or otherwise constitute unfair competition. An increasing number of governments are regulating competition law activities, including increased scrutiny in large markets such as China. Our business agreements or arrangements with customers or other companies could give rise to regulatory action or antitrust litigation. Some regulators, particularly those outside of the U.S., may perceive our business to be used so broadly that otherwise uncontroversial business practices could be deemed anticompetitive. Any claims or investigations, even if without foundation, may be very expensive to defend or respond to, involve negative publicity

25

and substantial diversion of management time and effort, and could result in reputational harm, significant judgments against us, or require us to change our business practices.

*We are subject to patent litigation.*

We have repeatedly been sued for allegedly infringing other parties' patents. At any given time, we are typically a defendant in a number of patent lawsuits and have been notified of several other potential patent disputes. We expect that we will increasingly be subject to patent infringement claims because, among other reasons:

- our products and services continue to expand in scope and complexity;
- we continue to expand into new business areas, including through acquisitions; and
- the number of patent owners who may claim that we, any of the companies that we have acquired, or our customers infringe their patents, and the aggregate number of patents controlled by such patent owners, continues to increase.

Such claims may be brought directly against us or against our customers whom we may indemnify either because we are contractually obligated to do so or we choose to do so as a business matter. We believe that an increasing number of these claims against us and other technology companies have been, and continue to be, initiated by third parties whose sole or primary business is to assert such claims. In addition, we have seen significant patent disputes between operating companies in some technology industries. Patent claims, whether meritorious or not, are time-consuming and costly to defend and resolve, and could require us to make expensive changes in our methods of doing business, enter into costly royalty or licensing agreements, make substantial payments to satisfy adverse judgments or settle claims or proceedings, or cease conducting certain operations, which would harm our business.

*We may be unable to adequately protect or enforce our intellectual property rights, or third parties may allege that we are infringing their intellectual property rights.*

The protection of our intellectual property, including our trademarks, patents, copyrights, domain names, trade dress, and trade secrets, is important to the success of our business. We seek to protect our intellectual property rights by relying on applicable laws and regulations in the U.S. and internationally, as well as a variety of administrative procedures. We also rely on contractual restrictions to protect our proprietary rights when offering or procuring products and services, including confidentiality and invention assignment agreements entered into with our employees and contractors and confidentiality agreements with parties with whom we conduct business.

Effective intellectual property protection may not be available in every country in which our products and services are made available. We may be required to expend significant time and expense in order to prevent infringement or to enforce our rights.
Although we have generally taken measures to protect our intellectual property rights, there can be no assurance that we will be successful in protecting or enforcing our rights in every jurisdiction, or that contractual arrangements and other steps that we have taken to protect our intellectual property will prevent third parties from infringing or misappropriating our intellectual property or deter independent development of equivalent or superior intellectual property rights by others. If we are unable to prevent third parties from adopting, registering or using trademarks and trade dress that infringe, dilute or otherwise violate our trademark rights, the value of our brands could be diminished and our business could be adversely affected. Also, we may not be able to discover or determine the extent of any unauthorized use of our proprietary rights. We have licensed in the past, and expect to license in the future, certain of our proprietary rights, such as trademarks or copyrighted material, to others. These licensees may take actions that diminish the value of our proprietary rights or harm our reputation. Any failure to adequately protect or enforce our intellectual property rights, or significant costs incurred in doing so, could diminish the value of our intangible assets and materially harm our business.

As the number of products in the technology and payments industries increases and the functionality of these products further overlaps, and as we acquire technology through acquisitions or licenses, we may become increasingly subject to intellectual property infringement and other claims. Litigation may be necessary to determine the validity and scope of the patent and other intellectual property rights of others. The ultimate outcome of any allegation is often uncertain and, regardless of the outcome, any such claim, with or without merit, may be time-consuming, result in costly litigation, divert management's time and attention from our business, and require us to, among other things, stop providing transaction processing and other payment-related services or redesign, stop selling our products or services, pay substantial amounts to satisfy judgments or settle claims or lawsuits, pay substantial royalty or licensing fees, or satisfy indemnification obligations that we have with certain parties with whom we have commercial relationships. Our failure to obtain necessary license or other rights, or litigation or claims arising out of intellectual property matters, may harm our business.

