# EXHIBIT 5



# SHADOW STUDENT DEBT

JULY 2020

In the shadow of the student loan market sits a hidden web of credit and debt taken on by students to pay for college. These high-cost, high-risk financial products are used to prop up predatory for-profit schools across the country. Over the past decade, financial services firms have partnered with these schools to drive students and families to take on billions of dollars of shadow student debt.

# Table of Contents

| | |
|---|---|
| Introduction | 04 |
| Sources of Information and Methodology | 07 |
| Shadow Student Debt | 08 |
| Part One: Identifying Shadow Student Debt | 08 |
| Part Two: How Shadow Student Debt Harms Students | 19 |
| Part Three: A History of Lawlessness | 31 |
| Recommendations | 33 |
| Conclusion | 36 |

# Introduction

Earlier this year, the Student Borrower Protection Center published a report highlighting risks to consumers posed by the traditional private student loan market, finding that this market had grown rapidly and that these loans caused financial distress for many of the most vulnerable borrowers.[i] In addition to $1.5 trillion in outstanding federal student loans, American borrowers now owe at least $140 billion in private student loans.[ii] These traditional private student loans are made by banks and other established private lenders. They have been the subject of warnings by financial regulators and tracked by independent financial analysts for nearly a decade. Together, federal and traditional private student loans form the foundation of what is commonly thought of as the student loan market.

In the shadow of the student loan market sits a hidden web of credit and debt incurred by students to pay for college. These high-cost, high-risk financial products are typically extended directly, backed by schools, or brokered by school financial aid officials in partnership with nonbank lenders, banks, and credit unions. Even though these debts are not federal student loans and many may not meet the legal definition of a private student loan, from the perspective of students and families, these debts incurred to finance higher education are student debt.[1]

The following discussion offers a detailed look at the web of "shadow student debt" built over the past decade by the lenders identified in this report, often in partnership with some

**The following report describes in detail how this debt has proliferated—identifying more than a dozen specialty financial services firms operating at thousands of schools across the country and targeting the most vulnerable students in the American higher education system.**

---

1  The "traditional private student loan market" refers only to the set of debts legally recognized as private student loans through the narrow definition set forth in the Truth in Lending Act (TILA) and its implementing regulation, Regulation Z. However, as discussed here, there are many forms of debt and credit—such as certain personal loans and all open-end credit—that are incurred by students to pay for higher education but which do not meet the regulatory definition of a "private education loan." This report aims to take a holistic view of student debt, analyzing the effects of various types of credit and debt—including, but not limited to, traditional private student loan debt—on students and families. *See* 12 C.F.R. § 1026. Readers should also note Regulation Z was written in response to requests from for-profit colleges themselves for a regulatory structure susceptible to this type of gamesmanship by industry. *See Letter from Carole A. Valentine, Vice President, Student Finance, Student Finance, Kaplan Higher Education to Jennifer J. Johnson, Secretary*, Board of Governors of the Fed. Res. Sys. (May 26, 2009), *available at* https://www.federalreserve.gov/SECRS/2009/May/20090529/R-1353/R-1353_052609_21086_378364340222_1.pdf ("Students entering into payment plans and retail installment contracts are simply being permitted to pay money due and owing to their schools in multiple installments instead of all at once. They are not receiving any funds, so they do not need a last chance to evaluate their decision to borrow.").

of the most predatory for-profit schools in America. The findings and analysis presented in this report are the products of a year-long investigation conducted by the Student Borrower Protection Center (SBPC) into these lenders and schools.

**Figure 1: Players and Practices that Prop Up Predatory For-Profit Schools**



The SBPC's investigation reveals that, over the past decade, students across the country have taken on billions of dollars in debt that has largely escaped the view of lawmakers and the public. As the following report explains, shadow student debt is often a result of predatory lending and features extremely high interest rates and fees. Once students take on these debts, they face servicing and collection abuses that leave them in persistent financial distress. Over the past decade, law enforcement actions against for-profit schools have

implicated some of the firms that drive students to take on shadow student debt, but these firms have largely avoided direct scrutiny. The following report describes in detail how this debt has proliferated—identifying more than a dozen specialty financial services firms operating at thousands of schools across the country and targeting the most vulnerable students in the American higher education system.

> **By identifying, investigating, and regulating shadow student debt, government officials also have an unprecedented opportunity to dismantle a key cog that continues to prop up the predatory for-profit school system.**

As described in the final section of this report, lawmakers, law enforcement officials, and regulators at every level of government can take immediate action to protect students and families from abuses by the firms driving borrowers to take on shadow student debt. By identifying, investigating, and regulating shadow student debt, government officials also have an unprecedented opportunity to dismantle a key cog that continues to prop up the predatory for-profit school system.

# Sources of Information & Methodology

In preparing this report, the SBPC first identified private-sector financial services firms implicated in several high-profile federal and state law enforcement actions taken against some of the largest operators of for-profit schools over the past decade.[iii] This review was also informed by documents and records produced during the closures of certain for-profit schools.[iv] The SBPC also reviewed documents and records produced by the U.S. Department of Education in response to several open records requests related to the use of third-party vendors by institutions of higher education participating in the Federal Student Aid program. The SBPC supplemented these sources by reviewing consumer complaints submitted to the Consumer Financial Protection Bureau and other public complaint forums, as well as information provided by legal services attorneys, researchers, policy experts, and individual borrowers. Finally, the SBPC reviewed conference and promotional materials produced by the largest trade associations representing for-profit colleges. Based on these sources of information, the SBPC identified more than a dozen finance companies with business models that pose significant risks to students and families—firms that extend credit or facilitate debt incurred by students at for-profit schools.

**The documents and records reviewed by the SBPC offer unique insight into the web of debt and credit built to support for-profit schools, propping up predatory companies while driving students deeply into debt.**

The SBPC then reviewed publicly available materials produced by these finance companies, including public websites, school-facing marketing materials, and borrower-facing contracts and disclosures. The SBPC supplemented this review of publicly available materials by conducting an internet search to identify additional schools that advertise partnerships with these finance companies. Finally, the SBPC queried state higher education licensure databases to supplement the review of schools partnering with these finance companies and the National Mortgage Licensing System (NMLS) to review state lending, servicing, and collections licenses by these firms.

These sources of information provided the basis for the findings, analysis, and commentary presented in the following report. The documents and records reviewed by the SBPC offer unique insight into the web of debt and credit built to support for-profit schools, propping up predatory companies while driving students deeply into debt.

# Shadow Student Debt

## Part One: Identifying Shadow Student Debt

A decade ago, students at for-profit schools largely depended on big banks for financing, borrowing billions of dollars of traditional private student loans each year. Many of these private student loans were quickly sold by lenders to investors, fueling the rapid growth of the private student loan market.[v] Through this scheme, which mirrored many of the worst practices by subprime mortgage lenders, private student lenders offloaded the risk of future loan defaults while banking short-term profits from this lucrative form of student lending.[vi] For predatory for-profit schools, driving students to take on private student loans also enabled them to maintain access to a much larger pot of federally backed loans and grants.

In the case of the largest private lender, Sallie Mae, these private student loans were allegedly offered as a "loss leader" in exchange for preferred access to students at for-profit schools who could also borrow Sallie Mae federally guaranteed loans.[vii] As a result, the company could afford to lend private loans to students without regard for their creditworthiness and with a clear understanding that a substantial share of these borrowers would default on these predatory private student loans.[viii] The Illinois Attorney General, in a predatory lending lawsuit filed against the company, quoted comments by Sallie Mae's then-CEO, who boasted that the company would lend to anyone:[ix]

---

*"If the borrower can create condensation on a mirror,*
*they need to get a loan this year."*

**- Sallie Mae CEO Thomas Fitzpatrick (2007)**

---

These loans proved ruinous for many for-profit school students driven into debt. Predatory private student loans frequently featured extremely high interest rates and origination fees, leading modest starting balances to balloon into five- and six-figure debts. These loans also drove former students to struggle with excessive debts relative to their incomes—a byproduct of the poor value of these predatory schools. More than a decade later, the borrowers saddled with these debts continue to face abusive student loan servicing tactics and aggressive practices by debt collectors and debt buyers.[x]

In the years following the 2008 financial crisis, investor demand for loans made to students at for-profit schools collapsed and, in response, large commercial lenders either completely withdrew from the subprime student loan market or sharply curtailed this lending.[xi] At the same time, the role of private lenders originating federal student loans came to an end.[xii]

The largest for-profit schools quickly created new lending schemes to fill this void, backing their own predatory loans with high anticipated default rates to ensure that prospective students could continue to finance their programs with debt. As described in the following sections of this report, for-profit schools weaned themselves off of bank-made loans, and their replacements quickly became a target for law enforcement officials.[xiii] As the Consumer Financial Protection Bureau described when announcing its 2014 lawsuit against Corinthian Colleges:[xiv]

———

*"Corinthian Colleges deliberately inflated tuition prices to be higher than federal loan limits so that most students were forced to rely on additional sources of funding. The Corinthian schools then relied on deceptive statements regarding its education program to induce students into taking out its high-cost private student loans . . . [with an] interest rate [that] was about 15 percent with an origination fee of 6 percent . . . more than 60 percent of Corinthian school students defaulted on their loans within three years."*

———

## FOR-PROFIT SCHOOLS PUSH SHADOW STUDENT DEBT

Over time, many for-profit schools sought out new lending partners and implemented different sets of tactics to ensure students could obtain private financing. These schools continue to embrace shadow student debt as a key pillar of the modern for-profit school business model.[xv]

These products are used by two types of for-profit colleges to ensure prospective students are able to quickly enroll and begin class, even when students lack the ability to pay some or all of the cost of tuition up front. Each type of school uses shadow student debt for different reasons, driven by the school's structure and revenue needs.

- **For-Profit Schools that Participate in the Federal Student Aid Program.** Large and small for-profit schools frequently drive students to incur shadow student debt to avoid running afoul of federal accountability metrics. Following a series of scandals driven by fraudulent for-profit schools three decades ago, Congress required schools in this sector to bring in at least 15 percent of their revenue

from sources other than Federal Student Aid.[xvi] In 1998, Congress revised this requirement into its current form—requiring for-profit schools to obtain at least one dollar in revenue from other non-federal sources for every nine dollars it receives from federal grants and loans, known as the "90/10" rule.[xvii] Shadow student debt is one of the ways for-profit schools can evade this key federal law intended to shield borrowers and taxpayers from excess risk.[xviii] Many of the financial products described in this report are marketed to schools specifically as a mechanism to sidestep the 90/10 rule.[xix] For example, when the for-profit school Career Point College shuttered its doors and filed for bankruptcy, the trustee to the bankruptcy uncovered evidence that showed the student financing firm American Student Financial Group (ASFG) employed a separate company under its control to use Career Point College funds to finance loans to the school. In doing so, ASFG took no risk in extending credit to students, and Career Point College was able to represent that it remained compliant with the 90/10 rule.[xx]

**Figure 2: Empowering For-Profit Schools to Avoid Accountability[2]**



## Evading Oversight

"Get **help meeting government regulations** and requirements including . . . **90/10 rules, and more.**"

https://perma.cc/2D27-QKVX

"For those struggling with 90/10, **we will help make certain your school meets its 10% goal** of non-government subsidized loans."

https://bit.ly/31VP8e4

"**Does your school have 90/10 challenges?** TuitionFlexPLUS[SM] offers schools the option to sell their payment plans on a forward purchase commitment basis. The purchase criteria is established up front so schools can forecast their cash flows in advance."

https://perma.cc/5AM6-GR5Y

2  Emphasis added throughout graphic. For further discussion, see pages 9-11. For complete citatations, see endnotes xviii, xix.

