# EXHIBIT 12

# UNITED STATES
# SECURITIES AND EXCHANGE COMMISSION
**Washington, D.C. 20549**

# FORM 10-Q

☒  **QUARTERLY REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934**

**For the quarterly period ended June 30, 2021.**

**OR**

☐  **TRANSITION REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934**

**For the Transition Period from to .**

**Commission file number 001-36859**

# PayPal Holdings, Inc.

**(Exact Name of Registrant as Specified in Its Charter)**

| | |
|---|---|
| **Delaware** | **47-2989869** |
| **(State or Other Jurisdiction of Incorporation or Organization)** | **(I.R.S. Employer Identification No.)** |
| **2211 North First Street    San Jose,    California** | **95131** |
| **(Address of Principal Executive Offices)** | **(Zip Code)** |

**(408) 967-1000**
**(Registrant's telephone number, including area code)**

Securities registered pursuant to Section 12(b) of the Act:

| *Title of each class* | *Trading Symbol(s)* | *Name of each exchange on which registered* |
|---|---|---|
| **Common stock, $0.0001 par value per share** | **PYPL** | **NASDAQ Global Select Market** |

Indicate by check mark whether the registrant: (1) has filed all reports required to be filed by Section 13 or 15(d) of the Securities Exchange Act of 1934 during the preceding 12 months (or for such shorter period that the registrant was required to file such reports), and (2) has been subject to such filing requirements for the past 90 days. Yes ☒ No ☐

Indicate by check mark whether the registrant has submitted electronically every Interactive Data File required to be submitted pursuant to Rule 405 of Regulation S-T (§232.405 of this chapter) during the preceding 12 months (or for such shorter period that the registrant was required to submit such files). Yes ☒ No ☐

Indicate by check mark whether the registrant is a large accelerated filer, an accelerated filer, a non-accelerated filer, a smaller reporting company or an emerging growth company. See the definitions of "large accelerated filer," "accelerated filer," "smaller reporting company," and "emerging growth company" in Rule 12b-2 of the Exchange Act.

| | | | |
|---|---|---|---|
| Large accelerated filer | ☒ | Accelerated filer | ☐ |
| Non-accelerated filer | ☐ | Smaller reporting company | ☐ |
| | | Emerging growth company | ☐ |

If an emerging growth company, indicate by check mark if the registrant has elected not to use the extended transition period for complying with any new or revised financial accounting standards provided pursuant to Section 13(a) of the Exchange Act. ☐

Indicate by check mark whether the registrant is a shell company (as defined in Rule 12b-2 of the Exchange Act). Yes ☐ No ☒

As of July 23, 2021, there were 1,175,032,150 shares of the registrant's common stock, $0.0001 par value, outstanding, which is the only class of common or voting stock of the registrant issued.

**PayPal Holdings, Inc.**
**TABLE OF CONTENTS**

|  |  |  | Page Number |
|---|---|---|---|
| Part I. | Financial Information | | 4 |
| | Item 1. | Condensed Consolidated Balance Sheets | 4 |
| | | Condensed Consolidated Statements of Income | 5 |
| | | Condensed Consolidated Statements of Comprehensive Income | 6 |
| | | Condensed Consolidated Statements of Stockholders' Equity | 7 |
| | | Condensed Consolidated Statements of Cash Flows | 9 |
| | | Notes to Condensed Consolidated Financial Statements | 10 |
| | Item 2. | Management's Discussion and Analysis of Financial Condition and Results of Operations | 40 |
| | Item 3. | Quantitative and Qualitative Disclosures About Market Risk | 56 |
| | Item 4. | Controls and Procedures | 59 |
| Part II. | Other Information | | 60 |
| | Item 1. | Legal Proceedings | 60 |
| | Item 1A. | Risk Factors | 60 |
| | Item 2. | Unregistered Sales of Equity Securities and Use of Proceeds | 62 |
| | Item 3. | Defaults Upon Senior Securities | 62 |
| | Item 4. | Mine Safety Disclosures | 62 |
| | Item 5. | Other Information | 62 |
| | Item 6. | Exhibits | 63 |
| Signatures | | | 64 |

**PayPal Holdings, Inc.**
**NOTES TO CONDENSED CONSOLIDATED FINANCIAL STATEMENTS (continued)**
**(Unaudited)**

*Other available facilities*

We maintain uncommitted credit facilities in various regions throughout the world, which had a borrowing capacity of approximately $ 80 million and $30 million in the aggregate, as of June 30, 2021 and December 31, 2020, respectively. This available credit includes facilities where we can withdraw and utilize the funds at our discretion for general corporate purposes. Interest rate terms for these facilities vary by region and reflect prevailing market rates for companies with strong credit ratings. As of June 30, 2021, the majority of the borrowing capacity under these credit facilities was available, subject to customary conditions to borrowing.

