1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

United States District Court
Northern District of California

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

HUEI-TING KANG, et al.,

        Plaintiffs,

    v.

PAYPAL HOLDINGS, INC, et al.,

        Defendants.

Case No. 21-cv-06468-CRB

**ORDER GRANTING MOTION TO DISMISS**

       Plaintiffs Huei-Ting Kang and Arthur Flores are suing PayPal Holdings, Inc. and four officers and employees (collectively, PayPal) for securities fraud under §§ 10(b) and 20(a) of the Securities Exchange Act of 1934 and SEC Rule 10b-5.  Seeking to represent a class of purchasers of PayPal common stock between April 27, 2016 and July 28, 2021 (the "Class Period"), Plaintiffs allege that PayPal made false or misleading statements pertaining to (1) its compliance with regulatory obligations as to its PayPal Credit product; (2) its compliance with regulations on debit card interchange fees; and (3) its response to letters about conduct by PayPal Credit merchants.  PayPal moves to dismiss for failure to state a claim.  The Court GRANTS the motion with leave to amend.

I.      **BACKGROUND**

     A.    **Parties**

       Plaintiffs Kang and Flores allege that they purchased PayPal common stock at artificially inflated prices during the Class Period and suffered damage.  Am. Compl. ¶ 27; Declarations (dkts. 17-5, 21-3).

       Defendant PayPal is a Delaware financial technology ("fintech") corporation based in California that enables consumers and merchants to send and receive digital payments.

1   Am. Compl. (dkt. 49) ¶¶ 2, 28, 34.

2       Plaintiffs also bring their claims against four individual defendants.  Daniel

3   Schulman was PayPal's President, CEO and a member of the Company's Board of

4   Directors.  Id. ¶ 29.  John Rainey cycled through the following three offices at PayPal:

5   Senior Vice President, Chief Financial Officer; Executive Vice President, Chief Financial

6   Officer; and Chief Financial Officer and Executive Vice President, Global Customer

7   Operations.  Id. ¶ 30.  Doug Bland was initially Vice President and General Manager of

8   PayPal Credit, Business Financing Solutions and later Senior Vice President and General

9   Manager of Global Credit.  Id. ¶ 31.  Joseph Gallo served in senior communications roles

10  at PayPal before becoming Director of Communications.  Id. ¶ 32.

11      **B.**     **Alleged Wrongdoing**

12      Most of Plaintiffs' allegations concern misrepresentations about two underlying

13  issues: (1) PayPal's compliance with regulatory obligations as to PayPal Credit; and (2)

14  PayPal's compliance with Regulation II, which caps debit card interchange fees.  Am.

15  Compl. ¶ 35.  The Court first summarizes the allegations of underlying noncompliance

16  before describing the statements.

17      **1.**     **PayPal Credit**

18      PayPal Credit is a revolving credit line issued by Synchrony Bank that allows

19  customers to pay for purchases with their PayPal Credit account on merchant websites.  Id.

20  ¶¶ 3, 35.  One of PayPal Credit's promotional finance offerings is a "deferred interest"

21  arrangement on purchases of $99 or more, where no interest is charged if the balance is

22  paid within six months of the purchase date, but interest is charged from the date of

23  purchase if the customer does not pay the balance in full within six months.  Id. ¶ 35.

24  Plaintiffs allege that, with respect to its merchants' statements regarding PayPal Credit,

25  PayPal violated its legal duties stemming from a CFPB Consent Order.

26      **a.**     **The Consent Order**

27      On May 19, 2015, the Consumer Finance Protection Bureau (CFPB) filed a

28  complaint alleging that PayPal deceptively advertised promotional benefits, misled

United States District Court
Northern District of California

United States District Court
Northern District of California

1   customers about deferred interest, enrolled customers in PayPal Credit without their

2   consent, engaged in illegal billing practices, and mishandled customer disputes for a litany

3   of violations of the Consumer Financial Protection Act (CFPA).  Id. ¶ 38; see RJN Ex 9

4   (dkt. 71-9); CFPB v. PayPal, Inc. and Bill Me Later, Inc., No. 1:15-cv-01426 (D. Md. May

5   19, 2015), ECF No. 1.  The Consent Order ("Order") was entered in the following day.

6   See RJN Ex 10 (dkt. 71-10).  It forbade PayPal from enrolling customers in PayPal Credit

7   without affirmative consent after a clear and prominent disclosure.  RJN Ex 10 ¶ 17.  It

8   also enjoined PayPal from misrepresenting the terms and conditions of any promotion and

9   required them to ensure that consumers receive the benefit of promotions exactly as

10   advertised.  See Am. Compl. ¶¶ 7, 11, 70.  Specifically, the Order provided:

> 19. In connection with offering, marketing, or providing
> PayPal Credit, Defendants, their officers, agents, servants,
> contractors, and employees, and all other persons in active
> concert or participation with them who have actual notice of
> this Order, whether acting directly or indirectly, are enjoined
> and restrained from misrepresenting any material aspect of
> PayPal Credit, including:
>
> A. Any benefits that a consumer will receive from using
> PayPal Credit and
>
> B. The terms and conditions of any promotional offer
> associated with PayPal Credit, such as deferred interest
> or money-back offers.
>
> 20. With respect to merchants that make promotional offers to
> consumers who use PayPal Credit, Defendants must ensure that
> consumers receive the benefit of the promotional offer by
> honoring the offer made through the merchant or providing
> other appropriate remediation such that the consumer receives
> at least the benefit of the promotional offer as represented by
> the merchant.

RJN Ex 10 ¶¶ 19-20; Am. Compl. ¶ 42.  The Order also required PayPal and its Board of

Directors to institute a comprehensive plan to ensure compliance and to report to the CFPB

that such compliance had been achieved.  Am. Compl. ¶ 40; RJN Ex. 10 ¶¶ 24-25.

### b.   Deceptive Marketing

Plaintiffs allege that PayPal was not complying with its legal obligations under the

Order because it "knowingly enabled for-profit and largely unaccredited institutions to

1   deceptively market PayPal Credit's terms to students for educational programs."  Am.

2   Compl. ¶ 54.  Plaintiffs' allegations are based on the claims of several confidential

3   witnesses, a 2020 report and letter by a nonprofit organization, and the later announcement

4   of an investigation into PayPal Credit by the CFPB.  See id. ¶¶ 55–61.