26

*We are regularly subject to general litigation, regulatory disputes, and government inquiries.*

We are regularly subject to claims, individual and class action lawsuits, government and regulatory investigations, inquiries or requests, and other proceedings involving competition and antitrust law, intellectual property, privacy, data protection, information security, anti-money laundering, counter-terrorist financing, sanctions, anti-corruption, consumer protection, accessibility claims, securities, tax, labor and employment, commercial disputes, services, escheatment of unclaimed or abandoned property, and other matters. In particular, our business faces ongoing consumer protection and intellectual property litigation, as discussed above. The number and significance of these disputes and inquiries have increased as our company has grown larger, our business has expanded in scope and geographic reach, and our products and services have increased in complexity. In addition, the laws, rules and regulations affecting our business, including those pertaining to Internet and mobile commerce, payments services, and credit, are subject to ongoing interpretation by the courts and governmental authorities, and the resulting uncertainty in the scope and application of these laws, rules and regulations increases the risk that we will be subject to private claims and governmental actions alleging violations of those laws, rules and regulations.

The scope, outcome and impact of claims, lawsuits, government investigations, and proceedings that we are subject to cannot be predicted with certainty. Regardless of the outcome, such investigations and proceedings can have an adverse impact on us because of legal costs, diversion of management resources, reputational damage, and other factors. Determining reserves for our pending litigation and regulatory proceedings is a complex, fact-intensive process that is subject to management's judgment. Resolving one or more such legal and regulatory proceedings could potentially require us to make substantial payments to satisfy judgments, fines or penalties or to settle claims or proceedings, any of which could materially and adversely affect our business. These proceedings could also result in reputational harm, criminal sanctions, consent decrees, or orders preventing us from offering certain products or services, requiring a change in our business practices in costly ways or development of non-infringing or otherwise altered products or technologies. Any of these consequences could materially and adversely affect our business.

Certain of our customer agreements contain arbitration provisions with class action waiver provisions that may limit our exposure to consumer class action litigation, but there can be no assurance that we will be successful in enforcing these arbitration provisions, or the class action waiver provisions in them, in the future or in any given case. Legislative, administrative or regulatory developments may directly or indirectly prohibit or limit the use of pre-dispute arbitration clauses and class action waiver provisions. Any such prohibitions or limitations on or discontinuation of the use of such arbitration or class action waiver provisions could subject us to additional lawsuits, including additional consumer class action litigation, or materially impact our ability to avoid exposure from consumer class action litigation.

*We may have exposure to greater than anticipated tax liabilities.*

The determination of our worldwide provision for income taxes and other tax liabilities requires estimation and significant judgment, and there are many transactions and calculations where the ultimate tax determination is uncertain. Like many other multinational corporations, we are subject to tax in multiple U.S. and foreign tax jurisdictions. Our determination of our tax liability is always subject to audit and review by applicable domestic and foreign tax authorities, and we are currently undergoing a number of investigations, audits and reviews by taxing authorities throughout the world. Any adverse outcome of any such audit or review could have a negative effect on our business and the ultimate tax outcome may differ from the amounts recorded in our financial statements and may materially affect our financial results in the periods for which such determination is made. While we have established reserves based on assumptions and estimates that we believe are reasonable to cover such eventualities, these reserves may prove to be insufficient.

In addition, our future income taxes could be adversely affected by earnings being lower than anticipated, or by the incurrence of losses, in jurisdictions that have lower statutory tax rates and higher than anticipated in jurisdictions that have higher statutory tax rates, by changes in the valuation of our deferred tax assets and liabilities, as a result of gains on our foreign exchange risk management program, or changes in tax laws, regulations, or accounting principles, as well as certain discrete items.