- **For-Profit Schools that Rely Solely on Private Sources of Financing.** Many for-profit schools, particularly smaller programs that offer training or degrees in fields such as truck driving, cosmetology, or massage therapy, do not participate in the Federal Student Aid program and are not subject to its accountability measures. Students that attend these programs often need financing to cover the full cost of attendance, and these schools routinely partner with lenders to deliver this financing to students. Even short-term programs can cost tens of thousands of dollars and, when students do not have the resources to pay up front, debt is typically the only option. These high-cost, high-risk credit or debt products allow these largely unaccredited career training programs to obtain revenue immediately while placing the future risk of a loan default with the lender or other owner of the loan.

> **These high-cost, high-risk credit or debt products allow these largely unaccredited career training programs to obtain revenue immediately while placing the future risk of a loan default with the lender or other owner of the loan.**

At one or both of these types of for-profit schools, students may face a wide range of abuses caused by the school itself or by a partner financial services company. Specifically, the SBPC's investigation focused on schemes that drive students into shadow debt in three specific but potentially interrelated circumstances that present a high likelihood of harm: 1) when the school itself is engaged in deception, fraud, or other abuses, 2) when the cost of financing a school or program leaves students with a debt-to-income ratio that makes it impossible to attain any degree of economic security, or 3) when shadow student debt is used to finance a program that lacks accreditation, authorization, or another key measure of program quality.[xxi]

## Spotlight: Shadow Debt Drives the For-Profit College Machine[3]



3  Graduate income and federal debt levels are medians for each school as reported in the Department of Education's College Scorecard. Debt-to-income ratios are calculated using those medians. For further discussion, see pages 11, 19-21.

12

## TYPES OF SHADOW STUDENT DEBT

The SBPC's investigation uncovered a wide range of credit and debt deployed by financial services firms in partnership with the schools that drive students and families to take on shadow student debt. These products can generally be grouped into three broad categories encompassing the most common types of shadow student debt. Financial companies frequently partner with schools to facilitate credit or debt in multiple of the following categories:

**Figure 3: Types of Shadow Student Debt**



### Schools as Exclusive Partners

**Schools partner with firms, blurring the line between educational and financial institutions.**



### Third-Party Lending

**Lenders offer students access to credit products that are not co-branded and where the school has no financial stake.**



### Debts owed Directly to Schools

**Students owe debts directly to schools for unpaid bills, which often accrue interest and may be serviced or collected by private firms.**

- **Schools as Exclusive Partners.** The SBPC's investigation also identified arrangements where credit products are designed to serve as financing for a specific school or program. These products are either developed and offered in partnership with the specific school, or the school itself serves as lender. Unlike the credit products described below, which are clearly marketed to students by third-party firms and independently underwritten by these lenders, this category of shadow student debt blurs the line between the financing provider and the school.[4] For example, one for-profit institution, the DWS Drone School, advertises a financing plan facilitated by the specialty student financing firm Paramount Capital Group as a "partnership to provide private funding for students," obscuring the relationship between the school and the private-sector firm providing the financing.[xxii] Similarly, an "institutional" financing program backed by another large specialty student financing company, TFC Tuition Financing, at the for-profit Southern California Health Institute (SOCHi) is introduced to students with the promise: "SOCHi works with TFC Tuition Financing to facilitate and monitor a payment plan to help finance your education."[xxiii]

---

4  *See, e.g.*, *New Financial Aid for Students*, The Masthead: News from Westlawn Institute of Marine Technology (Dec. 2007), https://perma.cc/4ZQS-NDAP (captured July 8, 2020) (note that the school itself is described as the one able "to provide financial aid to students"); *Announcing Our "TuitionFlex Program"*, ProTrain, https://perma.cc/TP44-3TAY (captured July 8, 2020) (in which the school, ProTrain, describes an Education Loan Source-facilitated program as "the ProTrain 'TuitionFlex Program'"); *School Catalog*, Inst. for Therapeutic Massage, 9, https://perma.cc/Q5FF-72KP (captured July 13, 2020) (in which the school describes that the school itself "provides several financing options to assist you in funding your education").

- **Third-Party Lending.** Lenders, including specialty student financing firms and fintech lenders, offer students at for-profit colleges access to credit products made independently of the schools themselves. The SBPC's investigation found that individual schools will often identify and promote these specialty lenders to their students on school websites and through financial aid materials.[5] For example, Climb Credit, a company that often operates as a lender explicitly endorsed by schools, offers financing to students attending short-term programs such as unaccredited bootcamps.[xxiv] Similarly, the financial technology company PayPal, through a subsidiary branded as PayPal Credit, offers credit to students attending higher education programs that do not allow them to borrow federal student loans.[xxv]

- **Debts Owed Directly to Schools.** In contrast to the preceding categories of shadow student debt, both of which are structured as extensions of credit, students may also find themselves indebted to schools or firms without ever taking out a student loan during the financial aid process. In these cases, students enroll in a postsecondary program and sign a contract with the school that identifies a set of pre-defined costs assumed by the student, including tuition and fees. Students are then permitted or encouraged to begin classes without paying some or all of this cost up-front. This may happen without students' knowledge or understanding; however, any unpaid balance becomes a debt that the student must eventually repay.[xxvi] In some cases, students are charged interest and fees on these debts, which may be initially treated as short-term credit and converted into installment loans after-the-fact.[6] Schools often outsource the management and collection of these unpaid student accounts to firms that specialize in the collection of this type of shadow student debt.[xxvii] For example, at institutions operated by the now-bankrupt for-profit college company Dream Center

> **Students may also find themselves indebted to schools or firms without ever taking out a student loan. . . . This may happen without students' knowledge or understanding.**

---

5  *See, e.g.*, *Financial Aid*, California Smog & Automotive Institute, https://perma.cc/AX9F-LS78 (captured July 6, 2020) (advertising TFC Tuition Financing under the header of "Financial Aid" on a school's website); *AIT Loan Payments*, Roadmaster Drivers School, https://perma.cc/9SX2-6WV5 (captured July 6, 2020) (advertising Paramount Capital Group and other lenders on a school's website); *Tuition and Fees*, The Woodlands School of Massage Therapy, https://perma.cc/4ST9-35XV (captured July 6, 2020) (advertising Tuition Options on a school's "Tuition & Fees" page, and linking to a loan application); *Financial Assistance Programs*, KCI EMT Training, https://perma.cc/VVG4-ENXL (captured July 1, 2020) (advertising PayPal Credit as a means to pay for an EMT training school); *see also* Climb Credit, *Climb Credit Announces $9.8 Million Series A Funding Round Led by Third Prime and New Markets Venture Partners*, Cision PR Newswire (June 26, 2019), https://perma.cc/4XUN-GKSK (captured June 22, 2020).

6  *See, e.g.*, *Montoya v. CRST Expedited Inc.*, 404 F. Supp. 3d 364, 379 (D. Mass. 2019) ("The contract states that the driver [trainee] acknowledges CRST advanced, in accordance with the pre-employment agreement, 'the payment of certain tuition, lodging, transportation and other expenses and fees incurred by' the driver. . . . Additionally, the driver employment contract states that if the driver breaches or is terminated, then the driver will owe and immediately must pay to CRST: (i) $6,500, (ii) the amounts advanced by CRST not yet repaid via paycheck deductions, and (iii) interest 'at a rate equal to the lesser of 1.5% per month or the maximum rate permitted by applicable federal and state usury laws.'"); *see also* *CRST Class Action Lawsuit*, Optime Administration LLC, https://crstlawsuit.com/ (*updated* June 9, 2020) ("The Court has ruled that CRST charged a usurious interest rate in violation of Iowa law when it sent debt collection letters to drivers that included an 18% interest rate."); *Course Catalog*, Veterinary Allied Staff Education, https://perma.cc/ME3M-CBPZ (captured July 5, 2020)

Education Holdings, students were encouraged to continue to take classes even as these students accumulated outstanding debts owed directly to the school for expenses not covered by Federal Student Aid. These debts were managed and collected by the shadow finance firm Tuition Options. When schools shut down after loss of accreditation, and the Dream Center entered receivership, Tuition Options continued collecting on students' obligations, which were treated by the receiver as assets on the insolvent company's balance sheet.[xxviii]

## SHADOW STUDENT DEBT IS PERVASIVE

The recent growth of shadow student debt is rooted in schemes by predatory schools to exploit students' desires for a better life, only to bury them in debt. Yet there remain significant gaps in any public accounting of the shadow student debt marketplace. The SBPC's findings suggest this lack of transparency is by design—by operating in an intentionally opaque manner, predatory firms can sidestep or obstruct meaningful oversight and make it difficult to estimate the size and scope of these debts.

> **The schools and firms that drive students to take on shadow student debt touch millions of students across the country and have extended billions of dollars in debt over the past decade.**

The SBPC estimates that the schools and firms that drive students to take on shadow student debt touch millions of students across the country and have extended billions of dollars in debt over the past decade.

- **Companies that drive students to take on shadow student debt operate at thousands of schools in every corner of the country.** The SBPC's investigation identified more than a dozen unique private-sector firms that drive students to take on shadow student debt.[7] For example, one shadow lender, TFC Tuition Financing, describes working with "over 2,500 schools and over 500,000 students since 1970," collecting "$500+ million" on behalf of school partners.[xxix] Tuition Options, a different financing firm, describes having "originated and serviced over $2 billion of private [financing] for more than 450,000

---

("If the student is unable to make the full payment by the end date all credentials will be held by Veterinary Allied Staff Education, LLC until payment is made in full. Additionally, an interest rate will accrue on the unpaid balance and the student will be required to complete a Tuition Payment Plan or a Retail Installment Agreement. The Retail Installment Agreement is required only when a student is unable to make full payment prior to completion of the program, this allowance is only offered on a case-by-case basis and is not considered to be a form of Financial Aid. The terms and conditions of the Agreement are set by the institution and in agreement with the student."); *Enrollment Agreement*, The Art Institute of California (Apr. 1, 2013), https://perma.cc/F6AG-U3G7 (captured July 5, 2020) ("Interest on Outstanding Balance. Students who have entered into a line of credit with the school may be subject to interest being charged based on their method of payment. Students that agree to have their balance paid off within each term or students who are financing their entire education with financial aid will not be charged interest. All Other Payment arrangements are subject to interest being charged if applicable.") (emphasis in original).

7  *See, e.g.*, TFC Tuition Financing, https://www.tfctuition.com/students/; Paramount Capital Group, https://www.paracap.com/; Tuition Options, https://www.tuitionoptions.com/schools-information-center/; *Career Training Smart Option Student Loan*, Sallie Mae, https://www.salliemae.com/student-loans/career-training-smart-option-student-loan/; Atlas Financial Group, http://www.atlasloan.com/; Education Loan Source, http://educationloansource.com/; Partners Financial Services, https://www.partners-mo.com/; Climb Credit,

student accounts" and currently working with "more than 600 campuses nationwide."[xxx] Similarly, the shadow finance company Climb Credit explains that it has "originated well over $100 million in loans [for] . . . over 11,000 students."[xxxi] Taken together, these three firms alone represent that they have extended more than $2.6 billion in student debt and credit. As discussed further in the subsequent sections of this report, there is no way to independently verify these claims, leaving lawmakers, regulators, and the public to trust these firms' public representations to assess the size of the marketplace for shadow student debt.