### FUTURE PRINCIPAL PAYMENTS

As of June 30, 2021, the future principal payments associated with our long term debt were as follows (in millions):

| | | |
|---|---|---|
| Remaining 2021 | $ | - |
| 2022 | | 1,000 |
| 2023 | | 1,000 |
| 2024 | | 1,250 |
| 2025 | | 1,000 |
| Thereafter | | 4,750 |
| Total | $ | 9,000 |

Other than as provided above, there are no significant changes to the information disclosed in our 2020 Form 10-K.

**NOTE 13-**
**COMMITMENTS AND CONTINGENCIES**

### COMMITMENTS

As of June 30, 2021 and December 31, 2020, approximately $ 3.6 billion and $3.0 billion, respectively, of unused credit was available to PayPal Credit account holders. Substantially all of our PayPal Credit account holders with unused credit are in the U.K. While this amount represents the total unused credit available, we have not experienced, and do not anticipate, that all our PayPal Credit account holders will access their entire available credit at any given point in time. In addition, the individual lines of credit that make up this unused credit are subject to periodic review and termination based on, among other things, account usage and customer creditworthiness.

### LITIGATION AND REGULATORY MATTERS

*Overview*

We are involved in legal and regulatory proceedings on an ongoing basis. Many of these proceedings are in early stages and may seek an indeterminate amount of damages. If we believe that a loss arising from such matters is probable and can be reasonably estimated, we accrue the estimated liability in our financial statements at that time. If only a range of estimated losses can be determined, we accrue an amount within the range that, in our judgment, reflects the most likely outcome; if none of the estimates within that range is a better estimate than any other amount, we accrue the low end of the range. For those proceedings in which an unfavorable outcome is reasonably possible but not probable, we have disclosed an estimate of the reasonably possible loss or range of losses or we have concluded that an estimate of the reasonably possible loss or range of losses arising directly from the proceeding (i.e., monetary damages or amounts paid in judgment or settlement) are not material. If we cannot estimate the probable or reasonably possible loss or range of losses arising from a legal proceeding, we have disclosed that fact. In assessing the materiality of a legal proceeding, we evaluate, among other factors, the amount of monetary damages claimed, as well as the potential impact of non-monetary remedies sought by plaintiffs (e.g., injunctive relief) that may require us to change our business practices in a manner that could have a material adverse impact on our business. With respect to the matters disclosed in this Note 13, we are unable to estimate the possible loss or range of losses that could potentially result from the application of such non-monetary remedies.



Table of Contents

**PayPal Holdings, Inc.**
**NOTES TO CONDENSED CONSOLIDATED FINANCIAL STATEMENTS (continued)**
**(Unaudited)**

Amounts accrued for legal and regulatory proceedings for which we believe a loss is probable and reasonably estimable were not material as of June 30, 2021. Except as otherwise noted for the proceedings described in this Note 13, we have concluded, based on currently available information, that reasonably possible losses arising directly from the proceedings (i.e., monetary damages or amounts paid in judgment or settlement) in excess of our recorded accruals are also not material. Determining legal reserves or possible losses from such matters involves judgment and may not reflect the full range of uncertainties and unpredictable outcomes. We may be exposed to losses in excess of the amount recorded, and such amounts could be material. If any of our estimates and assumptions change or prove to have been incorrect, it could have a material adverse effect on our business, financial position, results of operations, or cash flows.

*Regulatory proceedings*

We are required to comply with U.S. economic and trade sanctions administered by the U.S. Department of the Treasury's Office of Foreign Assets Control ("OFAC"). In March 2015, we reached a settlement with OFAC regarding possible violations arising from our sanctions compliance practices between 2009 and 2013, prior to the implementation of our real-time transaction scanning program. Subsequently, we have self-reported additional transactions that were inadvertently processed but subsequently identified as possible violations, and we have received new subpoenas from OFAC seeking additional information about certain of these transactions. Such self-reported transactions could result in claims or actions against us, including litigation, injunctions, damage awards, fines or penalties, or require us to change our business practices in a manner that could result in a material loss, require significant management time, result in the diversion of significant operational resources, or otherwise harm our business.