5          Citing confidential witnesses at PayPal, Plaintiffs allege the following facts relating

6   to its internal policies concerning PayPal Credit and its merchants.  A Director in Product

7   Marketing and Management stated that it was a "mutual understanding" between both

8   PayPal and merchant that both "were responsible for adhering to the language in the 2015

9   Consent Order," and that PayPal's "internal policy required it to remove merchants that did

10  not comply."  Id. ¶ 56.  A Regulatory Compliance Lead Tester at PayPal Credit stated that

11  all merchants "had to submit an application to the Company to be able to offer PayPal

12  Credit, meet PayPal Credit's specific criteria[,] and that merchants [could not] randomly

13  publish links directing consumers to PayPal's products without PayPal's knowledge."  Id.

14  ¶ 55.  According to a Senior Manager of Customer Experiences and Platform, PayPal

15  received merchant-specific data about when consumers used PayPal Credit to pay for

16  merchants' services.  Id. ¶ 59.  A Mid-Market Account Manager explained that "merchants

17  who offered PayPal Credit were required to provide to the Company business licenses,

18  bank statements and listed and verified business addresses."  Id. ¶ 57.  A leader of the

19  product marketing group focused on merchant business stated that a group of employees

20  from compliance and legal "conducted 'Know Your Customer' checks on individual

21  merchants."  Id. ¶ 58.  Another employee explained that a PayPal administrative tool

22  provided detailed information about merchants, classifying them by size and category, and

23  including transactional data between merchants and their customers.  Id. ¶ 60.  Finally, a

24  Risk Operations Merchant Support Senior Specialist stated that internal policy disallowed

25  educational merchants that offered degrees or certificates from using PayPal Credit, and

26  merchant category codes triggered alerts regarding improper use.  Id. ¶ 61.  But that

27  employee also stated that, although the policy required PayPal to provide warnings to

28  educational merchants and then disable their use of the product, PayPal failed to do so, and

United States District Court
Northern District of California

4

its compliance training materials did not properly explain which merchants could not use PayPal Credit.  Id.

In July 2020, the Student Borrower Protection Center (SBPC), a nonprofit organization focused on alleviating student debt, produced a report called "Shadow Student Debt" that discussed how for-profit colleges that are ineligible for federal student loans offer PayPal Credit as a method of payment for tuition expenses.  Am. Compl. ¶¶ 9, 62; see RJN Ex. 5 (dkt. 71-5).  The Report explained that PayPal Credit was "charging extremely high interest rates, usually more than four times the most expensive student loans, utilizing questionable underwriting practices, using misleading promotions to advertise the loans, including a lack of adequate and clear disclosure of deferred interest arrangements, and aiding in aggressive debt collection practices."  Am. Compl. ¶ 63.

On August 21, 2020, the SBPC and three other civic organizations sent a letter to PayPal, Schulman, the CFPB Director, and the Acting Comptroller of the Currency.  Id. ¶ 64; see RJN Ex 6 (dkt. 71-6).  The letter noted that PayPal Credit's annual interest rate of 25.4% was more than four times that of student loans, and that PayPal engaged in "aggressive collection practices," including requesting the full amount due on the borrower's death.  Am. Compl. ¶ 65.  It further explained that the "free interest for six months" promotion "failed to properly explain and disclose that failing to pay off the entire balance within six months would result in retroactive interest charges from the date of purchase, and that the entire unpaid interest would be added to the total principal balance." Id. ¶ 64; RJN Ex 6 at 3.  The letter stated: "It is imperative that PayPal immediately begin a comprehensive review of PayPal Credit's involvement in the for-profit college sector." RJN Ex 6 at 5.  It included an appendix with "a list of over 150 colleges, career academies, certificate programs, and other educational institutions prominently advertising [PayPal Credit] as a preferred option" for financing tuition.  RJN Ex 6 at 2; Am. Compl. ¶ 67.

After the August 2020 SBPC letter, some of the misleading promotions that omitted the necessary disclaimer were taken down.  Am. Compl. ¶ 86.  However, the misleading promotions remained on the websites of some for-profit schools, including the Academy of

5

Real Estate & Mortgage, Academy of Makeup Artistry Cammua, LearnBuildEarn, and Stroia School of Driving.  See id. ¶¶ 86–87.  On July 29, 2021, PayPal revealed in a public SEC filing that it had received a civil investigative demand (CID) from the CFPB "related to the marketing and use of PayPal Credit in connection with certain merchants that provide educational services."  Id. ¶ 151; see RJN Ex 12 (dkt. 71-12).  Plaintiffs therefore allege that PayPal violated the Consent Order by "knowingly enabl[ing]" for-profit institutions to deceptively market PayPal Credit.  Id. ¶ 54.

Plaintiffs also allege that PayPal violated the Consent Order by continuing to enroll customers in PayPal Credit without their consent.  Id. ¶ 74.  This allegation is based on one confidential witness' claim that "one or two out of every five or seven" PayPal Credit customers said that they "did not recall giving their consent to enroll" in an account.  Id.[1]

### 2.    Debit Card Interchange Fees

Plaintiffs also allege that, in issuing debit cards through a partner bank, it violated Regulation II, which restricts interchange fees for many debit card products.

### a.    Regulation II

When a debit transaction is authorized, the merchant generally is indirectly charged an "interchange fee," payable to the issuer.  Am. Compl. ¶¶ 90, 92–94.  The Dodd-Frank Wall Street Reform and Consumer Protection Act included a provision directing the Federal Reserve Board to prohibit excessive interchange fees.  Id. ¶ 91; see 15 U.S.C. § 1693o-2.

In 2011, the Board promulgated Regulation II to implement this provision.  See Debit Cards Interchange Fees and Routing, 76 Fed. Reg. 43,478 (July 20, 2011).  The regulation caps the interchange fees that a financial entity can charge on each debit transaction at 21 cents plus 0.05% multiplied by the total value of the transaction.  Id. ¶ 92 (citing 12 C.F.R. § 235.3(b)).  However, the underlying statutory provision required an

---

[1] Plaintiffs also vaguely allege violations of other parts of the Consent Order and other laws, including the CRPA, the Truth in Lending Act, and its implementing Regulation Z. E.g., Am. Compl. ¶¶ 44.  But it is unclear exactly what unlawful conduct they allege.

United States District Court
Northern District of California

exemption for any issuer that, "together with its affiliates, has assets of less than" $10 billion. 15 U.S.C. § 1693o-2(a)(6)(A).  Accordingly, Regulation II exempts small issuers, so long as (1) the issuer "holds the account that is debited," and (2) its assets, together with its affiliates, do not exceed $10 billion as of the end of the year preceding the date of the debit transaction. Am. Compl. ¶ 93 (quoting 12 C.F.R. § 235.5(a)(1)(i)-(ii)).  In its official commentary, the Board does not further define the holding requirement, stating only that, "[f]or purposes of determining whether an issuer is exempted[,] . . . the term issuer is limited to the entity that holds the account being debited." 12 C.F.R. § Pt. 235, App. A, at § 235.2(k) (emphasis added).