Various levels of government, such as U.S. federal and state legislatures, and international organizations, such as the Organization for Economic Co-operation and Development ("OECD") and the EU, are increasingly focused on tax reform and other legislative or regulatory action to increase tax revenue. Any such tax reform or other legislative or regulatory actions could increase our effective tax rate.

*We and our merchants may be subject to sales reporting and record-keeping obligations.*

A number of U.S. states, the U.S. federal government and foreign countries have implemented or are in the process of implementing reporting or record-keeping obligations on companies that engage in or facilitate ecommerce to improve tax compliance. Additionally, a number of jurisdictions are reviewing whether payment service providers and other intermediaries could be deemed

27

Table of Contents

the legal agent of merchants for certain tax purposes. We have modified our software to meet known requirements and expect further modifications will be required to comply with future requirements, which may change our customer experience and increase operational costs. Any failure by us to comply with these and similar reporting and record-keeping obligations could result in substantial monetary penalties and other sanctions, impact our ability to do business in certain jurisdictions, and harm our business.

*Acquisitions, joint ventures, strategic investments, and other strategic transactions could result in operating difficulties and could harm our business.*

Acquisitions, joint ventures, strategic investments, and other strategic transactions are important elements of our overall corporate strategy. We expect to continue to evaluate and consider a wide array of potential strategic transactions as part of our overall business strategy, including business combinations, acquisitions, and dispositions of certain businesses, technologies, services, products, and other assets, as well as joint ventures, strategic investments, and commercial and strategic partnerships. These transactions may involve significant challenges and risks, including:

- the potential loss of key customers, vendors and other key business partners of the companies we acquire, or dispose of, following and continuing after announcement of our transaction plans;
- declining employee morale and retention issues affecting employees of companies that we acquire or dispose of, which may result from changes in compensation, management, reporting relationships, future prospects, or the direction of the acquired or disposed business;
- difficulty making strategic hires of new employees;
- diversion of management time and a shift of focus from operating the business to the transaction, and in the case of an acquisition, integration and administration;
- the need to integrate the operations, systems (including accounting, management, information, compliance, human resource and other administrative systems), technologies, products and personnel of each acquired company, which is an inherently risky and potentially lengthy and costly process;
- the inefficiencies and lack of control that may result if such integration is delayed or not implemented, and unforeseen difficulties and expenditures that may arise as a result;
- the need to implement or improve controls, procedures and policies appropriate for a larger public company at companies that, prior to acquisition, may have lacked such controls, procedures and policies or whose controls, procedures and policies did not meet applicable legal, regulatory and other standards;
- potential exposure to new or increased regulatory oversight and regulatory obligations associated with new products or entry into new markets;
- risks associated with our expansion into new international markets;
- risks associated with the complexity of entering into and effective managing joint ventures, strategic investments, and other strategic partnerships
- lawsuits resulting from the transaction;
- liability for activities of the acquired company before the acquisition, including intellectual property and other litigation claims or disputes, violations of laws, rules and regulations, commercial disputes, tax liabilities and other known and unknown liabilities;
- the potential loss of key employees following the transaction;
- the acquisition of new customer and employee personal information, which in and of itself may require regulatory approval and or additional controls, policies and procedures and subject us to additional exposure and additional complexity and costs of compliance; and
- our dependence on the accounting, financial reporting, operating metrics and similar systems, controls and processes of acquired businesses and the risk that errors or irregularities in those systems, controls and processes will lead to errors in our financial statements or make it more difficult to manage the acquired business.

At any given time we may be engaged in discussions or negotiations with respect to one or more of these or other types of transactions, any of which could, individually or in the aggregate, be material to our financial condition and results of operations. There can be no assurance that we will be successful in identifying, negotiating, and consummating favorable transaction opportunities. It may take us longer than expected to fully realize the anticipated benefits of these transactions, and those benefits may ultimately be smaller than anticipated or may not be realized at all, which could adversely affect our business and operating results. Any acquisitions or dispositions may also require us to issue additional equity securities, spend our cash, or incur debt (and increased interest expense), liabilities, and amortization expenses related to intangible assets or write-offs of goodwill, which could adversely affect our results of operations and dilute the economic and voting rights of our stockholders.