**Figure 4: A Multi-Billion Dollar Market in the Shadows[8]**



"[W]e have originated and serviced over **$2 billion** of private education loans for more than **450,000 student accounts** . . . [at] more than **600 campuses** nationwide.
https://perma.cc/PEM2-BDFF

"**$500m+** Tuition payments collected"

"[O]ver **2,500 schools** and **over 500,000 students**. . . ."
https://perma.cc/EC7E-UDGY; https://perma.cc/2MBZ-Q2Y7

"We've partnered with **over 900 schools**. . . ."
https://perma.cc/EY6F-SHNT

"**[M]ore than four thousand students** and trainees participating in **over 650 . . . training programs.**"
https://perma.cc/97HE-4DSA

"Climb has originated **well over $100 million** in loans, funded the education and skills training of **over 11,000 students**, and partnered with **more than 140 schools**. . . ."
https://perma.cc/4XUN-GKSK

---

https://climbcredit.com/schools; PayPal Credit, https://www.paypal.com/us/webapps/mpp/paypal-credit; Liberty Career Finance, https://libertycareerfinance.net/; Universal Finance Corporation, https://universalfinco.com/; Meritize, https://www.meritize.com/; ECSI, https://www.ecsi.net/; Wells Fargo, https://www.wellsfargo.com/student/community-college-loans/; UGA Finance, https://ugafinance.com/.

8 Emphasis added throughout graphic. For further discussion, see pages 15-17. For complete citatations, see endnotes xxix-xxxv.

- **Millions of students are vulnerable to abuses by the firms driving the growth of shadow student debt.** The SBPC's investigation examined public data on student enrollment at schools that advertise partnerships with the firms responsible for driving the growth of shadow student debt or which have agreed to discharge debts owed directly to schools as a result of a recent law enforcement action. These schools, including some of the largest operators of for-profit schools, have collectively enrolled millions of students over the past decade.[xxxii] While the share of these students who took on shadow student debt is unknown, evidence demonstrates that these schools, in partnership with financial services firms, engaged in practices that drove students to take on shadow student debt. This underscores the broad scope of a market historically subject to little scrutiny. For example, last year, the University of Phoenix entered into a consent decree with the Federal Trade Commission and agreed to discharge $141 million of debt owed directly to the school, which continues to enroll nearly 100,000 students nationwide.[xxxiii]

- **Enforcement actions against for-profit schools have uncovered billions of dollars in shadow student debt over the past decade.** Over the past decade, hundreds of thousands of students took on billions of dollars in shadow student debt incurred when attending the for-profit schools that have been targets of high-profile actions by federal and state law enforcement officials. These enforcement actions, which in many cases focused on deceptive marketing and fraud unrelated to schools' lending practices, nevertheless exposed these debts as key drivers of predatory schools' revenue.[xxxiv] An SBPC review of court filings and settlement documents reveals that students collectively owe or owed more than $2.4 billion in shadow credit and debt taken on to finance programs at schools named in a dozen recent law enforcement actions.[xxxv]

> **Over the past decade, hundreds of thousands of students took on billions of dollars in shadow student debt to attend predatory for-profit schools.**

Together, the SBPC's review of public statements, court filings, and marketing materials demonstrate that students and families have collectively taken on more than $5 billion in shadow credit and debt.

**Figure 5: Enforcement Actions and Public Documents Reveal Billions in Shadow Student Debt[9]**

| LOANS | SHADOW DEBT UNCOVERED |
|---|---|
| TUITION OPTIONS | $2 BILLION |
| ITT INSTITUITIONAL LOANS/CUSO + PEAKS (at time of bankruptcy settlement) | $661 MILLION |
| CORINTHIAN COLLEGES/GENESIS LOANS | $569 MILLION |
| TFC TUITION FINANCE | $500 MILLION |
| CAREER EDUCATION CORPORATION INSTITUTIONAL RECEIVEABLES | $494 MILLION |
| CORINTHIAN COLLEGES/AEQUITAS CAPITAL MANAGEMENT | $191 MILLION |
| ITT/CUSO (amount uncovered in CFPB complaint) | $189 MILLION |
| UNIVERSITY OF PHOENIX INSTITUTIONAL LOANS | $141 MILLION |
| CLIMB CREDIT | $100 MILLION |
| DEVRY UNIVERSITY INSTITUTIONAL LOANS | $51 MILLION |
| BRIDGEPOINT EDUCATION INSTITUTIONAL LOANS | $24 MILLION |
| WESTWOOD COLLEGE/APEX | $18 MILLION |
| TOTAL | $5 BILLION |

9  A review of public statements and marketing materials shows that the largest firms identified in this report have collectively driven students to take on more than $2.6 billion in shadow student debt. *See* endnote xxxv. A review of court filings from high-profile enforcement actions against predatory for-profit schools reveals at least $2.4 billion in shadow student debt owed by students enrolled at these schools. *See* Figure 4, *supra* page 16. Taken together, the SBPC's investigation identified at least $5 billion in shadow student debt. Note that the $18 million figure for Westwood College/Apex includes only debt discharged in Illinois and Colorado.

# Part Two: How Shadow Debt Harms Students

Distinct from schemes by for-profit schools to defraud students or drive them to take on unaffordable levels of debt, the SBPC's investigation reveals that the credit or debt itself may feature terms and conditions that are predatory or may be marketed through practices that violate borrowers' rights. These abuses have harmed hundreds of thousands of the most economically vulnerable students and families as shadow student debt has proliferated over the past decade.[xxxvi]

Informed by evidence of past predatory lending and illegal debt collection tactics by the firms and schools that drive students and families to take on shadow student debt, the following section offers an overview of current industry practices that present significant risks to students and families.

## PRODUCTS' TERMS, CONDITIONS, AND FEATURES CONTINUE TO CAUSE HARSHIP FOR STUDENTS

The SBPC's investigation identified a range of current product terms, conditions, and features that continue to cause significant financial distress for borrowers. The issues identified in the following section may be present when students incur any of the three types of shadow student debt discussed above—credit extended independently by third party lenders, credit extended or backed by schools themselves, and debts owed to schools for unpaid account balances.

- **Extremely High Interest Rates.** The SBPC's investigation identified interest rates as high as 35 percent, placing them at three to four times the cost of the highest-priced federal student loans and beyond rates seen among many of the highest-priced credit card products.[10] For example, students enrolled at Michigan's Coast 2 Coast Truck Driving School can borrow through the school's sanctioned lending program backed by Paramount Capital Group, with interest rates ranging from 14 to 19 percent.[xxxvii] Similarly, borrowers attending Dream Center

> SBPC's investigation reveals that the credit or debt itself may feature terms and conditions that are predatory or may be marketed through practices that violate borrowers' rights.

---

10 *See, e.g.*, *Enroll More Students When You Partner With Climb*, Climb Credit, https://perma.cc/YJH3-DJA9 (captured June 17, 2020) ("APRs on loans range from 0.26% - 34.68%"); *PayPal Credit Terms and Conditions*, PayPal Credit, https://perma.cc/T3WA-XJS4 (captured June 30, 2020) ("Annual Percentage Rate (APR) for Purchases 23.99%"); *Tuition & Payment Info*, International Institute of Transportation Resource, Inc., https://perma.cc/B3V5-TFDJ (captured June 17, 2020)  ("an interest rate of 18% per annum"); *School Programs*, Atlas Fin. Group, https://perma.cc/2EL4-G3CX  (captured June 17, 2020) ("INTEREST RATE 18%-19%"). The highest priced federal student loan currently available, the PLUS loan, carries an interest rate of 5.3 percent. *See Federal Interest Rates and Fees*, Fed. Student Aid, https://studentaid.gov/understand-aid/types/loans/interest-rates (last accessed July 13, 2020). One author identifies the highest interest rate currently available on a credit card as 36%. *See What is the highest credit card interest rate?*, WalletHub, https://perma.cc/LE78-RF87 (captured July 8, 2020). The group with the highest dmean effective credit card interest rates noted in the CFPB's most recent CARD Act report—deep subprime borrowers utilizing private label credit cards—saw rates averaging roughly 24 percent. *See The Consumer Credit Card Market*, Consumer Fin. Prot. Bureau (Aug. 2019), https://files.consumerfinance.gov/f/documents/cfpb_consumer-credit-card-market-report_2019.pdf#page=59.

**Figure 6: The Costs and Consequences of Shadow Student Debt[11]**



schools took on debts originated and serviced by Tuition Options at 19 percent interest.[xxxviii] A student fully financing his or her attendance at Utah's Bonnie Joseph Academy of Cosmetology & Barbering program through its partnership with TFC Tuition Financing would face interest rates of up to 20 percent on as much as $21,700 in total tuition and expenses.[xxxix] Earnings information specific to Bonnie Joseph Academy graduates is not available,[xl] but annual salaries for cosmetologists typically range from $21,749 to $29,654 across states.[xli] In effect, students who supplement a federal student loan with financing recommended by Bonnie Joseph Academy through its partnership with TFC Tuition Financing could pay as much as $416 per month, or 23 percent of their gross income, toward their TFC loans each month.[xlii]

---

11 Emphasis added throughout graphic. For further discussion, see pages 19-20. For citatations, see *supra* note 10 and endnotes xxxvii-xxxix;

- **Excessive Fees.** The SBPC's investigation found that the companies driving students to take on shadow student debt frequently tack on additional origination and processing fees, ensuring that borrowers begin paying interest on higher starting balances and inflating the cost of this debt.[12] In contrast, these practices are atypical in the private student loan market generally, where the largest private student lenders routinely claim to never charge these types of fees.[xliii] For example, Oregon's IITR Truck School charges a $150 registration fee, a $25 application fee, and a $300 financing fee on top of an 18 percent interest rate for students borrowing through its partnership with TFC Tuition Financing.[xliv] Similarly, Bonnie Joseph Academy, discussed above, charges a $10 "processing fee" each month when borrowers make payments toward their loan.[xlv] Further, the specialty finance company Climb Credit charges up to 5 percent in origination fees on their loan products.[xlvi]

> Where lenders fail to consider borrowers' ability to repay these loans, borrowers may find themselves deeply indebted with no viable path to satisfy these debts—ensuring a financial future defined by debt collection and damaged credit.

- **Dangerous Underwriting Practices.** The SBPC's investigation found cases of suspicious underwriting practices at a wide range of schools. In some cases, lenders require applicants to first be denied by other lenders, such as Sallie Mae, before they can be approved for financing.[xlvii] In other cases, companies advertise automatic approvals,[13] marketing products that do not require credit checks[14] or any underwriting in order to be approved for a loan.[15] Where lenders fail to consider borrowers' ability to repay these loans,

---

[12] *See, e.g., Tuition Fees*, Bonnie Joseph Academy, https://perma.cc/H6YX-VEC4 (captured on June 30, 2020) ("Processing fee for in house lending 10.00 a month"); *Preferred Lender Listing*, Arizona College, https://perma.cc/QHV3-6JMW (captured on July 7, 2020) ("Origination fee at the beginning of the loan"); *2020 Student Handbook*, American Sentinel University, https://perma.cc/TL95-DPHW (captured on July 7, 2020) (noting a $250 charge to access a Tuition Options-backed payment plan).