PayPal Australia Pty Limited ("PPAU") self-reported a potential violation to the Australian Transaction Reports and Analysis Centre ("AUSTRAC") on May 22, 2019. This self-reported matter relates to PPAU incorrectly filing required international funds transfer instructions over a period of time under the Anti-Money Laundering and Counter-Terrorism Financing Act 2006 ("AML/CTF Act"). On September 23, 2019, PPAU received a notice from AUSTRAC requiring that PPAU appoint an external auditor (a partner of a firm which is not our independent auditor) to review certain aspects of PPAU's compliance with its obligations under the AML/CTF Act. The external auditor was appointed on November 1, 2019. As required under the terms of AUSTRAC's notice, as amended, PPAU issued to AUSTRAC the external auditor's interim reports on December 31, 2019, March 13, 2020, May 6, 2020 and July 7, 2020 and a final report on August 31, 2020.

AUSTRAC has notified PPAU that its enforcement team is investigating the matters reported upon by the external auditor in its August 31, 2020 final report. PPAU is continuing to cooperate with AUSTRAC in all respects, including remediation activities, ongoing regular engagement with AUSTRAC, responding to requests for information and documents, and reporting to AUSTRAC of international funds transfer instructions based on the operation of the AML/CTF Act. We cannot estimate the potential impact, if any, on our business or financial statements at this time. In the event an adverse outcome arises from any associated enforcement, proceeding, or other further matter initiated by AUSTRAC, this could result in enforceable undertakings, injunctions, damage awards, fines or penalties, or require us to change our business practices in a manner that could result in a material loss, require significant management time, result in the diversion of significant operational resources, or otherwise harm our business.

We have received Civil Investigative Demands ("CIDs") from the Consumer Financial Protection Bureau ("CFPB") related to Venmo's unauthorized funds transfers and collections processes, and related matters. The CIDs request the production of documents and answers to written questions. We are cooperating with the CFPB in connection with these CIDs.

We have received a CID from the CFPB related to the marketing and use of PayPal Credit in connection with certain merchants that provide educational services. The CID requests the production of documents, written reports, and answers to written questions. We are cooperating with the CFPB in connection with this CID.

We have responded to subpoenas and requests for information received from the U.S. Securities and Exchange Commission Enforcement Division ("SEC") relating to whether the interchange rates paid to the bank that issues debit cards bearing our licensed brands were consistent with Regulation II of the Board of Governors of the Federal Reserve System, and to the reporting of marketing fees earned from the Company's branded card program. We are cooperating with the SEC in connection with this investigation.



Table of Contents

**PayPal Holdings, Inc.**
**NOTES TO CONDENSED CONSOLIDATED FINANCIAL STATEMENTS (continued)**
**(Unaudited)**

*General matters*

Other third parties have from time to time claimed, and others may claim in the future, that we have infringed their intellectual property rights. We are subject to patent disputes and expect that we will increasingly be subject to additional patent infringement claims involving various aspects of our business as our products and services continue to expand in scope and complexity. Such claims may be brought directly or indirectly against our companies and/or against our customers (who may be entitled to contractual indemnification under their contracts with us), and we are subject to increased exposure to such claims as a result of our acquisitions, particularly in cases where we are introducing new products or services in connection with such acquisitions. We have in the past been forced to litigate such claims, and we believe that additional lawsuits alleging such claims will be filed against us. Intellectual property claims, whether meritorious or not, are time-consuming and costly to defend and resolve, could require expensive changes in our methods of doing business, or could require us to enter into costly royalty or licensing agreements on unfavorable terms or make substantial payments to settle claims or to satisfy damages awarded by courts.