### b.    PayPal's Debit Cards

Plaintiffs allege that PayPal has total assets of $74 billion. Id. ¶ 97.  However, Bancorp, an FDIC member bank with less than the $10 billion asset threshold specified in Regulation II, issues PayPal's debit cards. Id. ¶ 95.  Those cards bear the name of PayPal's brands, including the Venmo debit card, the PayPal Business Mastercard, and the PayPal Cash Card. Id.  The user agreements for each of these debit cards indicate that Bancorp does not hold the customer's account funds. Id. ¶ 97.  Yet because Bancorp ostensibly qualifies for the small issuer exemption, it issues these products with approximately twice the interchange fees that would be allowed for a larger issuer (such as PayPal). Id. ¶¶ 95, 15.

Plaintiffs allege that PayPal's partnership with Bancorp "evade[s] and circumvent[s]" Regulation II's interchange fee cap. Id. ¶¶ 5, 89.  They allege that PayPal retains "virtually all" or "the overwhelming majority" of the interchange fees that consumers pay to Bancorp. Id. ¶¶ 15, 96.  They base this allegation largely on the fact that PayPal's competitor Square has a similar arrangement with its issuers. Id. ¶ 96.  Consequently, in Plaintiffs' view, "neither PayPal nor Bancorp is entitled to claim an exemption from the requirements of Regulation II," which is made "clear" by "the plain language of both the [statute] and Regulation II and its accompanying commentary from the Federal Reserve." Id. ¶¶ 15, 16.  "At the very least," PayPal "knew or recklessly

1    disregarded the increased risk of regulatory scrutiny and subsequent investigations given

2    the intense focus on this issue from both the industry and regulators over the last decade."

3    Id. ¶ 16.

4         In late 2020, PayPal's issuance of debit cards through Bancorp began to draw

5    scrutiny.  On October 23, the Clearing House Association LLC (CHA), a research and

6    analysis organization focused on financial regulation, submitted a public comment to the

7    Board of Governors of the Federal Reserve, suggesting clarifications to Regulation II to

8    disallow the practices of large companies like PayPal.  Am. Compl. ¶¶ 17, 99, 149; RJN

9    Ex 11 (dkt. 71-11) at 2.  The letter observed that these companies engaged issuers with less

10   than $10 billion to "issu[e] debit and prepaid cards in reliance on the small issuer

11   exemption to avoid applicability of the interchange fee limitation to the fintech company's

12   card services offerings" while having those issuers "hold only a small portion of funds . . .

13   under the theory that a nominal amount of funds being held by the [ ] sponsor bank

14   satisfies the fund holding requirement."  RJN Ex 11 at 2.  The CHA noted that the Board's

15   current interpretation of Regulation II "provided little guidance clarifying what qualifies as

16   'holding' the account."  Id. at 3.  The CHA recommended that the Board "adopt Frequently

17   Asked Questions ('FAQs') and revisions to the official commentary to Regulation II that

18   close gaps in the availability of the small issuer exemption between fintech companies and

19   financial institutions."  Id. at 2.  The CHA specifically cited PayPal's partnership with

20   Bancorp to issue the PayPal Cash Mastercard debit card.  Id. at 2 n.5.

21        On July 29, 2021, PayPal stated in its 2Q21 10-Q that it had responded to

22   subpoenas and requests for information from the Division of Enforcement at the SEC

23   concerning "whether the interchange rates paid to the bank that issues debit cards bearing

24   our licensed brands were consistent with Regulation II."  RJN Ex 12 at 36.

25        **C.    Statements**

26        Plaintiffs allege that PayPal made three sets of false statements.  The first set

27   consists of statements by PayPal and its officials describing its compliance efforts in

28   general terms.  For example, in its Form 10-Q for the first quarter of 2016, PayPal wrote:

United States District Court
Northern District of California

8

1
2
3
4
5
6

> We operate globally and in a rapidly evolving regulatory environment characterized by a heightened regulatory focus on all aspects of the payments industry. That focus continues to become even more heightened. . . . Non-compliance with laws and regulations, increased penalties and enforcement actions related to non-compliance, changes in laws and regulations or their interpretation, and the enactment of new laws and regulations applicable to us could have a material adverse impact on our business, results of operations and financial condition. Therefore, we monitor these areas closely to ensure compliant solutions for our customers who depend on us.

7     Id. ¶ 107.  PayPal also made statements specifically describing their compliance with the

8     Consent Order.  In its Form 10-Q for the second quarter of 2016, it stated: "We continue to

9     cooperate and engage with the CFPB and work to ensure compliance with the Consent

10    Order, which may result in us incurring additional costs associated with compliance or

11    redress."  Am. Compl. ¶ 109.  PayPal made many statements that were substantially the

12    same as the above.  See id. ¶¶ 113, 114, 117, 119, 122, 123, 124, 127, 128, 129, 130, 131,

13    132, 135, 140, 141, 146; see, e.g., RJN Ex 2 (dkt. 71-2) at 10.

14         Schulman made many similar comments.  On an April 27, 2016 earnings call, he

15    stated that a "great example of [our risk compliance infrastructure] is the relationship we

16    have built with our regulators as it relates to our PayPal Credit offerings," and that "what

17    regulators want and what we want are truly aligned."  Id. ¶ 105; see also id. ¶ 115 (January

18    26, 2017 statement about alignment with obligations under Dodd-Frank and the CFPB); id.

19    ¶ 133 (May 28, 2020 statement that the company had the "opportunity to have been

20    investing hundreds of millions of dollars into risk and compliance"); id. ¶ 142 (Feb. 11,

21    2021: "Our risk management and our compliance teams are now world class.").

22         Other officials made similar general comments.  For example, Rainey stated on

23    May 22, 2017 that "it's important to first understand that what regulators want and what

24    we want are very much aligned."  Id. ¶ 120; see also id. ¶ 125 (May 24, 2018: "We also

25    spend a lot of money in compliance. . .  [W]e view that as a competitive advantage.").

26    Bland made at least one similar comment.  See id. ¶ 144 (Feb. 23, 2021 statement that the

27    company has "a commitment to doing what is right for our customers through transparency

28    to make sure people understand what these products are. . . . So we will continue to work

9

1   with regulators to ensure our products are responsibly used that they're serving the purpose

2   to provide buyers with increased flexibility and control.").