Joint ventures and minority investment inherently involve a lesser degree of control over business operations, thereby potentially increasing the financial, legal, operational and/or compliance risks associated with the joint venture or minority investment. In addition, we may be dependent on joint venture partners, controlling shareholders, management or other persons or entities who

28

Table of Contents

**PayPal Holdings, Inc.**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS-(Continued)**

**Note 14-Stock Repurchase Program**

In January 2016, our Board of Directors authorized a stock repurchase program that provides for the repurchase of up to $2 billion of our common stock, with no expiration from the date of authorization. This stock repurchase program is intended to offset the impact of dilution from our equity compensation programs and, subject to market conditions and other factors, may also be used to make opportunistic repurchases of our common stock to reduce outstanding share count. Any share repurchases under our stock repurchase program may be made through open market transactions, block trades, privately negotiated transactions or other means at times and in such amounts as management deems appropriate and will be funded from our working capital or other financing alternatives. However, any stock repurchases are subject to market conditions and other uncertainties and we cannot predict if or when any stock repurchases will be made. Moreover, we may terminate our stock repurchase program at any time without notice.

The stock repurchase activity under our stock repurchase program during the year ended December 31, 2016 is summarized as follows:

| | Shares Repurchased | | Average Price Paid per Share[1] | | Value of Shares Repurchased | | Remaining Amount Authorized |
|---|---|---|---|---|---|---|---|
| | | | (In millions, except per share amounts) | | | | |
| Authorization of plan in January 2016 | | | | | | $ | 2,000 |
| Repurchases of shares of common stock for three months ended: | | | | | | | |
| March 31, 2016 | 16.9 | $ | 35.27 | $ | 596 | $ | 1,404 |
| June 30, 2016 | 7.8 | $ | 38.67 | $ | 300 | $ | 1,104 |
| September 30, 2016 | 1.3 | $ | 36.80 | $ | 49 | $ | 1,055 |
| December 31, 2016 | 1.3 | $ | 38.92 | $ | 50 | $ | 1,005 |
| Balance as of December 31, 2016 | 27.3 | | | $ | 995 | $ | 1,005 |

[1] Average price paid per share includes broker commissions.

These repurchased shares of common stock were recorded as treasury stock and were accounted for under the cost method. No repurchased shares of common stock have been retired.

**Note 15-Stock-Based and Employee Savings Plans**

Prior to the separation (i.e., periods up to July 17, 2015), PayPal employees participated in eBay's equity incentive plans, including stock options, restricted stock units ("RSUs") and performance-based restricted stock units ("PBRSUs"). In addition, certain PayPal employees participated in eBay's employee stock purchase plan. All awards granted under these plans consisted of eBay common shares. PayPal's consolidated statement of income reflected compensation expense for these stock-based plans associated with the portion of eBay's equity incentive plans in which PayPal employees participated.

Following separation, outstanding awards granted to PayPal employees under eBay's equity incentive plans were converted into PayPal awards under PayPal's equity incentive plans based on a conversion ratio. This conversion ratio was determined as the closing per-share price of eBay shares on the last regular trading session prior to separation divided by the opening per-share price of PayPal shares on the first regular trading session after separation. There was no significant incremental stock-based compensation expense recorded as a result of the share conversions.

**Equity Incentive Plans**

The Board of Directors adopted the PayPal Holdings, Inc. 2015 Equity Incentive Award Plan (the "Plan") on June 16, 2015. Under the terms of the Plan, equity awards, including stock options, RSUs, restricted stock awards, PBRSUs, deferred stock units, and stock payments may be granted to our directors, officers and employees. At December 31, 2016, we had 92 million shares authorized under our equity incentive plans and 61 million shares were available for future grant. Shares issued as a result of stock option exercises and the release of stock awards were funded primarily with the issuance of new shares of common stock.