[13] *See, e.g.*, Education Loan Source, *Education Loan Source Launches Private Student Loan Program for DEXSTA Federal Credit Union*, Cision PR Newswire (July 8, 2010) https://perma.cc/9BBM-645G (captured June 30, 2020) (advertising "underwriting with 100% approval").

[14] *Financial Assistance*, MT Training Center, https://perma.cc/42KT-Z7TM (captured June 30, 2020) ("No credit check and financing is guaranteed!"); *Tuition Payment Plan Information*, The Landing School, https://perma.cc/ZA2A-CBPJ (captured June 30, 2020) ("There is no credit check."); *TFC Tuition Financing*, California Association of Private Postsecondary Schools, https://perma.cc/KLR3-2FSJ (captured July 1, 2020) ("NO CREDIT CHECKS,").

[15] *Financing Options*, Link 2 Life Emergency Training, Inc., https://perma.cc/6MGV-A7GX (captured July 1, 2020) ("No credit requirements! Get approved with bad credit or no credit. Everyone qualifies"); *Finance Your CDL Training With a Loan From Liberty Career Finance*, Liberty Career Finance, https://perma.cc/L275-RUNT (captured July 1, 2020) ("[W]e're often able to provide loans to students even if they have a less-than-perfect credit history, or no credit history at all. . . . Our philosophy is simple: Credit shouldn't deny anyone's freedom to succeed!"). Although federal student loans do not undergo underwriting, these loans provide student loan borrowers with options for income contingent repayment, partial financial hardship protections, and fixed interest rates set by Congress, among other protections. The traditional private student loan market does not offer these same benefits, instead relying on sound underwriting to mitigate risk. In the shadow student finance market, sound underwriting goes out the window, and lenders instead create oppressive terms to mitigate risk.

borrowers may find themselves deeply indebted with no viable path to satisfy these debts—ensuring a financial future defined by debt collection and damaged credit. For example, the for-profit Energetic Health Institute uses the shadow lender UGA Finance as a third-party lender to "guarantee approval on all student loan applications."[xlviii] In a similar fashion, North Carolina's Mountain Eagle College advertises an "exclusive financing plan" through Tuition Options where students can "get approved with bad credit or no credit. Everyone qualifies."[xlix]

## FIRMS' PRACTICES AND TACTICS COMPOUND THE FINANCIAL DISTRESS CAUSED BY THESE PRODUCTS

The SBPC's investigation also revealed a series of common practices and tactics that may drive students and families to take on shadow student debt or may substantially increase the risks posed by these debts. Generally distinct from the terms, conditions, or features of the financial products themselves, these practices or tactics span the lifecycle of shadow student debt, beginning with the marketing of these debts and extending through servicing and collections.

> **Schools and firms that drive students to take on shadow debt may use a range of tactics to obscure the fact that, in many cases, the debt incurred by borrowers is a student loan.**

The SBPC's investigation found that companies driving students to take on these debts frequently engaged in the following practices and tactics:

- **Misleading Marketing of Financial Products.** Schools and firms that drive students to take on shadow student debt may use a range of tactics to obscure the fact that, in many cases, the debt incurred by borrowers is a student loan.[16] For example, the California-based chain of for-profit veterinary schools, Veterinary Allied Staff Education, LLC, allows students to enroll in school and take classes without having paid or financed their tuition in advance.[l] When explaining this arrangement in the fine print of its course catalog, the school discloses that "an interest rate will accrue on the unpaid balance and the student will be required to complete a . . . Retail Installment Agreement. The Retail Installment Agreement is required only when a student is unable to make full payment prior to completion of the program . . . [and] is not considered to be a form of Financial Aid."[li] Similarly, Robert Fiance Beauty Schools promotes a

---

16 *See, e.g.*, *Payment Plans and Tuition Options*, NoVa Laser and Esthetics Training, https://perma.cc/WC72-FU3E (captured July 5, 2020) ("NVLET recognizes that there may be certain situations in which our students are unable to pay in full for their tuition and are unable to use credit or secure a loan. For these students, we've structured the following in-house financing options. . . ."); *TFC Tuition Financing*, Career Education Review, https://perma.cc/7T7F-W2QH (captured July 11, 2020) (referring to its loan offerings as "non-credit-based financing solutions"); *School Catalog 2017-2018*, California Institute of Advanced Management, https://perma.cc/7A9L-QEWN (captured June 30, 2020) (referring to its loan product as "a payment plan that will include interest").

TFC Tuition Financing product as "a non-credit based financing option for students who don't qualify for financial aid or who need to finance a portion of their tuition."[lii] However, these marketing materials go on to disclose that "loan terms can extend up to 7 years for certain programs" and that "[i]nterest rates are determined by your down payment."[liii]

- **Aggressive Debt Collection Practices.** A review of court filings and consumer complaints reveals a range of aggressive debt collection practices employed by the schools and firms that drive students to take on shadow student debt. A prime instance is the practice of transcript and credential withholding, wherein a school refuses to give students access to their diplomas if they have an outstanding debt owed to the school or if they have fallen behind on a financial obligation.[17] For example, in the disclosures included at the conclusion of its course catalog issued to students, the for-profit school First Institute describes its financing option facilitated by Tuition Options by explaining that "[i]f, following graduation, a student falls into delinquency, additional copies of their diploma and/or transcript will be withheld".[liv] Similarly, a school may take the extraordinary step of revoking a former

> The SBPC's investigation also uncovered evidence suggesting widespread noncompliance with existing laws and regulations designed to protect students and consumers.

student's professional certification in the event of a loan default. For example, when marketing its loan program to potential partner nursing schools, TFC Tuition Financing boasts that the relevant certification body "will also allow your financial team to suspend a student's certification if they default on their loan payments."[lv] In addition to transcript and credential withholding, students and borrowers who have taken on shadow student debt have been flooded with hundreds of robocalls to collect on unpaid debt. For example, allegations made in court filings reveal that Tuition Options made "more than 100" illegal robocalls after a borrower fell delinquent on a debt.[lvi]

- **Ignoring or Evading Consumer Protection Laws and Regulations.** The SBPC's investigation also uncovered evidence suggesting widespread noncompliance with existing laws and regulations designed

---

17 *See, e.g.*, *Catalogue 2018-2019*, *"Payments and Release of Records,"* Classic Traffic School, LLC, https://perma.cc/MSA4-VQMP (captured July 2, 2020) ("Students that owe any part of the tuition due will not be given a Certificate of Completion until full payment is received. Students entering into a loan agreement with Paramount Capital Group must make at least three agreed upon payments prior to graduation in order to receive the Certificate of Completion."); *2017 500-hour Massage Therapy Program Course Catalog & Student Handbook, "Late Payments,"* The Lauterstein-Conway Massage School, https://perma.cc/H7E6-AJGR (captured July 2, 2020) ("If ONE payment to TFC is more than 10 days late, you will not receive your transcripts until all non-tuition fees and at least two-thirds of your total tuition are paid. If TWO or more payments to TFC are more than 10 days late, you will not receive your transcripts until all non-tuition fees and tuition are paid in full."); *Catalog, "Tuition Policy,"* Cosmetica Beauty and Barbering Academy, https://perma.cc/6C5X-8JQU (captured July 2, 2020) ("The Institution reserves the right to withhold a graduate student's diploma until that student's account balance is current as per the terms of the agreement signed by the student"); *Packaging, "Student Authorization Form,"* Community Care College, Clary Sage College, and Oklahoma Technical College, https://perma.cc/XTJ3-4K9R (captured June 21, 2020) ("hold transcript or diploma until balance is at a $0").

to protect students and consumers. For example, some lenders appear to require prospective borrowers to enroll in autopay or direct monthly debit from the borrower's bank or credit accounts before they can be approved for a loan.[18] The Electronic Funds Transfer Act (EFTA) prohibits lenders from conditioning "the extension of credit to a consumer on such consumer's repayment by means of preauthorized electronic fund transfers."[lvii] However, some lenders and schools appear to compel borrowers to pre-authorize automatic payments. For example, one for-profit school explains clearly on its website that "[a]utomatic payments (checking account or credit card) are required" when its students use financing provided by TFC Tuition Credit.[lviii] Similarly, financing firm Education Loan Source markets its "TuitionFlex" lending program to potential school partners by explaining: "[w]hen the payment is withdrawn automatically through ACH, the school is essentially first in line to be paid before the student's other monthly expenses."[lix]

---

[18] *See e.g., Financial Aid*, Finger Lakes School of Massage, https://perma.cc/4PRY-4BPU (captured June 17, 2020) ("Automatic payments (checking account or credit card) are required . . ."); *Tuition*, Jack Mountain Bushcraft School, https://perma.cc/TQ9J-R79C (captured July 7, 2020) ("Automatic payment withdrawals are required").

## Spotlight: The Cost and Consequences of Shadow Student Debt[19]



**Excessive Fees**

"TFC charges a **non-refundable application fee of $25, a loan fee of $300 (financeable), and an interest rate of 18% per annum**. Although **these fee's [sic] and rates seem very high**, it is often the only chance for someone with less than perfect credit to attend IITR."

https://perma.cc/B3V5-TFDJ



**Excessive Fees**

"Fees that apply are **10.00 monthly processing fees** and interest rates of 9.99-20.00% and also late fees will be assessed."

https://perma.cc/H6YX-VEC4

---

19 Emphasis added throughout graphic. For further discussion, see page 21. For complete citations, see endnotes xliv-xlvi.

## Spotlight: The Cost and Consequences of Shadow Student Debt[20]



**Reckless Underwriting Practices**

"Students **must first be declined for a Sallie Mae loan** or other private bank loan before they can utilize TFC Tuition Financing for tuition amounts."

https://perma.cc/Y5EN-BE2J



**Reckless Underwriting Practices**

"No credit requirements! Get approved with bad credit or no credit. **Everyone qualifies**."

https://perma.cc/GN87-W64J

20 Emphasis added throughout graphic. For further discussion, see pages 21-22. For complete citations, see endnotes xlvii-xlix.

## Spotlight: The Cost and Consequences of Shadow Student Debt[21]

### Misleading Marketing of Financial Products



Installment Payment Plan

Tuition is ... $1,500.00 ... $1,166.66 ... an by paying ...ents of

Refund P...

VASE, without penalty or obligation, shall refund 100 percent of the amount paid for course charges, less the application fee of one hundred dollars ($100), if notice of cancellation is made prior to or on the first day of instruction. VASE students on a payment plan who have not attended the first week of class will be dropped from the program. A refund at a prorated scale of the tuition will be provided, except for the non-refundable registration fee. The student may reapply for the next Alternate Route, RVT Program without an additional ...

"Additionally, **an interest rate will accrue on the unpaid balance**. . . . and **is not considered to be a form of Financial Aid.**"

Refunds will be made based on a percentage of the amount paid to the time attended minus non-refundable application fee. This refund policy is for those students who have completed

https://perma.cc/ME3M-CBPZ



Equip... ...s, and are s... ...y be purch... ...y choo... ...ls of the s... The e... ...der to succe... ...ved by the s... responsibility of their loss or damages rests upon the student. Due to sanitary regulations, equipment and uniforms purchased from ROBERT FIANCE BEAUTY SCHOOLS may not be returned to the school for credit or refund. Textbooks, once written in, cannot be returned.