From time to time, we are involved in other disputes or regulatory inquiries that arise in the ordinary course of business, including suits by our customers (individually or as class actions) alleging, among other things, improper disclosure of our prices, rules, or policies, that our practices, prices, rules, policies, or customer/user agreements violate applicable law, or that we have acted unfairly and/or not acted in conformity with such prices, rules, policies, or agreements. In addition to these types of disputes and regulatory inquiries, our operations are also subject to regulatory and/or legal review and/or challenges that may reflect the increasing global regulatory focus to which the payments industry is subject and, when taken as a whole with other regulatory and legislative action, such actions could result in the imposition of costly new compliance burdens on our business and customers and may lead to increased costs and decreased transaction volume and revenue. Further, the number and significance of these disputes and inquiries are increasing as our business has grown and expanded in scale and scope, including the number of active accounts and payments transactions on our platforms, the range and increasing complexity of the products and services that we offer, and our geographical operations. Any claims or regulatory actions against us, whether meritorious or not, could be time consuming, result in costly litigation, settlement payments, damage awards (including statutory damages for certain causes of action in certain jurisdictions), fines, penalties, injunctive relief, or increased costs of doing business through adverse judgment or settlement, require us to change our business practices in expensive ways, require significant amounts of management time, result in the diversion of significant operational resources, or otherwise harm our business.

*INDEMNIFICATION PROVISIONS*

Our agreements with eBay governing our separation from eBay provide for specific indemnity and liability obligations for both eBay and us. Disputes between eBay and us have arisen and others may arise in the future, and an adverse outcome in such matters could materially and adversely impact our business, results of operations, and financial condition. In addition, the indemnity rights we have against eBay under the agreements may not be sufficient to protect us, and our indemnity obligations to eBay may be significant.

In the ordinary course of business, we include limited indemnification provisions in certain of our agreements with parties with whom we have commercial relationships. Under these contracts, we generally indemnify, hold harmless, and agree to reimburse the indemnified party for losses suffered or incurred by the indemnified party in connection with claims by any third party with respect to our domain names, trademarks, logos, and other branding elements to the extent that such marks are related to the subject agreement. We have provided an indemnity for other types of third-party claims, which are indemnities related primarily to intellectual property rights, confidentiality, willful misconduct, data privacy obligations, and certain breach of contract claims. We have also provided an indemnity to our payments processors in the event of card association fines against the processor arising out of conduct by us or our customers. It is not possible to determine the maximum potential loss under these indemnification provisions due to our limited history of prior indemnification claims and the unique facts and circumstances involved in each particular situation.



## ITEM 2: UNREGISTERED SALES OF EQUITY SECURITIES AND USE OF PROCEEDS

**REPURCHASES OF EQUITY SECURITIES**

In July 2018, our Board of Directors authorized a stock repurchase program that provides for the repurchase of up to $10 billion of our common stock, with no expiration from the date of authorization. Our stock repurchase program is intended to offset the impact of dilution from our equity compensation programs and, subject to market conditions and other factors, may also be used to make opportunistic repurchases of our common stock to reduce outstanding share count. Any share repurchases under our stock repurchase program may be made through open market transactions, block trades, privately negotiated transactions including accelerated share repurchase agreements or other means at times and in such amounts as management deems appropriate, and will be funded from our working capital or other financing alternatives. Moreover, any stock repurchases are subject to market conditions and other uncertainties and we cannot predict if or when any stock repurchases will be made. We may terminate our stock repurchase program at any time without prior notice.

The stock repurchase activity under our stock repurchase program during the three months ended June 30, 2021 is summarized below:

| | Total number of shares purchased | Average price paid per share[1] | Total number of shares purchased as part of publicly announced plans or programs | Approximate dollar value of shares that may yet be purchased under the plans or programs |
|---|---|---|---|---|
| | | (In millions, except per share amounts) | | |
| Balance as of March 31, 2021 | | | | $  7,110 |
| April 1, 2021 through April 30, 2021 | 0.7 | $  263.46 | 0.7 | 6,937 |
| May 1, 2021 through May 31, 2021 | 0.1 | $  251.89 | 0.1 | 6,910 |
| June 1, 2021 through June 30, 2021 | - | $  - | - | 6,910 |
| Balance as of June 30, 2021 | 0.8 | | 0.8 | $  6,910 |

[1] Average price paid per share for open market purchases includes broker commissions.

## ITEM 3: DEFAULTS UPON SENIOR SECURITIES

None.

## ITEM 4: MINE SAFETY DISCLOSURES

Not applicable.

## ITEM 5: OTHER INFORMATION

None.