3          Second, Plaintiffs allege that PayPal and various officials made misleading

4   statements regarding compliance with (and regulatory risk surrounding) Regulation II.  In

5   its quarterly statement for the second quarter of 2016, it wrote: "Any material reduction in

6   credit or debit card interchange rates in the United States or other markets could adversely

7   affect our competitive position. . . .  Future changes to those regulations could potentially

8   adversely affect our business."  Id. ¶ 111.  PayPal made substantially similar statements in

9   later filings.  See id. ¶¶ 114, 117, 124, 127, 131, 141.  PayPal also stated repeatedly that

10  "the fees that we collect in certain jurisdictions may become the subject of regulatory

11  change."  See id. ¶¶ 117, 124, 127, 131, 141.

12         Third, Plaintiffs allege that, after the SBPC sent its letter, Gallo made misleading

13  statements about PayPal's response.  Gallo stated that PayPal takes the SBPC's letter "very

14  seriously," that PayPal "adheres to all state and federal regulations to ensure clear, easy to

15  understand information about products," that PayPal has "no direct relationship" with the

16  for-profit schools, and that if a for-profit school is found to use misleading messaging, "we

17  will quickly move to terminate the use of our services."  Am. Compl. ¶ 136; RJN Ex 7

18  (dkt. 71-7).  A week later, Gallo stated that "[w]e have already begun taking action against

19  some of the entities mentioned in the letter," that PayPal "does not market PayPal Credit

20  directly to for-profit educational institutions or other associated entities and the company

21  has no direct relationship with entities in question," and that it takes the claims "very

22  seriously."  Id. ¶ 138; RJN Ex 8 (dkt. 71-8).

23         **D.    Corrective Disclosures**

24         Plaintiffs allege that they suffered losses when three corrective disclosures brought

25  the truth to light.

26                 **1.    SBPC Letter**

27         On August 21, 2020, the SBPC sent a letter stating that for-profit colleges

28  misleadingly described PayPal Credit's promotion.  Id. ¶ 64; RJN Ex 6 at 3.  The SBPC

United States District Court
Northern District of California

announced in a press release that they had sent these letters. Am. Compl. ¶ 148. The price of PayPal's common stock declined by less than 1%. Am. Compl. ¶ 148. Plaintiffs allege that the market's reaction was "muted" because of Gallo's allegedly misleading statements that same day to the Washington Post distancing PayPal from the for-profit schools' conduct. Id.; see id. ¶ 85; RJN Ex 7.

### 2.    CHA Public Comment

On October 23, 2020, the CHA submitted a public comment to the Federal Reserve arguing for clarifications to Regulation II to prevent large companies from using the small issuer exemption. Am. Compl. ¶¶ 17, 99, 149. The CHA specifically cited PayPal's partnership with Bancorp to issue the PayPal Cash Mastercard debit card. RJN Ex 11 at 2 n.5. Plaintiffs allege that this disclosure caused the price of PayPal's stock to decline by nearly 3% on October 26, 2020. Id. ¶ 150.

### 3.    Investigation Announcements

The third corrective disclosure occurred on July 29, 2021, when Bloomberg News reported that PayPal faced probes from the CFPB (regarding the marketing of PayPal Credit) and the SEC (regarding compliance with Regulation II). Am. Compl. ¶ 151. On that same day, PayPal filed its 2Q21 10-Q with the SEC. Id.; see RJN Ex 12. In it, PayPal stated that it had received a CID from the CFPB "related to the marketing and use of PayPal Credit in connection with certain merchants that provide educational services." RJN Ex 12 at 36. It also stated that PayPal had responded to subpoenas and requests for information from the SEC concerning "whether the interchange rates paid to the bank that issues debit cards bearing our licensed brands were consistent with Regulation II of the Board of Governors of the Federal Reserve System, and the reporting of marketing fees earned from the Company's branded card program." Id.

On July 29, 2021, the price of PayPal stock declined by over 6%. Id. ¶ 152. It declined further over the following two days, resulting in a cumulative decline of about 10.2%. Id. ¶¶ 151-53.

### E.    Procedural History

Kang filed this suit on August 20, 2021.  Compl. (dkt. 1).  Three putative members moved to appoint lead plaintiff and counsel, but they then stipulated for Kang and Flores as lead plaintiffs.  Order (dkt. 29).  Plaintiffs filed an amended complaint on January 25, 2022.  Am. Compl.  Plaintiffs bring three claims: (1) for misleading statements in violation of Section 10(b) and Rule 10b-5(b); (2) for scheme liability in violation of Rule 10b-5(a), (c); and (3) against Schulman and Rainey for violations of Section 20(a).  PayPal moves to dismiss.  See MTD (dkt. 70); see also Opp. (dkt. 76); Reply (dkt. 78).

## II.    LEGAL STANDARD

Under Rule 12(b)(6) of the Federal Rules of Civil Procedure, a complaint may be dismissed for failure to state a claim for which relief may be granted.  Fed. R. Civ. P. 12(b)(6).  Rule 12(b)(6) applies when a complaint lacks either "a cognizable legal theory" or "sufficient facts alleged" under such a theory.  Godecke v. Kinetic Concepts, Inc., 937 F.3d 1201, 1208 (9th Cir. 2019).  Evaluating a motion to dismiss, the Court "must presume all factual allegations of the complaint to be true and draw all reasonable inferences in favor of the nonmoving party."  Usher, 828 F.2d at 561.  "[C]ourts must consider the complaint in its entirety, as well as other sources courts ordinarily examine when ruling on Rule 12(b)(6) motions to dismiss, in particular, documents incorporated into the complaint by reference, and matters of which a court may take judicial notice."  Tellabs, Inc. v. Makor Issues & Rights, Ltd., 551 U.S. 308, 322 (2007).

If a court dismisses a complaint for failure to state a claim, it should "freely give leave" to amend "when justice so requires."  Fed. R. Civ. P. 15(a)(2).  A court nevertheless has discretion to deny leave to amend due to, among other things, "repeated failure to cure deficiencies by amendments previously allowed, undue prejudice to the opposing party by virtue of allowance of the amendment, [and] futility of amendment."  Leadsinger, Inc. v. BMG Music Pub., 512 F.3d 522, 532 (9th Cir. 2008) (citing Foman v. Davis, 371 U.S. 178, 182 (1962)).

### III.   DISCUSSION

The Court grants PayPal's motion to dismiss all claims for two independent reasons.  First, Plaintiffs do not plausibly plead that PayPal misrepresented anything.  Second, Plaintiffs do not plausibly allege a strong inference of scienter.