Other charges such as Student Registration Fee, Student Operator Permit and Examination Fee charges imposed by the N. J. State Board of Cosmetology & Hairstyling are the responsibility of the student.

After instruction has begun, the amount for Uniform, textbooks and equipment accepted by the student are not refundable. If cancellation occurs within 3 business days the registration fee ... be refunded.

A student discontinuing the program, and is receiving Financial Aid will be held to the government's Return Of Title IV Aid Policy and the school's Cancellation and Settlement Policy. Enrollment time is defined as the time elapsed between the actual starting date and the date of the students' last day of ... last day of physical attendance. Or the date a student on an approved leave of absence notifies the school that he or she will not be returning. The date of withdrawal shall be the earlier of the date of the expiration of the leave of absence or the date the student notifies the institution he or she will not be returning.

**ROBERT FIANCE**
**BEAUTY SCHOOLS**

"This is a **non-credit based financing option** for students who don't qualify for financial aid or who need to finance a portion of their tuition. It is available and pre-approved for all students.

**Loan terms** can extend up to 7 years for certain programs."

...school...tend for the determinations, amount and frequency of its scholarship awards is solely based on each school's enrollment capacity and is re-evaluated regularly at the discretion of the Executive Director.

...be charged at the hourly rate of $10.00 in advance.

If ROBERT FIANCE BEAUTY SCHOOLS for some reason must permanently close and no longer has offer instruction after a

https://perma.cc/BJU2-ABN7

### Misleading Marketing of Financial Products

21 Emphasis added throughout graphic. For further discussion, see pages 22-23. For complete citations, see endnotes l-liii.

## Spotlight: The Cost and Consequences of Shadow Student Debt[22]

**Aggressive Debt Collection Practices**



"If, following graduation, a student falls into delinquency, **additional copies of their diploma and/or transcript will be withheld.**"

https://perma.cc/V3D2-YGVD



"AMCA will also allow your financial team to **suspend a student's certification** if they default on their loan payments."

https://perma.cc/RSZ3-WK45

**Aggressive Debt Collection Practices**

22 Emphasis added throughout graphic. For further discussion, see page 23. For complete citations, see endnotes liv-lvi.

## Spotlight: The Cost and Consequences of Shadow Student Debt[23]



## Aggressive Debt Collection Practices



"A student may not be permitted to attend class until delinquent payments are brought current . . . . The authorization sections are to allow the student to hold transcript or diploma until balance is at a $0; . . . [and] **allow the school to refund any excess loan funds to the lender. . . .**"

https://perma.cc/XTJ3-4K9R



"Defendant placed **more than 100 'robocalls'** to her cellphone in an attempt to collect money she purportedly owed under her student loan."

"Defendant argues that all of the claims brought by Plaintiff are **covered by the Arbitration Agreement.**"

https://perma.cc/HZ4G-R2LW

## Aggressive Debt Collection Practices

23 Emphasis added throughout graphic. For further discussion, see page 23. For complete citations, see endnotes liv-lvi.

## Spotlight: The Cost and Consequences of Shadow Student Debt[24]

**Evading Consumer Protection Law**





"**Automatic payments (checking account or credit card) are required**, there are limits to amounts that can be financed, and a co-signer is required."

https://perma.cc/4PRY-4BPU



"**When the payment is withdrawn automatically through ACH, the school is essentially first in line to be paid before the student's other monthly expenses.**"

https://perma.cc/NF6J-P4AS

**Evading Consumer Protection Law**

---

[24] Emphasis added throughout graphic. For further discussion, see pages 22-23. For complete citations, see endnotes lvii-lix.

# Part Three: A History of Lawlessness

## BACKGROUND

For more than a decade, federal and state law enforcement officials built a robust evidentiary record illustrating how the for-profit school industry itself harms students, families, and communities. Through these school-facing law enforcement actions, lawmakers, regulators, and the public now have a broad understanding of how these companies drive revenue by exploiting vulnerable students.

Across these law enforcement actions, documents and records included in court filings also implicate many of the financial services firms discussed in the preceding sections of this report. These records reveal that the companies pushing shadow student debt have been critical cogs in the for-profit school scheme, propping up the worst actors and preying on these same vulnerable students.

In addition to actions taken against the companies that operate for-profit schools, state law enforcement officials and regulators have started to scrutinize the practices of the financial services companies described in this report, bringing the first actions against these firms for a range of violations of state consumer protection laws.

> **State law enforcement officials and regulators have started scrutinizing practices and bringing the first actions against these firms for a range of violations of state consumer protection laws.**

## ILLEGAL PRACTICES BY FIRMS DRIVE STUDENTS INTO SHADOW STUDENT DEBT

The following examples serve as case studies to illustrate how the schools and companies driving students and families to take on shadow student debt can run afoul of existing state laws.

- **A Lending Scheme by Two For-Profit Colleges, Facilitated by Tuition Options, Violated Minnesota Usury Law.** In 2014, the Minnesota Attorney General brought an enforcement action against two for-profit schools, Minnesota School of Business and Globe University, for operating an illegal lending scheme in the state.[lx] In this action, the State of Minnesota alleged that the schools made high-rate consumer loans in violation of Minnesota usury law, which caps the interest rate charged on certain loans at eight percent. The state also alleged that this lending constituted unlicensed consumer lending in the state. In the course of this litigation, which has spanned more than six years, court filings revealed that Tuition Options partnered with these schools to execute this scheme.[lxi] In 2019, following years of litigation and appeals, the Minnesota Supreme Court sided with the state, agreeing that the financing engineered by these schools and this firm constituted illegal consumer lending in violation of both state usury law and licensing requirements.[lxii]

- **TFC Credit Corporation Conducted Unlicensed Student Loan Servicing in Connecticut.** As of July 2020, ten states and the District of Columbia require student loan servicers to obtain state licenses.[lxiii] These laws require that any company engaging in student loan servicing in the state obtain a license from the state's financial regulator and be subject to recurring oversight for compliance with applicable consumer protection laws. In 2019, Connecticut, which was the first state in the nation to enact a student loan servicing licensing law, took an enforcement action against TFC Credit Corporation for conducting unlicensed student loan servicing in the state.[lxiv]

- **Tuition Options Operated as an Unlicensed Sales Finance Company in New York.** Many states require consumer finance companies that lend, sell, service, or collect consumer credit to obtain one of a range of applicable licenses to operate in a given state and be subject to recurring state oversight by the state's financial regulator. The private-sector firms that drive students and families to take on shadow student debt may perform one or all of these functions and may have a range of obligations under various state licensing laws. Last year, the New York Department of Financial Services took action against Tuition Options for illegally operating as an unlicensed Sales Finance Company.[lxv] In this case, Tuition Options was making unlicensed loans to students at for-profit schools, but rather than be repaid, the company accepted collateral offered by schools through various financing agreements that students would sign. Additionally, Tuition Options purchased the financing agreement used as collateral directly by the school.[lxvi] This action illustrates the complicated relationship between the schools and firms that drive students to take on shadow student debt, blurring the lines between lender, originator, loan holder, guarantor, servicer, and collector.

**Figure 14: A History of Lawlessness**



**INSIDE** HIGHER ED

Career Education Corp. Settles With States, Forgives Student Debt

**READ MORE**



FEDERAL TRADE COMMISSION
PROTECTING AMERICA'S CONSUMERS

**FTC Obtains Record $191 Million Settlement from University of Phoenix to Resolve FTC Charges It Used Deceptive Advertising to Attract Prospective Students**

**READ MORE**



THE WALL STREET JOURNAL.

For-Profit College Company to Refund Students $23.5 Million in CFPB Settlement **READ MORE**



NEW YORK STATE

**DFS superintendent Linda A. Lacewell announces settlement with national student loan servicer of for-profit schools**     **READ MORE**



CONNECTICUT
DEPARTMENT OF BANKING

**CONSENT ORDER: IN THE MATTER OF TFC CREDIT CORPORATION OF CALIFORNIA**

*"TFC acted as a student loan servicer in Connecticut without a student loan servicing license. . . ."*

READ MORE

# Recommendations

## Protecting Students and Bringing Companies Out of the Shadows

As described in detail in the preceding sections of this report, there is ample evidence that shadow student debt is causing severe financial distress for vulnerable students and families across the lifecycle of these financial products.

Students and families may be steered into predatory loans. Borrowers may be forced to pay debts bearing extremely high interest rates and fees. They may also be subject to abusive loan servicing and debt collection tactics. Many may even see these debts used as a pretext for denying borrowers' the economic benefit of their completed higher education.

There also remain significant unanswered questions regarding the volume of outstanding shadow student debt, the companies driving students to take on this debt, and the role these debts play in propping up some of the worst actors in the for-profit school sector.

The issues exposed by the SBPC's investigation demand action by lawmakers, regulators, and law enforcement officials at every level of government. To protect current and former students and their families, government officials should take the following immediate steps:

- **Enforce existing consumer protection laws.** Law enforcement officials and regulators at every level of government must enforce existing laws that prohibit many of the predatory practices identified in this report. For example, states should carefully scrutinize the interest rates charged to students for these products to determine whether shadow student debt violates state usury laws, as the State of Minnesota did in the public enforcement action discussed above.[lxvii] Similarly, the practices revealed in this report may run afoul of a wide range of other federal and state consumer laws, including prohibitions on unfair, deceptive, and abusive acts and practices. Again, enforcement officials and regulators can look to recent litigation as a roadmap: in 2014, the CFPB alleged that ITT's predatory lending scheme was an abusive practice, where the company made "expensive, high-risk loans that [it] knew were likely to default" and where it pushed "students into expensive, high-risk loans for the purpose of window-dressing . . . financial statements."[lxviii] Where schools and firms mirror these tactics—engaging in predatory lending or enabling schools to manipulate federal accountability metrics—state enforcement officials and regulators should enforce the federal prohibition on abusive practices directly using the "long-arm" provision of the Dodd-Frank Act, or use an equivalent state cause of action where available.[lxix]

- **Enforce existing state licensing and registration requirements to bring firms out of the shadows.** Many states require lenders, servicers, and debt collectors to obtain licenses or registration to operate legally within state borders. State licensing and registration acts as the gateway to effective oversight, ensuring that regulators understand which firms operate in their states and are able to hold these firms accountable when they break the law. As discussed in the preceding section of this report, companies that drive students to take on shadow student debt have been the target of enforcement actions by banking regulators in New York and Connecticut where, in both cases, these financial services firms failed to obtain required licenses.[lxx] Regulators should use this report as a roadmap, scrutinizing the practices of the companies driving students to take on shadow student debt to determine whether they have obtained necessary licenses and registration to operate as lenders, servicers, debt collectors, or other regulated financial services providers.