### A.   Judicial Notice

As a preliminary issue, PayPal requests judicial notice and/or incorporation by reference of 22 exhibits.  See RJN (dkt. 72); Chepiga Decl. Ex 2-22 (dkts 71-2 to 71-22); see also RJN at 4 (table indicating the citations in the complaint to each document).  Plaintiffs do not oppose, but they argue that many facts in these documents are disputed such that their truth should not be assumed.  See Response (dkt. 74).

Courts may take judicial notice of a fact that is "not subject to reasonable dispute," i.e., that is "generally known" or "can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned."  Fed. R. Evid. 201(b).  "Publicly accessible websites and news articles are among the proper subjects of judicial notice."  Diaz v. Intuit, Inc., 2018 WL 2215790, at *3 (N.D. Cal. May 15, 2018).  Courts may not, however, "take judicial notice of disputed facts contained in [ ] public records."  Khoja v. Orexigen Therapeutics, Inc., 899 F.3d 988, 999 (9th Cir. 2018) (citation omitted).

A document is incorporated by reference when the complaint "refers extensively to the document or the document forms the basis of the plaintiff's claim."  Khoja, 899 F.3d at 1002 (quoting United States v. Ritchie, 342 F.3d 903, 908 (9th Cir. 2003)). This doctrine "prevents plaintiffs from selecting only portions of documents that support their claims, while omitting portions of those very documents that weaken—or doom—their claims."  McGovney v. Aerohive Networks, Inc., 2019 WL 8137143, at *7 (N.D. Cal. Aug. 7, 2019) (quoting Khoja, 899 F.3d at 1002).  "Although incorporation by reference generally permits courts to accept the truth of matters asserted in incorporated documents, . . . it is improper to do so only to resolve factual disputes against the plaintiff's well-pled allegations in the complaint."  Khoja, 899 F.3d at 1014.

Here, the incorporated documents do not "dispute facts stated in a well-pleaded

complaint," but instead properly provide a basis for PayPal's argument that Plaintiffs sometimes inaccurately characterize the contents of those documents.  See J.K.J. v. City of San Diego, 17 F.4th 1247, 1254 (9th Cir. 2021) ("[W]here the complaint makes conclusory allegations that are contradicted by documents referred to or incorporated in the complaint, a court may decline to accept such conclusory allegations as true.").  Plaintiffs specifically challenge consideration of facts in the Yahoo! Finance article, RJN Ex 8, which is quoted throughout the Complaint and contains one of the alleged misstatements at issue.  RJN 4; Am. Compl. ¶ 138.  But incorporation by reference of this exhibit is necessary to assess the veracity of the challenged statement in context.  See In re NVIDIA Corp. Sec. Litig., 768 F.3d 1046, 1058 n.10 (9th Cir. 2014) (a document may be "consider[ed] . . . in its entirety" where Plaintiffs "rel[ied] on portions of it in their complaint").  Accordingly, all exhibits are subject to judicial notice and/or incorporation by reference, and the Court uses them to provide context for the allegations.  See Khoja, 899 F.3d at 999-1002.

### B.    Rule 10b-5(b) Claim

Plaintiffs' first claim is against PayPal and the individual defendants for violations of Section 10(b) and Rule 10b-5(b).  Am. Compl. ¶¶ 178-87.

Section 10(b) of the Securities Exchange Act of 1934 forbids the "use or employ, in connection with the purchase or sale of any security . . . [of] any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the [SEC] may prescribe as necessary or appropriate in the public interest or for the protection of investors."  15 U.S.C. § 78j(b).  SEC Rule 10b-5 implements § 10(b) and declares it unlawful:

> (a) To employ any device, scheme, or artifice to defraud,
> (b) To make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made . . . not misleading, or
> (c) To engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person, in connection with the purchase or sale of any security.

17 C.F.R. § 240.10b-5.

1    The Supreme Court has implied a right of action to stock purchasers or sellers

2    injured by a violation of § 10(b) and Rule 10b-5.  See Dura Pharms., Inc. v. Broudo, 544

3    U.S. 336, 341 (2005).  To state a claim, plaintiffs must plead "(1) a material

4    misrepresentation (or omission); (2) scienter, i.e., a wrongful state of mind; (3) a

5    connection with the purchase or sale of a security; (4) reliance . . .; (5) economic loss; and

6    (6) 'loss causation,' i.e., a causal connection between the material misrepresentation and

7    the loss."  Id. at 341–42 (citation omitted).

8                          **1.    Misstatement**

9    Plaintiffs do not satisfy the first element of a Rule 10b-5 claim, which is a material

10   false statement or omission.  Id. at 341.  In pleading this element, the Private Securities

11   Litigation Reform Act of 1995 (PSLRA) requires plaintiffs to "specify each statement

12   alleged to have been misleading [and] the reason or reasons why the statement is

13   misleading," 15 U.S.C. § 78u–4(b)(1); Tellabs, 551 U.S. at 313.

14   A plaintiff can establish "[f]alsity" by pointing to "statements that directly

15   contradict what the defendant knew at that time."  Khoja, 899 F.3d at 1008.  A plaintiff can

16   establish a material omission by pointing to the defendant's "silence" despite a "duty to

17   disclose."  Matrixx Initiatives, Inc. v. Siracusano, 563 U.S. 27, 45 (2011) (quoting Basic

18   Inc. v. Levinson, 485 U.S. 224, 239 n.17 (1988)).  Such a duty arises from a statement that,

19   although "not false," is "misleading" because it "omits material information."  Khoja, 899

20   F.3d at 1008–09.  "Disclosure is required only when necessary to make [the] statements

21   made, in the light of the circumstances under which they were made, not misleading."  Id.

22   at 1009 (quoting Matrixx, 563 U.S. at 44) (cleaned up).  Of course, a party "fails to

23   disclose material information" to investors only when the party in question actually "has

24   [the] information that" investors are "entitled to know."  Chiarella v. United States, 445

25   U.S. 222, 228 (1980).

26   "Whether its allegations concern an omission or a misstatement," a plaintiff must

27   also allege "materiality."  Khoja, 899 F.3d at 1009.  A false statement or omission's

28   materiality depends on whether "there is a substantial likelihood that a reasonable

1   shareholder would consider" the information to be "important." <u>Basic</u>, 485 U.S. at 231

2   (quoting <u>TSC Indus., Inc. v. Northway, Inc.</u>, 426 U.S. 438, 449 (1976)).  This inquiry is

3   "inherently fact-specific." <u>Matrixx</u>, 563 U.S. at 39.  For an omission, "there must be a

4   substantial likelihood that the disclosure of the omitted fact would have been viewed by

5   the reasonable investor as having significantly altered the 'total mix' of information made

6   available." <u>Basic</u>, 485 U.S. at 231–32 (quoting <u>TSC Indus.</u>, 426 U.S. at 449).  This

7   standard is not "too low," because a "minimal standard might bring an overabundance of

8   information within its reach, and lead management simply to bury shareholders in an

9   avalanche of trivial information." <u>Id.</u> at 231 (citation omitted).