- **Enact new, comprehensive student financing registration laws at the state level to create unprecedented transparency and accountability.** As described in the preceding sections of this report, in many states these firms and schools have been able to evade scrutiny by exploiting gaps in existing state oversight statutes. State law enforcement officials and regulators have an opportunity to enforce existing laws, but to address the full scope of the problems identified in this report, students and their families need state lawmakers to take a holistic approach to oversight and regulation of all forms of debt and credit taken to pay for higher education. As a first step, released with the publication of this report, SBPC developed new model state legislation to require all companies that drive students into shadow student debt to register with state regulators, and make public key information about how they do business and the debts incurred by their customers. This model legislation can also act as an important supplement in states where existing licensing and registration laws capture some, but not all, of the firms and functions described in this report.[25]

- **Implement, enforce, and expand the Student Loan Sunshine Act.** In 2008, Congress passed the Student Loan Sunshine Act as part of the most recent reauthorization of the Higher Education Act, creating the first reporting and disclosure requirements where schools endorse or recommend student loans made by private lenders.[lxxi] Unfortunately, in the decade since this law was passed, many of the lenders and schools described in this report have embraced business models that attempt to sidestep these requirements, taking advantage of an Education Department willing to turn a blind eye when students are driven into predatory debts. The Education Department must immediately issue new regulations to ensure schools are honest with students about their deals with financial services firms, halting the misleading marketing

---

25 State lawmakers, advocates, and other stakeholders can learn more about this proposal and obtain a copy of this model legislation by visiting www.protectborrowers.org/shadowregistry. This proposal was released as part of the SBPC's States for Student Borrower Protection project, along with other model state legislation to rein in abuses across the student loan market and protect students and families from predatory schools. Readers can learn more about this project at www.protectborrowers.org/states.

tactics and other abuses described in this report. Where the Department of Education lacks authority to regulate certain for-profit schools, Congress must strengthen and modernize the Student Loan Sunshine Act to ensure that students are protected from the consequences of these back-room deals between lenders and schools. In doing so, Congress should apply these requirements to all types of debt and give students and families the right to take schools and lenders to court when they break the law.

- **Create a federal registry of all nonbank financial services firms, including the firms driving the growth of shadow student debt.** As discussed above, the private-sector firms that continue to drive students and families to take on shadow student debt have deliberately developed business practices designed to sidestep oversight by the Department of Education. Fortunately, the Dodd-Frank Act provides the CFPB with the authority, via supervision, to create a nationwide registry of all nonbank providers of consumer financial products and services, including the firms identified in this report.[lxxii] Protecting consumers in emerging markets depends on regulators' capacity to understand and respond to a rapidly changing landscape. By establishing a national registry of nonbank financial services firms and sharing information with regulators and law enforcement officials at every level of government, the Bureau can quickly build critical regulatory infrastructure necessary to monitor and oversee shadow student debt.

# Conclusion

The evidence presented in this report documents the rising threat posed to students and families by shadow student debt. For-profit schools and their partners have quietly built a multi-billion-dollar market that has operated with little scrutiny. This report documents in detail the wide range of negative consequences borne by students and families as a result.

As students struggle to manage this high-cost, high-risk credit and debt, for-profit schools continue to grow with impunity—often leveraging this debt to unlock tens of billions of dollars in Federal Student Aid each year. These schools have driven billions in profits back to investors and executives, even as they continue to leave students, families, and communities shattered. Shadow student debt raises the stakes for the students who enroll at predatory schools, increasing the likelihood that the pursuit of a worthless degree will lead to a financial future plagued by persistent economic hardship.

> **Lawmakers, regulators, and law enforcement officials at every level of government should immediately scrutinize the players and practices identified in this report and modernize the laws necessary to protect students.**

Lawmakers, regulators, and law enforcement officials at every level of government should immediately take the steps outlined above to scrutinize the players and practices identified in this report and to modernize the laws necessary to protect students. The benefits of these actions and reforms will extend far beyond the financial services sector—by exposing and halting abuses by the companies that drive students and families to take on billions of dollars in shadow student debt, officials will also remove a key cog driving the predatory for-profit college machine.

# Endnotes

i.      *Private Student Lending*, Student Borrower Prot. Ctr. (Apr. 2020), https://protectborrowers.org/wp-content/uploads/2020/04/PSL-Report_042020.pdf. Note that the report referenced in this footnote identifies the total volume of outstanding private student loan debt at $130 billion. Subsequent to the publication of this report, using the same methods identified therein, the authors' project that the total volume of outstanding private student loan debt has increased to $140 billion as of July 2020.

ii.     The private student loan market size can be calculated as the overall value of U.S. student debt less the overall balance of federal student debt. *Consumer Credit – G.19*, Board of Governors of the Fed. Res. Sys., https://www.federalreserve.gov/releases/g19/HIST/cc_hist_memo_levels.html (last updated July 1, 2020); Dep't of Educ., *Federal Student Aid Portfolio Summary,* https://studentaid.ed.gov/sa/sites/default/files/fsawg/datacenter/library/PortfolioSummary.xls (last accessed July 1, 2020).

iii.    *Fed. Trade Comm'n v. University of Phoenix*, No. 2:19-cv-05772 (D. Ariz. filed Dec. 10, 2019); *Fed. Trade Comm'n v. Career Educ. Corp.*, No. 1:19-cv-05739 (N.D. Ill. filed Aug. 27, 2019); *In re: Bridgepoint Educ., Inc.*, No. 2015-CFPB-0016 (administrative proceeding filed Sept. 9 2016); *Consumer Fin. Prot. Bureau v. Corinthian Colleges*, No. 1:14-cv-07194 (N.D. Ill. filed Sept. 16, 2014); *Minnesota v. Minn. Sch. of Bus., Inc., et al.*, No. 27-cv-14-12558 (D. Minn. filed July 22, 2014); *Consumer Fin. Prot. Bureau v. ITT Educational Services*, No. 1:14-cv-00292 (S.D. Ind. filed Feb. 26, 2014); *U.S., et al. v. Educ. Mgmt. Corp. et al.*, No. 2:07-cv-00461 (W.D. Penn. filed Aug. 8, 2011).

iv.     *Digital Media Solutions, LLC vs. South University of Ohio, LLC, et al.*, No. 1:19-cv-145 (N.D. Ohio filed Jan. 18, 2019); *Minnesota v. Minn. Sch. of Bus., Inc.*, 935 N.W.2d 124 (Minn. 2019).

v.      *See generally* Consumer Fin. Prot. Bureau and U.S  Dep't of Educ., *Private Student Loans* (Aug. 29, 2012), *available at* https://www.consumerfinance.gov/about-us/newsroom/consumer-financial-protection-bureau-and-u-s-department-of-education-joint-report-finds-a-cycle-of-boom-and-bust-in-private-student-loan-market/.

vi.     *See generally id.*

vii.    Compl. at 2, *Illinois v. Navient Corp., Sallie Mae Bank, et al.*, No. 2017CH00761 (Ill. Cir. Ct. Jan. 18, 2018), *available at* https://www.illinoisattorneygeneral.gov/pressroom/2017_01/NavientFileComplaint11817.pdf.

viii.   *Id.* at 26.

ix.     *Id.* at 26 (According to the complaint, then CEO of Sallie Mae, Thomas Fitzpatrick, said that his firm would lend to anybody, telling an internal meeting of executives: "If the borrower can create condensation on a mirror, they need to get a loan this year."); *Press Release, Attorney General Madigan Sues Navient and Sallie Mae for Rampant Student Loan Abuses*, Illinois Attorney General (Jan. 18, 2017), https://www.illinoisattorneygeneral.gov/pressroom/2017_01/20170118.html.

x.      Tamara Cesaretti, *Maryland Stands Up to Predatory Student Lawsuit Machine Targeting Borrowers of Color*, Student Borrower Prot. Ctr. (Mar. 4, 2020), https://protectborrowers.org/maryland-stands-up-to-predatory-student-loan-lawsuit-machine-targeting-borrowers-of-color/.

xi.      The Authors would like to thank Deanne Loonin, formerly of the National Consumer Law Center, for her comprehensive and prescient 2011 study of lending by for-profit schools. This report would not have been possible without her work. See Nat'l Consumer Law Ctr., *Piling It On: The Growth of Proprietary School Loans and the Consequences for Students* (Jan. 2011), *available at* https://www.studentloanborrowerassistance.org/wp-content/uploads/File/proprietary-schools-loans.pdf ("When the market crashed in 2008, the alliance between lenders and for-profit schools came to a fairly sudden and almost complete stop."). Of those large commercial lenders that remained following this significant retrenchment, Wells Fargo retained its position as one of the largest providers of private student loans. However, in July 2020, Wells Fargo announced that it would no longer make new private student loans to student loan borrowers, suggesting that the embattled banking giant may exit the student loan market entirely in the future. Shahar Ziv, *Wells Fargo Stopped Taking New Student Loan Applications*, Forbes (July 6, 2020), https://www.forbes.com/sites/shaharziv/2020/07/06/wells-fargo-stopped-taking-new-student-loan-applications/.

xii.     The Health Care and Education Reconciliation Act of 2010, Pub. L. No. 111–152, 124 Stat. 1029.

xiii.    *Consumer Fin. Prot. Bureau v. Corinthian Colleges*, No. 1:14-cv-07194 (N.D. Ill. filed Sept. 16, 2014); *Consumer Fin. Prot. Bureau v. ITT Educational Services*, No. 1:14-cv-00292 (S.D. Ind. filed Feb. 26, 2014).

xiv.     *Consumer Fin. Prot. Bureau v. Corinthian Colleges*, No. 1:14-cv-07194 (N.D. Ill. filed Sept. 16, 2014).

xv.      Sallie Mae and other large financial institutions continue to lend to predatory and low-quality schools. However, they do so at a significantly smaller scale than the pre-2008 period. For example, Sallie Mae offers a separate financial product known as the Smart Option Career Training student loan, which is marketed for use by students at "professional training and trade certificate courses (culinary, technical, etc.) at a non-degree-granting school." *Career Training Smart Option Student Loan*, Sallie Mae, https://www.salliemae.com/student-loans/career-training-smart-option-student-loan/ (last accessedJuly 7, 2020). However, as Sallie Mae reports in its quarterly SEC filings, this product amounts to less than 0.1% of its Private Education Loan portfolio. SLM Corp., *Quarterly Report (Form 10-Q)* at 81 (Apr. 22, 2020), *available at* https://slmcorp.gcs-web.com/static-files/70acdcf8-76e4-44db-b76f-7a93a67ffdc0.

xvi.     *See* S. Rep. No. 102-58 (1991), *available at* https://drive.google.com/file/0B7aqIo3eYEUtQzRuX0JCQ3BIT3c/view; *see also Abuses in Federal Student Grant Programs Proprietary School Abuses: Hearing Before the Permanent Subcomm. on Investigations of the Comm. On Gov't Aff.*, 104th Cong. (1995), *available at* https://drive.google.com/file/d/0B7aqIo3eYEUtazBxMUpPbGxhS1E/view.

xvii.    U.S. Dep't of Educ., Fed. Student Aid, *Business Officer Training 90/10 Regulation & Calculation*, *available at* https://www2.ed.gov/offices/OSFAP/training/materials/90-10slides.pdf.

xviii.   *See, e.g.*, *TUITIONFlex*, Education Loan Source, https://perma.cc/5AM6-GR5Y (captured June 21, 2020) ("Does your school have 90/10 challenges?").

xix.     *See, e.g.*, *id.*; *Making Education Affordable for Every Student*, TFC Tuition Financing, https://perma.cc/2D27-QKVX (captured July 7, 2020) ("Get help meeting government regulations and requirements including . . . 90/10 rules, and more."); *Paramount Capital Group*, WalletHub, https://protectborrowers.org/wp-content/uploads/2020/07/paramount-90_10-exhibit.pdf ("For those struggling with 90/10, we will help make certain your school meets its 10% goal of non-government subsidized loans."). *See supra* notes xvi-xviii.

xx.      Patrick Danner, *Lawsuit: Student-loan company defrauded Career Point College*, San Antonio Express-News (Oct. 29, 2018), https://www.expressnews.com/business/local/article/Lawsuit-Student-loan-company-defrauded-Career-13345556.php.

xxi.     *See, e.g.*, Edie Lau, *Abrupt Heritage College Closure Strands Vet Tech Students*, VIN News Service (Feb.