10          The preliminary problem with Plaintiffs' argument that PayPal made misleading

11   statements about compliance (i.e., with the Consent Order or with Regulation II) is that a

12   statement about compliance is not made misleading just because a later regulatory inquiry

13   occurs.  At the time that they made the statements, PayPal "had no obligation or

14   requirement to elaborate on any alleged non-compliance because it had not yet been found

15   to be non-compliant." <u>In re Facebook, Inc. Sec. Litig.</u>, 477 F. Supp. 3d 980, 1024 (N.D.

16   Cal. 2020); <u>see</u> <u>In re Paypal Holdings, Inc. S'holder Derivative Litig.</u>, 2018 WL 466527, at

17   *3 (N.D. Cal. Jan. 18, 2018) (the securities laws "do not impose upon companies a duty to

18   disclose uncharged, unadjudicated wrongdoing").

19          Plaintiffs' argument is weaker still because they fail to plausibly allege that PayPal

20   in fact violated any regulatory obligation.  The Consent Order contained three (arguably)

21   relevant obligations.  First, it stated that PayPal may not enroll customers without their

22   consent.  <u>See</u> RJN Ex 10 ¶ 17.  But Plaintiffs do not plausibly allege that PayPal violated

23   this obligation; they include only a bare allegation that a confidential witness spoke to

24   some customers who "did not recall" giving consent.  <u>See</u> Compl. ¶ 74.  Second, the Order

25   forbids PayPal and "all other persons in active concert or participation with them who have

26   actual notice of this Order" from "misrepresent[ing] any material aspect of PayPal Credit"

27   including "the terms and conditions of any promotional offer."  RJN Ex 10 ¶ 19.  Plaintiffs

28   allege that <u>merchants</u> misrepresented PayPal Credit, but they never allege that PayPal did

so.  A "mutual understanding" between PayPal and merchant that both "were responsible for" following the Order did not impose additional legal obligations on PayPal.  Id. ¶ 56.  And it is unclear what Plaintiffs mean that PayPal "enable[d]" these merchants to promote in a misleading way.  Opp. at 5.  Third, the Consent Order required that, "with respect to merchants that make promotional offers to consumers who use PayPal Credit," PayPal must "ensure that consumers receive the benefit of the promotional offer by honoring the offer made through the merchant," RJN Ex 10 ¶ 20.  But Plaintiffs do not allege that PayPal failed to honor a promotional offer made by the merchant.  Because no alleged conduct violated the Order, PayPal was truthful when it stated that it complied with it.  See Compl. ¶ 109 ("We continue to cooperate and engage with the CFPB and work to ensure compliance with the Consent Order."); id. ¶¶ 114, 117, 119, 122, 123, 124, 127, 128, 129, 130, 131, 135, 140.

Similarly, Plaintiffs cite no support for their opinion that PayPal violated Regulation II by issuing debit cards through Bancorp and taking advantage of the small issuer exemption.  See id. ¶¶ 97, 99-100.  Plaintiffs allege that PayPal took advantage of an apparent ambiguity as to whether a small issuer holding a nominal quantity of the relevant funds suffices to "hold" the funds, when PayPal brands the debit card and holds the rest of the funds.  Although this practice appears to dodge the intent of the regulatory scheme, without more, it is not an actual violation.  And Plaintiffs' argument is undermined by the CHA letter, which explicitly acknowledged "gaps" in the regulation and argued that "revisions" were necessary to clarify or fix it.  RJN Ex. 11 at 2.  Moreover, the challenged statements about Regulation II explicitly acknowledged that PayPal might face regulatory risk as to interchange fees (i.e., challenges to its current practices or revisions to Regulation II).  E.g., Compl. ¶ 117 (stating that "the fees we collect in certain jurisdictions may become the subject of regulatory challenge"); id. ¶¶ 114, 124, 127, 131, 141.  Those statements were truthful.

Moreover, the general statements about compliance at issue here are the kind of corporate puffery that are rarely (if ever) actionably misleading.  Essentially all of these

17

statements announce a "heightened" "focus" on regulatory issues and that the company "monitor[s] these areas closely to ensure compliant solutions."  See id. ¶¶ 107, 113, 114, 117, 123, 124, 127, 128, 129, 130, 131, 132, 135, 140, 141, 146.  These statements are corporate puffery because they are "vague, highly subjective claims as opposed to specific, detailed factual assertions."  Veal v. LendingClub Corp., 423 F. Supp. 3d 785, 804 (N.D. Cal. 2019) (quotation and citation omitted); see, e.g., id. (statement about company's "relentless focus on compliance" was puffery); In re Facebook, Inc. Sec. Litig., 477 F. Supp. 3d 980, 1023 (N.D. Cal. 2020) (same as to statement that the company "worked hard to make sure that we comply with" a consent order).  The Individual Defendants' statements are also puffery.  See Am. Compl. ¶ 115 (Schulman: "We believe that what regulators want, what we want are completely aligned."); id. ¶ 142 (Schulman: "Our risk management and our compliance teams are now world class."); id. ¶ 120 (Rainey: "what regulators want and what we want are very much aligned"); id. ¶ 144 (Bland: "So we will continue to work with regulators to ensure our products are responsibly used").  Nor did Gallo make misleading statements after the SBPC letter: he stated that PayPal took it "very seriously" (corporate puffery) that "[w]e have already begun taking action against some of the entities mentioned" (not plausibly false).  Am. Compl. ¶¶ 136, 138; see id. ¶ 86 (alleging that some of the entities took the promotions down shortly after the letter).[2]

---

[2] Even if Plaintiffs had identified specific legal violations, those violations would need to be frequent or widespread enough to render the statements misleading.  The general and "aspirational" statements of compliance here did not "reasonably suggest[] that there would be no violations."  Retail Wholesale & Dep't Store Union Loc. 338 Ret. Fund v. Hewlett-Packard Co., 845 F.3d 1268, 1278 (9th Cir. 2017); see Reidinger v. Zendesk, Inc., 2021 WL 796261, at *7 (N.D. Cal. Mar. 2, 2021) (Breyer, J.), aff'd, 2022 WL 614235 (9th Cir. Mar. 2, 2022) (emphasizing that the defendant "never stated that its employees had unfailingly complied with [] best practices").  The confidential witnesses describe a seemingly good-faith (if imperfect) process of ensuring that merchants do not misrepresent PayPal Credit.  See Am. Compl. ¶ 55-61.  Plaintiffs allege that just 151 for-profit schools (out of the 34 million merchants that use PayPal, see RJN Ex 3 at 5) had misleading descriptions of PayPal Credit.  And Plaintiffs admit that once the SBPC brought those schools to PayPal's attention, all but eight took the language down.  Opp. at 2.  This case is a far cry from the cases Plaintiffs cite for its view that general statements of compliance are actionable if there are "specific violations of law."  Opp. at 4; see, e.g., Reese v. Malone, 747 F.3d 557, 578 (9th Cir. 2014), overruled on other grounds (statements of compliance were false because systemic noncompliance was later "confirmed by the company's guilty plea, consent decree, and millions of dollars in fines and penalties" under three sets of laws).