3, 2017), https://news.vin.com/default.aspx?pid=210&Id=7837448&useobjecttypeid=10&fromVIN-NEWSASPX=1; *Online Tuition Payment*, Dawn Career Institute, https://perma.cc/A4TD-N4V4?type=image (captured July 10, 2020; *Financial Assistance*, The Salon Professional Academy, https://perma.cc/L55L-F5VM (captured July 10, 2020).

xxii.    *Drone Workforce Solutions and Paramount Capital Group Announce Funding for Drone Training*, DWS Drone School (Jan. 6, 2020), https://perma.cc/FN9N-74R2 (captured July 8, 2020).

xxiii.   *Types of Aid Available*, Southern California Health Institute, https://perma.cc/SR75-3ABV (captured June 30, 2020).

xxiv.   For a list of Climb's partner schools, *see What's Your Top Choice*, Climb Credit, https://climbcredit.com/compare/vetting (last accessed July 7, 2020). Climb does not specify how many schools are included in its vetting tool, but recent reports from the company indicate that it lends to students at "more than 140 schools." Climb Credit, *Climb Credit Announces $9.8 Million Series A Funding Round Led by Third Prime and New Markets Venture Partners*, Cision PR Newswire (June 26, 2019), https://perma.cc/4XUN-GKSK (captured June 22, 2020).

xxv.    *Online Paralegal Studies Certificate Program*, Boston College, https://perma.cc/DJ65-NHV9 (captured June 30, 2020) (advertising PayPal Credit as a method to finance attendance at Boston University's "Online Paralegal Studies Certificate Program"); *see also Financial Assistance Programs*, KCI EMT Training, https://perma.cc/VVG4-ENXL (captured July 1, 2020) (advertising PayPal Credit as a means to pay for an EMT training school); *Tuition & Tax Credits*, Energetic Health Institute, https://perma.cc/Z2XZ-89E5 (captured June 30, 2020) ("How Can I Pay My Tuition? We accept all 4 Major Credit Cards, Cashiers Checks, Health Saving Account or PayPal Credit"); *PayPal Credit*, Central Career School, https://perma.cc/3R5K-TUN8 (captured July 1, 2020) ("PAY NOW OR PAY OVER TIME WITH PAYPAL CREDIT."); *Tuition*, Academy for Dental Assisting Careers, https://perma.cc/H49H-ET7Y (captured July 1, 2020) ("You can also apply for PayPal Credit").

xxvi.   Anita Chabria, *For-Profit Film School Turned Their Hollywood Dreams into Student Debt Nightmares*, L.A. Times (Jan 22, 2020), https://www.latimes.com/california/story/2020-01-12/video-symphony-student-debt-nightmares (describing a situation in which, after losing access to Title IV funding, a for-profit college "transformed into a debt holding company" and sued students for tuition and fee amounts "including federal loan amounts the government refused to give the school after the allegations of misconduct").

xxvii.  *See, e.g., Custom-Designed Institutional Loan Programs*, Tuition Options, https://www.tuitionoptions.com/details-for-schools/ (last accessed July 7, 2020) (advertising "[c]omprehensive servicing and reporting functions" and "accounts receivable management").

xxviii. Order, *Digital Media Solutions, LLC v. South University of Ohio, LLC, et al.*, No. 1:19-cv-00145 (N.D. Ohio Mar. 23, 2020), *available at* https://www.courtlistener.com/docket/8514271/554/digital-media-solutions-llc-v-south-university-of-o/.

xxix.   *Increase Your School's Enrollment with Better Financing Solutions*, TFC Financing, https://perma.cc/2MBZ-Q2Y7 (captured June 22, 2020); *About Us*, TFC Financing, https://perma.cc/EC7E-UDGY (captured June 22, 2020).

xxx.    *Tuition Options Overview*, LinkedIn, https://perma.cc/PEM2-BDFF (captured June 27, 2020).

xxxi.   Climb Credit, *Climb Credit Announces $9.8 Million Series A Funding Round Led by Third Prime and New Markets Venture Partners*, Cision PR Newswire (June 26, 2019), https://perma.cc/4XUN-GKSK (captured June 22, 2020).

xxxii.  For example, some of the largest for-profit chains still operating today, including the University of Phoenix, Devry University, Ashford University, American InterContinental University (AIU) and Colorado Technical

University collectively enrolled more than 600,000 students over the past decade, driving many to take on these debts. Author's calculation based on data from the U.S. Department of Education's College Scorecard calculated as the cumulative number of undergraduates reported as enrolled each school in 2018-19 (the most recent school year for which data are available) and 2012-13, given that the average for-profit attendee spends roughly 6 years in school, to avoid double counting student. *College Scorecard*, U.S. Dep't of Educ., https://collegescorecard.ed.gov/data/; *Trends in College Pricing*, CollegeBoard at 22, https://research.collegeboard.org/pdf/trends-college-pricing-2018-full-report.pdf#page=22.

xxxiii.  Stacy Cowley, *University of Phoenix Cancels $141 Million in Debt for 'Deceptive' Ads*, N.Y. Times (Dec. 10, 2019), https://www.nytimes.com/2019/12/10/business/university-phoenix-ftc-ads.html; *see also Electronic Promissory Note*, University of Phoenix Retail Installment Contract, https://www.ecsi.net/prom6z/.

xxxiv.  *See, e.g.*, *In re: Career Educ. Corp.* (Iowa Att'y Gen. Jan 3, 2019), *available at* https://www.iowaattorneygeneral.gov/media/cms/CEC_AVC_FINAL_w_Sigs_and_Exhibits_8E59529F9FFF0.pdf (CEC "engaged in unfair and deceptive practices by making misleading statements to prospective students, failing to disclose material facts to prospective students"); Order for Permanent Injunction, *Fed. Trade Comm'n v. DeVry Educ. Group*, No. 2:16-cv-00579 (C.D. Cal. Dec. 15, 2016), *available at* https://www.ftc.gov/system/files/documents/cases/161215_devry_stipulationrefinalorder.pdf ("Defendants participated in deceptive acts or practices in violation of Section 5 of the FTC Act, 15 U.S.C. § 45, in the advertising, marketing, and sale of their educational products and services.").

xxxv.  SBPC's review of court filings in the following investigations identified more than $2.4 billion in shadow student debt owed by students enrolled at schools targeted in public enforcement actions.  *See* Order for Perm. Inj., *Fed. Trade Comm'n v. The Univ. of Phoenix, Inc., et al.*, No. 2:19-cv-05772 (D. Ariz. Dec. 20, 2019), *available at* https://www.ftc.gov/system/files/documents/cases/de_15_stipulated_order_for_permanent_injunction_and_monetary_judgment.pdf ("Ceased collection of a minimum of One Hundred Forty Million Nine Hundred Sixty-Six Thousand Eight-Hundred and Six Dollars ($140,966,806) in Covered Consumer Debt."); Order for Perm. Inj., *Fed. Trade Comm'n v. DeVry Educ. Group*, No. 2:16-cv-00579 (C.D. Cal. Dec. 15, 2016), *available at* https://www.ftc.gov/system/files/documents/cases/161215_devry_stipulationrefinalorder.pdf ("A total of Thirty Million Three Hundred Fifty-One Thousand and Nineteen Dollars ($30,351,019) in forgiveness of unpaid private student loans. . . . A total of Twenty Million Two Hundred Forty-Eight Thousand Nine Hundred Eighty-One Dollars ($20,248,981) in forgiveness of debts from accounts receivable."); Consent Order, *In re: Bridgepoint Education*, No. 2016-CFPB-0016 (Consumer Fin. Prot. Bureau Sept. 12, 2016), *available at* https://files.consumerfinance.gov/f/documents/092016_cfpb_BridgepointConsentOrder.pdf ("During the Relevant Period, thousands of Students borrowed a total of roughly $23,544,184."); Final Consent Judgment, *Colorado v. Alta Colleges Inc. & Westwood College, Inc.*, (Colo. Dist. Ct. Mar 14, 2012), *available at* https://www.stopfraudcolorado.gov/sites/default/files/press/westwood_consent_judgment.pdf ("WESTWOOD, and any agents acting on WESTWOOD's behalf or at its direction, shall credit $2,500,000.00 . . . to the outstanding balance on any and all open accounts in existence as of December 31, 2011."); Assurance of Voluntary Compliance Entered Into Between Westwood Colleges, et al. and Office of the Illinois Attorney General (Oct. 9, 2015), *available at* https://www.republicreport.org/wp-content/uploads/2015/07/Westwood-Colleges-Assurance-of-Voluntary-Compliance14.pdf; *Press Release, Attorney General Ellison's Office Notches Big Victory for Defrauded MSB/Globe Students*, The Office of the Minn. Att'y Gen. (Nov. 6, 2019), https://www.ag.state.mn.us/Office/Communications/2019/11/06_MSBGlobe.asp#:~:text=November%206%2C%202019%20(SAINT%20PAUL,)%20and%20Globe%20University's%20(Globe) ("refunds totaling $33.7 million"); Order, *Digital Media Solutions, LLC v. South University of Ohio, LLC, et al.*, No. 1:19-cv-00145 (N.D. Ohio Mar. 23, 2020), *available at* https://www.courtlistener.com/docket/8514271/554/digital-media-solutions-llc-v-south-university-of-o/ ("[F]orgive the approximately $1.6 million of outstanding DCEH Misrepresentation Period HLC Student Loans. . . . [R]eimburse the applicable HLC Students the approximately $133,279 of HLC Student Loan Collections."); Final Consent Judgment, *Hoffman v. Educ. Mgmt. Corp., et al.*, (Sup. Ct. N.J. Nov. 16, 2015), *available at* https://nj.gov/oag/newsreleases15/Hoffman_v_EMC_final-consent-judgment.pdf ("Defendants agree to forgo efforts to collect all amounts that Defendants claim is owed to EDMC .