1     The Rule 10b-5(b) claim therefore fails because none of the statements are plausibly

2    false or misleading.

3            **2.      Scienter**

4     The Rule 10b-5(b) claim also fails because, even assuming the existence of one or

5    more misleading statements, Plaintiffs fail to plead a strong inference of "scienter."  See

6    Ernst & Ernst v. Hochfelder, 425 U.S. 185, 197–99 (1976).

7     A Rule 10b-5 claim must allege conduct involving manipulation or deceit.  Santa Fe

8    Indus., Inc. v. Green, 430 U.S. 462, 473–74 (1977).  Accordingly, a plaintiff must allege

9    that the defendant had the "intent to deceive, manipulate, or defraud."  Ernst & Ernst, 425

10   U.S. at 188.  Further, the PSLRA requires plaintiffs to "state with particularity facts giving

11   rise to a strong inference that the defendant acted" with the requisite scienter—that is, the

12   intent "to deceive, manipulate, or defraud."  Tellabs, 551 U.S. at 313–314 (quoting 15

13   U.S.C. § 78u–4(b)(2); Ernst & Ernst, 425 U.S. at 194 & n.12).  The plaintiff must do more

14   than allege facts from which "a reasonable person could infer that the defendant acted with

15   the required intent."  Id. at 314 (citation omitted).  "To qualify as 'strong,' . . . an inference

16   of scienter must be more than merely plausible or reasonable—it must be cogent and at

17   least as compelling as any opposing inference of fraudulent intent."  Id.

18           Knowledge of falsity or deception is enough to satisfy this standard.  See Gebhart v.

19   SEC, 595 F.3d 1034, 1041 (9th Cir. 2010).  And although the Supreme Court has never

20   addressed whether recklessness establishes scienter under Rule 10b-5, see Tellabs, 551

21   U.S. at 319 n.3, the Ninth Circuit has held that "deliberate . . . or conscious recklessness"

22   as to the statement's false or misleading character establishes scienter.  SEC v. Platforms

23   Wireless Int'l Corp., 617 F.3d 1072, 1093 (9th Cir. 2010) (quoting Gebhart, 595 F.3d at

24   1041–42).  That is because deliberate, conscious recklessness is "a form of intentional or

25   knowing misconduct."  Id. (quoting In re Silicon Graphics Inc. Sec. Litig., 183 F.3d 970,

26   976 (9th Cir. 1999)).  The defendant must have subjectively "appreciate[d] the gravity of

27   the risk of misleading others" and "consciously disregarded" that risk.  Id. (quoting

28   Gebhart, 595 F.3d at 1042 n.11).

United States District Court
Northern District of California

19

Plaintiffs have not alleged that any officer acted intentionally or with conscious recklessness. That is because (assuming that PayPal was in serious noncompliance that rendered its statements misleading) there is no plausible allegation that any of the officers knew this fact. Plaintiffs point to no statement or conduct by any Individual Defendant that indicate knowledge about any regulatory violation. Although a confidential witness recalls undated "weekly or biweekly meetings" where "updates were provided" on the Consent Order, the witness does not attest to any Individual Defendant ever attending a meeting or receiving a report about any alleged violation. See Am. Compl. ¶ 156. The unpublished decision on which Plaintiffs most extensively rely underscores how lacking their allegations are. Opp. at 8-9 (discussing Oklahoma Police Pension & Ret. Sys. v. LifeLock, Inc., 780 F. App'x 480 (9th Cir. 2019)). In LifeLock, a strong inference of scienter was appropriate because—unlike here—corporate officers had seen "reports that contained detailed statistics about" the alleged problem and one of the officers "admitted that she was working to fix" it. Id. at 484-85. It's no surprise that these key facts in LifeLock "undercut the only plausible nonculpable explanation" for the officers' conduct—that they did not know about the problem. Id. at 485. Here, even assuming significant noncompliance occurred, there is no allegation that any defendant was ever aware of it.

The circumstantial evidence likewise does not raise a strong inference of scienter. Plaintiffs argue that scienter can be inferred from statements about the inner workings of the company or about "heav[y]" investment in compliance, see Opp. at 10-11 (quoting Am. Compl. ¶ 160), but these statements are far from sufficiently specific. See Metzler Inv. GMBH v. Corinthian Colls., Inc., 540 F.3d 1049, 1068 (9th Cir. 2008) ("[C]orporate management's general awareness of the day-to-day workings of the company's business does not establish scienter—at least absent some additional allegation of specific information conveyed to management and related to the fraud."). Nor can scienter be inferred from Plaintiffs' insistence that the misconduct involved products of "critical importance." Plaintiffs argue that (1) PayPal Credit produces "extremely high margins,"

20

and (2) debit cards produce 30% of the revenue generated by Venmo, one of PayPal's core products.  Opp. at 8 n. 4 (citing Am. Compl. ¶¶ 4, 153).  But these numbers are themselves misleading.  The alleged misconduct involving PayPal Credit involved 151 out of the 34 million merchants that use PayPal.  RJN Ex 3 at 5.  And 30% of Venmo's revenue in 2021 is $300 million, see Am. Compl. ¶ 4, which amounts to a mere 1.2% of PayPal's total revenue that year.  See Reply at 6 n.5.  Even assuming (improbably) that PayPal's purported violation of Regulation II jeopardized all debit card revenue, 1.2% of a company's revenue is not sufficient to impute scienter.