. . which amounts totaled, as of September 1, 2015, approximately $102,800,000.00."); *In re: Career Educ. Corp.* (Iowa Att'y Gen. Jan 3, 2019), *available at* https://www.iowaattorneygeneral.gov/media/cms/CEC_AVC_FINAL_w_Sigs_and_Exhibits_8E59529F9FFF0.pdf ("CEC agrees to forgo any and all efforts to collect any amounts that are owed to CEC by such Qualifying Former Students . . . which amounts totaled, as of December 1, approximately $493,687,220."); Complaint, *Consumer Fin. Prot. Bureau v. Student CU Connect CUSO, LLC*, No. 1:19-cv-2397 (S.D. Ind. June 14, 2019), *available at* https://files.consumerfinance.gov/f/documents/cfpb_student-CU-connect-cuso-llc_complaint_2019-06.pdf ("The CUSO Loan program originated approximately $189 million in student loans to ITT students."); Class Action Settlement Agreement, *In re: ITT Educational Services, Inc.*, No. 16-07207 (S.D. Ind. Sept. 4, 2019), *available at* https://predatorystudentlending.org/wp-content/uploads/2018/02/2290-1-student-settlement-motion-exhibits.pdf ("As of the Petition Date, there was approximately $30,000,000.00 in Student Receivables placed [with servicers and collection companies]. . . . In addition, ITT held, as of the Petition Date approximately $630,945,284.00 in additional Student Receivables which it had not placed with. . . any other servicer or collection agency."); Compl., *Consumer Fin. Prot. Bureau v. Corinthian Colleges*, No. 1:14-cv-07194 (N.D. Ill. Sept. 16, 2014), *available at* https://files.consumerfinance.gov/f/201409_cfpb_complaint_corinthian.pdf ("The total outstanding balance of these loans is in excess of $568.7 million."); Compl., *Consumer Fin. Prot. Bureau v. Aequitas Capital Mgmt.*, No. 3:17-cv-01278 (D. Ore. Aug. 17, 2017), *available at* https://files.consumerfinance.gov/f/documents/201708_cfpb_aequitas-complaint.pdf ("Aequitas held a portfolio of these student loans with an unpaid balance of approximately $190.5 million.").

xxxvi.  *See, e.g.*, Compl., *Consumer Fin. Prot. Bureau v. Aequitas Capital Mgmt.*, No. 3:17-cv-01278 (D. Ore. Aug. 17, 2017), *available at* https://files.consumerfinance.gov/f/documents/201708_cfpb_aequitas-complaint.pdf ("Corinthian students who defaulted on Genesis Loans suffered harmful consequences including negative credit reporting, along with consequences that flow from that. Negative items on a credit report like defaults can result in difficulty in renting an apartment, denial of employment, ineligibility for other forms of financing, or eligibility only on less favorable terms than would otherwise have been available.").

xxxvii.  *Tuition*, Coast 2 Coast Truck Driving School, https://perma.cc/MHT6-8XHB (captured June 17, 2020) ("APR ranges from 13.99% – 18.99%").

xxxviii.  Decl. at 13, *Digital Media Solutions, LLC v. S. Univ. of Ohio, LLC*, No. 1:19-cv-145 (N.D. Ohio Jan 2, 2020), https://www.courtlistener.com/recap/gov.uscourts.ohnd.250611/gov.uscourts.ohnd.250611.515.3.pdf#page=13 (Tuition Options "Maximum Interest Rate: 19.01%").

xxxix.  *Financial Aid*, Bonnie Joseph Academy, https://perma.cc/2US3-5M96 (captured June 16, 2020) ("interest rates of 9.99-20.00%"); *Tuition Fees*, Bonnie Joseph Academy, https://perma.cc/H6YX-VEC4 (captured June 30, 2020) ("Cosmetology/Barbering Course: . . . Total $21,700.00").

xl.  *Bonnie Joseph Academy of Cosmetology & Barbering*, U.S. Dep't of Educ. College Scorecard, https://collegescorecard.ed.gov/school/?481456-Bonnie-Joseph-Academy-of-Cosmetology-Barbering (last accessed July 13, 2020) (listing the term "Data Not Available" under the field "Salary After Completing").

xli.  *What Is the Average Cosmetologist Salary by State*, ZipRecruiter, https://www.ziprecruiter.com/Salaries/What-Is-the-Average-Cosmetologist-Salary-by-State (last accessed July 13, 2020).

xlii.  Author's calculation based on a 20% nominal annual interest rate and $15,700 starting balance. Some borrowers may use TFC loans to supplement federal student aid, while others may be ineligible for federal student aid and use private credit to finance the total cost of such a program. In this example, SBPC assumed a borrower financed the full cost of this program beyond the maximum amount of unsubsidized loans available per year to federal student loan borrowers without the use of grants. *Subsidized and Unsubsidized Loans*, U.S. Dep't of Educ., Fed. Student Aid, https://studentaid.gov/understand-aid/types/loans/subsidized-unsubsidized/ (last accessed July 13, 2020). However, one need not make such an assumption. The loan is assumed to have a term of five years, a level in line with other loan programs provided through TFC. *See, e.g.*, *Federal Consumer Information Handbook & Rules and Regulation For The Culinary School of Fort Worth*, The Culinary School of Fort Worth, https://perma.cc/39YS-Z74V (captured

June 30, 2020).

xliii.    Josh Mitchell & AnnaMaria Andriotis, *Banks Want a Bigger Piece of Your Student Loan*, The Wall Street Journal (Mar. 7, 2018), https://www.wsj.com/articles/banks-look-to-break-governments-hold-on-student-loan-market-1520418600 ("And unlike federal loans, most private loans don't charge an origination fee when borrowers sign up for the loan.").

xliv.    *Tuition & Payment Info*, IITR Truck School, https://perma.cc/B3V5-TFDJ (captured June 17, 2020).

xlv.    *Tuition Fees*, Bonnie Joseph Academy, *supra* note xxxix.

xlvi.    *Climb Credit Disclosures*, Climb Credit, https://perma.cc/YJH3-DJA9 (captured June 17, 2020) ("[I]ncludes an up to 5% origination fee.").

xlvii.    *Financial Aid*, Central Maryland School of Massage, https://web.archive.org/web/20180830184003/https://www.teachingmassage.com/admissions/financial-aid.php (captured Aug. 30, 2018) ("Students must first be declined for a Sallie Mae loan or other private bank loan before they can utilize TFC Tuition Financing for tuition amounts.").

xlviii.    *Tuition & Tax* Credits, Energetic Health Institute, *supra* note xxv.

xlix.    *Financial Options*, Mount Eagle College & University, https://perma.cc/GN87-W64J (captured June 30, 2020).

l.    *Tuition, Fees and Refund* Policy, Veterinary Allied Staff Education, https://perma.cc/TF5Q-XZ4A (captured July 10, 2020).

li.    *Catalog and Program Curriculum*, Veterinary Allied Staff Education, https://perma.cc/ZF7F-CQX8 (captured July 10, 2020). The authors were not able to identify the private firm, if any, that this chain of schools uses to facilitate the origination, servicing or collection of this financing based on a review of publicly available materials provided on the school's website.

lii.    *Financial Aid*, Robert Fiance Beauty Schools, https://perma.cc/BJU2-ABN7 (captured June 16, 2020).

liii.    *Id.*

liv.    *2019 Catalog, "Graduation Requirements,"* Florida Institute of Recording, Sound, and Technology, https://perma.cc/V3D2-YGVD (captured June 16, 2020); *see also School Catalog, "Tuition Financing,"* Oak Tree Massage School, https://perma.cc/6S6C-6ZUW (captured June 30, 2020).

lv.    *Decrease Student Loan Defaults And Increase Placement Rates*, TFC Tuition Financing, https://perma.cc/RSZ3-WK45 (captured June 16, 2020).

lvi.    *Serrano v. Tuition Options, LLC*, No. 17-cv-24443, 2018 WL 3145809, at *1 (S.D. Fla. June 27, 2018), *available at* https://www.leagle.com/decision/infdco20180628c06; *see also* Tariq Habash, *One More Way States Can Step Up as Betsy DeVos Rolls Back Legal Protections*, Student Borrower Prot. Ctr (Feb. 14, 2020), https://protectborrowers.org/one-more-way-states-can-step-up-as-betsy-devos-rolls-back-legal-protections/.

lvii.    Electronic Fund Transfer Act, 15 U.S.C. § 1693k (2020).

lviii.    *Financial Aid*, Finger Lakes School of Massage, https://perma.cc/4PRY-4BPU (captured June 17, 2020).

lix.    *Education Loan Source Offers New Flexible Repayment Solution*, Education Loan Source, https://perma.cc/NF6J-P4AS (captured June 21, 2020).

lx.    *Press Release, Attorney General Ellison's Office Notches Big Victory for Defrauded MSB/Globe Students*,

lxi.     *supra* note xxxv.

lxi.     *Id.* ("The Schools offered the loans to students...usually at interest rates between 12 and 18 percent...The Schools never paid out money to the student; rather, the Schools' affiliated entities... [including] Tuition Options, LLC...credited the loaned amount against the student's outstanding tuition balance at three predetermined dates during the academic year. The funds were not available to the student for any other purpose.").

lxii.    *Minnesota v. Minn. Sch. of Bus., Inc.*, 935 N.W.2d 124 (Minn. 2019), *available at* https://www.consumerfinancemonitor.com/wp-content/uploads/sites/14/2017/08/MN-decision.pdf.

lxiii.   Seth Frotman, *States Are Leading the Fight to End the Student Debt Crisis, Student Borrower Prot. Ctr.* (June 15, 2020), www.protectborrowers.org/states/ (including Connecticut, the District of Columbia, California, Illinois, Washington, Rhode Island, Colorado, New York, New Jersey, Maine, and Virginia).

lxiv.    Consent Order, *In re: TFC Credit Corp. of Cal.* (Ct. Banking Comm'n May 28, 2019), *available at* https://portal.ct.gov/-/media/DOB/Enforcement/Consumer-Credit/2019-CC-Orders/TFC-Credit-Corporation-CO.pdf?la=en.

lxv.     *Press Release, DFS Superintendent Linda A. Lacewell Announces Settlement with National Student Loan Servicers of For-Profit Schools*, N.Y.C. Dep't of Fin. Services (Aug. 15, 2019), *available at* https://www.dfs.ny.gov/reports_and_publications/press_releases/pr1908151. Companies that drive students to take on shadow student debt have also been the target of public enforcement actions for abuses related to other lines of business.

lxvi.    *See, e.g.*, *id*; *In re: Paramount Capital Group, Inc.*, No. 13-498 (Att'y Gen. of N.Y. Apr. 18, 2014), *available at* https://ag.ny.gov/sites/default/files/pdfs/bureaus/health_care/new/2014-04-18%20Paramount%20Capital%20Group_DCB.pdf; *Medical Lenders Fined After Charging Interest of As Much As 55%*, CNBC (Apr. 30, 2014), https://www.cnbc.com/2014/04/30/ny-strikes-deal-to-settle-with-medical-bill-lenders-over-high-interest-rates.html.

lxvii.   *Press Release, Attorney General Ellison's Office Notches Big Victory for Defrauded MSB/Globe Students*, *supra* note xxxv.

lxviii.  *Consumer Fin. Prot. Bureau v. ITT Educational Services*, No. 1:14-cv-00292 (S.D. Ind. filed Feb. 26, 2014).

lxix.    12 U.S.C. § 5552.

lxx.     *See* Consent Order, *In re: TFC Credit Corp. of Cal.* (Ct. Banking Comm'n May 28, 2019), *available at* https://portal.ct.gov/-/media/DOB/Enforcement/Consumer-Credit/2019-CC-Orders/TFC-Credit-Corporation-CO.pdf?la=en; *Press Release, DFS Superintendent Linda A. Lacewell Announces Settlement with National Student Loan Servicers of For-Profit Schools*, N.Y.C. Dep't of Fin. Services (Aug. 15, 2019), *available at* https://www.dfs.ny.gov/reports_and_publications/press_releases/pr1908151.

lxxi.    Higher Education Opportunity Act, Pub. L. No. 110-315.

lxxii.   12 U.S.C. § 5514; *see also* Dodd-Frank Wall Street Reform and Consumer Protection Act, Pub. L. No. 111-203.