Plaintiffs point to stock sales by the Individual Defendants, but those do not support scienter either.  Stock sales only do so when they are "dramatically out of line with prior trading practices at times calculated to maximize the personal benefit."  No. 84 Employer–Teamster Joint Council Pension Trust Fund v. America West Holding Corp., 320 F.3d 920, 938 (9th Cir. 2003).  Plaintiffs place weight on the fact that Schulman and Rainey had not sold stock before the Class Period, but this has little explanatory power because PayPal only began to be publicly traded less than one year before the Class Period.  See In re FVC.COM Sec. Litig., 32 F. App'x 338, 341–42 (9th Cir. 2002).  Plaintiffs also argue that Schulman and Rainey sold more shares of stock after the SBPC Report was released than before, but their own allegations show that this is not true.  See Am. Compl. ¶¶ 167-68.  Even if it were true, it would not obviously help their case.[3]  Most importantly, the Individual Defendants' stock sales are not suspicious because both Schulman and Rainey increased their overall holdings over the Class Period through vested options.  See RJN Ex 16 at 2 & 118 (Schulman's holdings increased by 48%); Ex 17 at 2 & 50 (Rainey's holdings increased from 0 shares to 107,845); Applestein v. Medivation, Inc., 861 F. Supp. 2d 1030, 1043 (N.D. Cal. 2012) (finding no strong inference of scienter because the

---

[3] A person who committed fraud would logically cash out after the fraud occurred but before it was revealed.  It is less clear why such a person would unload more stock after the fraud began to be revealed (i.e., after the SBPC letter) than he did after the fraud occurred but before it was revealed.

1    individual defendants increased their stock holdings during the Class Period).[4]

2         In the absence of clear allegations of scienter, innocent inferences as to the officers'

3    state of mind are "cogent and at least as compelling as any opposing inference of

4    fraudulent intent."  See Tellabs, 551 U.S. at 314.  The far more likely inference from the

5    complaint, including the statements of the confidential witnesses, is that PayPal and its

6    officers instituted a program to comply with the Consent Order.  Its officers did not know

7    that a small number of its merchants were misrepresenting PayPal Credit until the SBPC

8    released its letter in August 2020, after which (as Gallo told the press) they took action.

9    Am. Compl. ¶ 85.  Similarly, even assuming PayPal's debit interchange fees violated

10   Regulation II, Plaintiffs' allegations do not suggest that any officer knew that this was an

11   actual violation (as opposed to an ambiguity or loophole in the regulation) until the CHA

12   comment letter (if not later).

13        Accordingly, the Court grants PayPal's motion to dismiss the Rule 10b-5(b) claim

14   because Plaintiffs plausibly pleaded neither an actionable misstatement nor a strong

15   inference of scienter.[5]

16        **C.      Rule 10b-5(a) & (c) Claim**

17        Plaintiffs also allege a scheme liability claim against PayPal under Rule 10b-5(a) &

18   (c).  Am. Compl. ¶¶ 188-96; see 17 C.F.R. § 240.10b-5(a), (c) (declaring it unlawful "[t]o

19   employ any device, scheme, or artifice to defraud" or "[t]o engage in any act, practice, or

20   course of business which operates or would operate as a fraud or deceit upon any person,

21   in connection with the purchase or sale of any security").

22        Plaintiffs allege that PayPal's scheme involved "enabling misleading promotions

23   for predatory for-profit schools throughout the Class Period in violation of the 2015

24   _____

25   [4] Plaintiffs argue that the Court cannot consider increases in holdings through vested options on a
     motion to dismiss, see Opp. at 12 n.7, but this is incorrect.  See In re Silicon Graphics Inc. Sec.

26   Litig., 183 F.3d 970, 986 (9th Cir. 1999), as amended (Aug. 4, 1999) (vested options should be
     considered on a motion to dismiss to determine whether stock sales are suspicious).

27   [5] Because the Court finds that Plaintiffs have not pleaded that PayPal made an actionable
     misstatement, Plaintiffs necessarily fail to allege loss causation as well.  Because no plausible

28   fraud occurred, any loss suffered by investors was necessarily caused by "some other fact."  See
     Lloyd v. CVB Financial Corp., 811 F.3d 1200, 1210 (9th Cir. 2016).

United States District Court
Northern District of California

Consent Order, launching a deliberate media campaign to cover up the violations with false assurances that the misleading promotions had been removed" and "engag[ing] in a shadow banking scheme in violation of Regulation II to reap unreasonable and disproportionate interchange fees."  Am. Compl. ¶ 191.  They insist vaguely that the scheme liability claim is not duplicative of the statements claim because it is based on "underlying misleading <u>conduct</u>, which misled investors about the Company's business operations in the same way that their statements did."  <u>See</u> Opp. 14-15.  Plaintiffs are correct that a scheme liability claim can depend on misstatements that also violate subsection (b).  <u>See</u> <u>Lorenzo v. Sec. & Exch. Comm'n</u>, 139 S. Ct. 1094, 1102 (2019) (explaining that subsection (b) and subsections (a) and (c) of Rule 10b-5 do not govern "mutually exclusive[] spheres of conduct").  That's why the Ninth Circuit held that it was reversible error when a district court dismissed a scheme liability claim sua sponte after concluding that the subsection (b) claim failed.  <u>See</u> <u>In re Alphabet, Inc. Sec. Litig.</u>, 1 F.4th 687, 709 (9th Cir. 2021).

But PayPal correctly argues that this alleged scheme consists entirely of (and fails for the same reasons as) the misstatements analyzed above.  Reply at 10.  Just as Plaintiffs have failed to plausibly allege that any of the statements in the complaint were false or misleading, they do not allege any false or misleading conduct.  That is particularly so because they do not plausibly allege that PayPal violated any regulatory obligation.  Nor do they allege a strong inference of scienter.  The Court grants the motion to dismiss the Rule 10b-5(a), (c) claim.

### D.    Section 20(a) Claim

Plaintiffs also allege a Section 20(a) claim against Schulman and Rainey.  Am. Compl. ¶¶ 197-202.  Section 20(a) provides a right of action against any person "who, directly or indirectly, controls any person liable under any provision of this chapter or of any rule or regulation thereunder."  15 U.S.C. § 78t(a).  The Section 20(a) claim fails because it cannot stand absent a primary violation.  <u>Lipton v. Pathogenesis Corp.</u>, 284 F.3d 1027, 1035 n.15 (9th Cir. 2002).

23

## IV.    CONCLUSION

For the foregoing reasons, the Court GRANTS the motion to dismiss.  As this is the Court's first substantive order on a complaint in this case, the Court grants leave to amend. See Leadsinger, 512 F.3d at 532.  Plaintiffs may file an amended complaint within 21 days of this order.

**IT IS SO ORDERED.**

Dated: August 8, 2022



CHARLES R. BREYER
United States District Judge

United States District Court
Northern District of California

24