1

**POMERANTZ LLP**

2

3
Jennifer Pafiti (SBN 282790)
1100 Glendon Avenue, 15th Floor
Los Angeles, California 90024
Telephone: (310) 405-7190
E-mail: jpafiti@pomlaw.com

4

5

*Lead Counsel for Lead Plaintiffs*

6

7
*[Additional Counsel on Signature Page]*

8

9
UNITED STATES DISTRICT COURT

10
NORTHERN DISTRICT OF CALIFORNIA

11
SAN FRANCISCO DIVISION

12

| | |
|---|---|
| HUEI-TING KANG and ARTHUR FLORES, | CASE NO.:  3:21-cv-06468-CRB |
| Plaintiffs, | **CLASS ACTION** |
| v. | HON. CHARLES R. BREYER |
| PAYPAL HOLDINGS, INC., et al., | **SECOND AMENDED CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE SECURITIES LAWS** |
| Defendants. | **JURY TRIAL DEMANDED** |

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**TABLE OF CONTENTS**

**Page**

TABLE OF ~~CONTENTS~~ ................................................................................................ i

~~TABLE OF~~ DEFINITIONS .......................................................................................... iv

NATURE OF THE ACTION ........................................................................................ 1

     ~~A.~~ A. The CFPB Investigation into PayPal Credit & Continuing Violations ................... 3

     ~~B.~~ B. Regulatory Problems with Interchange Fees, Including the SEC Investigation ...... ~~6~~8

     ~~C.~~ C. Investors React Negatively at the News that the Company's Risk of
          Regulatory     Scrutiny Has Materialized ............................................................. ~~7~~9

JURISDICTION AND VENUE ..................................................................................... ~~8~~10

PARTIES ...................................................................................................................... ~~9~~10

SUBSTANTIVE ALLEGATIONS ................................................................................ ~~10~~11

     ~~A.~~ A. Background ..................................................................................................... ~~10~~11

     ~~B.~~ B. PayPal Credit's Checkered History of CFPA Violations and the 2015 Consent
          Order .............................................................................................................. ~~11~~13

     ~~C.~~ C. Continued Violations of the 2015 Consent Order and Federal Consumer
          Financial Laws Significantly Increased the Likelihood of Regulatory
          Scrutiny and Investigations Throughout the Class Period ............................. ~~14~~15

          ~~1.~~ 1. PayPal Credit's Deferred Interest Offerings Violated the CFPA's
               Prohibitions Against Deceptive, Unfair, and Abusive Practices
               Throughout the Class Period ................................................................. ~~14~~16

               ~~i.~~ i. PayPal is Subject to the CFPA .................................................... ~~15~~16

               ~~ii.~~ ii. PayPal Engaged in Deceptive, Unfair, and Abusive Practices
                    Throughout the Class Period in Violation of both the 2015
                    Consent Order and the CFPA ..................................................... ~~17~~18

          ~~2.~~ 2. The Misleading Promotions to Students Offering PayPal Credit
               Violated Regulation Z Throughout the Class Period ........................... ~~26~~31

          ~~3.~~ 3. PayPal Continues to Violate Federal Statutes and Regulations Despite
               Misleading, Public Assurances that it Would Stop .............................. ~~29~~34

     ~~D.~~ D. PayPal's Participation in a Shadow Banking Scheme that Circumvents and
          Evades Federal Regulations Substantially Increased the Risk of Regulatory
          Scrutiny and Investigations Throughout the Class Period ............................. ~~31~~36

PAYPAL AND THE INDIVIDUAL DEFENDANTS MADE FALSE OR MISLEADING
     STATEMENTS DURING THE CLASS PERIOD ...................................................... ~~38~~43

LOSS CAUSATION ..................................................................................................... ~~52~~57

ADDITIONAL ALLEGATIONS OF SCIENTER ................................................................... ~~54~~59

    ~~A.~~ A. The Individual Responsibilities Imposed by the 2015 Consent Order on PayPal's Board of Directors and Senior Management Raise a Strong Inference of Scienter ................................................................... ~~54~~59

    ~~B.~~ B. The Individual Defendants Knew About the SBPC's Findings yet Failed to Take Appropriate, Corrective Actions Despite False Assurances to the Contrary ................................................................... ~~56~~62

    ~~C.~~ C. Defendants' Own Statements Support an Inference of Scienter ........................... ~~55~~62

    ~~D.~~ D. Any Assumption Regarding Defendants' Lack of Knowledge that PayPal's Debit Cards Skirted Regulation II is Absurd ................................................................... ~~57~~65

    ~~E.~~ E. Schulman's and Rainey's Stock Sales Enhance an Inference of Scienter ........... ~~59~~65

LEAD PLAINTIFFS' CLASS ACTION ALLEGATIONS ................................................................... ~~61~~67

COUNT I ................................................................... ~~63~~70

COUNT II ................................................................... ~~66~~72

COUNT III ................................................................... ~~68~~74

PRAYER FOR RELIEF ................................................................... ~~69~~75

DEMAND FOR TRIAL BY JURY ................................................................... ~~69~~75

CERTIFICATE OF SERVICE ................................................................... ~~72~~78

**TABLE OF DEFINITIONS**

| Term or Acronym | Definition |
|---|---|
| 2015 Consent Order | The Consent Order between the Consumer Financial Protection Bureau and PayPal, entered into on May 20, 2015 |
| Bancorp | The Bancorp Bank, Inc. |
| Bland | Defendant Doug Bland, Vice President and General Manager of PayPal Credit |
| Braintree | Braintree Payments, a PayPal-owned product that automates online payments for merchants by providing payment gateways and billing, storage and other payment related support |
| CEO | Chief Executive Officer |
| CFO | Chief Financial Officer |
| CFPA | Consumer Financial Protection Act |
| CFPB | Consumer Financial Protection Bureau |
| CFPB Complaint | *CFPB v. PayPal, Inc. and Bill Me Later, Inc.*, No. 1:15-cv-01426, (D. Md. May 19, 2015) |
| CID | Civil Investigative Demand |
| Class Period | April 27, 2016 to July 28, 2021 |
| Clearing House Association | Clearing House Association, LLC |
| Company | PayPal Holdings, Inc. |
| Complaint | Amended Complaint |
| CW | Confidential Witness |
| EFTA | Electronic Fund Transfer Act of 1978 |
| Exchange Act | The Securities Exchange Act of 1934 |
| Federal Reserve | Board of Governors of the Federal Reserve System |
| Gallo | Defendant Joseph Gallo, Director of Communications at PayPal |
| GGR | Global Government Relations |
| Individual Defendants | Defendants Daniel Schulman, John Rainey, Doug Bland, and Joseph Gallo |
| Lead Plaintiffs | Lead Plaintiffs Huei-Ting Kang and Arthur Flores |

| Term or Acronym | Definition |
| --- | --- |
| Marqeta | Marqeta, Inc. |
| NASDAQ | National Association of Securities Dealers Automated Quotation Global Select Market |
| PayPal | PayPal Holdings, Inc. |
| PayPal Credit | An open-end, revolving credit line built into a PayPal account that allows an account holder to pay for purchases online over a specified period after a credit application is approved by PayPal |
| PYPL | PayPal's stock ticker |
| Rainey | Defendant John Rainey, CFO of PayPal |
| Regulation II | Federal Reserve Debit Card Interchange Fees and Routing Regulation pursuant to Section 1075 of the Electronic Fund Transfer Act of 1978 |
| Regulation Z | The Consumer Financial Protection Bureau's implementing regulation to the Truth in Lending Act |
| SBPC | Student Borrower Protection Center |
| SBPC Letters | Letters sent from the Student Borrower Protection Center dated August 21, 2020 to Defendants PayPal and Schulman, and to the Director of the CFPB and the Acting Comptroller of the Currency |
| SBPC Report | Student Borrower Protection Center report on Shadow Student Debt: *Shadow Student Debt*, STUDENT BORROWER PROTECTION CENTER, July 2020 |
| SEC | U.S. Securities and Exchange Commission |
| Schulman | Defendant Daniel Schulman, CEO of PayPal |
| Square | Square Inc., now known as Block Inc. |
| Sutton | Sutton Bank |
| Synchrony | Synchrony Bank |
| TILA | Truth in Lending Act |
| Venmo | A social payments service owned by PayPal that enables consumers to make and share payments online |

Lead Plaintiffs Huei-Ting Kang and Arthur Flores (referred to herein as "Lead Plaintiffs" or "Plaintiffs"), individually and on behalf of all other persons similarly situated, by their undersigned attorneys, for their Second Amended Class Action Complaint for Violations of the Federal Securities Laws (the "Second Amended Complaint") against Defendants (defined below), allege the following based upon personal knowledge as to those allegations concerning Lead Plaintiffs and, as to all other matters, the investigation conducted by and through their attorneys, including, among other things, a review of the Defendants' public statements and filings made with the United States Securities and Exchange Commission ("SEC"), wire and press releases either issued by or regarding PayPal Holdings, Inc. ("PayPal" or the "Company"), published analysts' reports about the Company, information obtained from interviews with knowledgeable former employees of the Company and other persons with knowledge regarding these allegations (hereafter the Confidential Witnesses or the "CWs"), and other information obtainable on the Internet.  Lead Plaintiffs believe that substantial evidentiary support exists for the allegations set forth herein after a reasonable opportunity for discovery.

## NATURE OF THE ACTION

1.      This is a class action on behalf of all persons and entities who purchased or otherwise acquired PayPal's publicly traded common stock during the period from April 27, 2016 through July 28, 2021, both dates inclusive (the "Class Period"), seeking to pursue remedies under Sections 10(b) and 20(a), 15 U.S.C. §§ 78(j)(b) and 78t(a), of the Securities Exchange Act of 1934 ("Exchange Act") and Rule 10b-5, 17 C.F.R. § 240.10b-5 promulgated thereunder.  Excluded from the Class are Defendants herein; the officers and directors of the Company during the Class Period, and, at all relevant times, any entity in which any of the Defendants have or had a controlling interest; and the affiliates, immediate family members, legal representatives, heirs, successors or assigns of any of the above.

2.      PayPal is a digital payments company and technology platform, based in San Jose, California, that enables consumers and merchants to send and receive payments on the Internet. Its Proprietary Payments platform consists of seven core products, two of which are relevant here: PayPal Credit and Venmo.  During the Class Period, Defendants made misleading representations

about compliance to conceal or downplay two significant regulatory problems: (1) ongoing, systematic violations of a Consent Order entered in May 2015 following an investigation into PayPal Credit by the Consumer Financial Protection Bureau ("CFPB"), and (2) the issuance of debit cards, including the Venmo debit card, in violation of federal law.

3.      PayPal Credit is an open-end, revolving credit line built into a PayPal account that allows an account holder to pay for purchases online over a specified period after a credit application is approved by PayPal.  During the Class Period, Defendants considered PayPal Credit to be one of their most important divisions because it was a significant provider of revenues that produced extremely high margins.  PayPal Credit's core offering is a buy now, pay later financing arrangement on purchases over $99.  No interest is charged if the balance is paid within six months of the purchase date, but interest is automatically charged and compounded from the date of purchase if the consumer fails to pay any part of the full balance within six months.

4.      Like PayPal, Venmo is a social payments service that enables consumers to make and share payments online.  It was acquired by PayPal in 2013.  It has recently experienced explosive growth, and its revenues have skyrocketed from $200 million in 2018 to nearly $1 billion in 2021 and are expected to double in 2022 given its intense popularity with millennials and the rapid acceleration of online payments due to current market conditions.  Nearly 30% of this revenue is attributable to unreasonable and disproportionate interchange fees that PayPal earns from the Venmo debit card.

5.      Interchange fees are paid to the issuer of a debit card that holds the debit cardholder's account.  Typically, the issuer is a bank that both issues the debit card under its own brand and actually holds the customer's account.  However, federal statutes and regulations cap the amount of interchange fees that large issuers can charge to limit costs for consumers and promote competition in the market.  To evade and circumvent this cap, PayPal contracts with smaller banks such as The Bancorp, Inc., ("Bancorp") to claim that the smaller bank is the issuer, even though the bank does not hold the customer's account.  During the Class Period, PayPal also earned interchange fees from the PayPal Business MasterCard and the PayPal Cash Card.  These

1  debit cards are also issued in partnership with Bancorp, and similarly evade and circumvent the

2  regulatory cap on interchange fees.

3  **A. The CFPB Investigation into PayPal Credit & Continuing Violations**

4      6.      Before the Class Period began, in May 2015, the CFPB filed a complaint against

5  PayPal and a proposed Consent Order (hereafter "the 2015 Consent Order") that was subsequently

6  entered in the U.S. District Court for the District of Maryland.  The CFPB's investigation found

7  that PayPal violated the Consumer Financial Protection Act of 2010 ("CFPA") in numerous ways

8  by engaging in unfair, deceptive and abusive acts and practices in connection with the offering,

9  marketing, providing and servicing of PayPal Credit.  Specifically, and of particular relevance to

10  this Action, the CFPB found that PayPal (1) enrolled customers in PayPal Credit without their

11  consent, (2) failed to clearly and prominently explain the terms and conditions of a deferred

12  interest offer, (3) misrepresented the terms and conditions of promotional offers associated with

13  PayPal Credit, and (4) failed to ensure that merchants who offered PayPal Credit honored

14  promotions or provided customers with at least the benefit of the offer as represented in the

15  promotion.  CW1, a highly placed former employee who served as the Head of Compliance for

16  U.S. Credit and U.S. Operations during the Class Period until March 2018, confirms that the

17  CFPB, and the 2015 Consent Order, was particularly concerned about the impact of misleading

18  deferred interest promotions, and that the focus was to make sure that consumers understood what

19  the payment rules were.  CW13 further corroborates CW1's account, and states that the Consent

20  Order concerned customer confusion regarding the sign-up process for PayPal Credit.  CW14

21  bolsters both accounts, and states that unclear offers for PayPal Credit led to the entry of the 2015

22  Consent Order.

23      7.      The 2015 Consent Order enjoined and restrained PayPal and the Individual

24  Defendants named in this Action from misrepresenting any terms and conditions regarding

25  deferred interest and requires them to ensure that any merchant that offers PayPal Credit honors

26  the offer and provides the consumer with at least the benefit of the promotion as it was represented

27  by the merchant.  Thus, the 2015 Consent Order squarely required PayPal to ensure that merchants

28  did not misleadingly claim free interest for six months without explaining that interest is

compounded from the date of purchase if the consumer fails to pay the full balance within six months.

8. Throughout the Class Period, Defendants repeatedly violated the 2015 Consent Order and several federal consumer financial laws by (1) enrolling customers in PayPal Credit without their knowledge or consent, (2) misrepresenting the terms and conditions of PayPal Credit's deferred interest offers, and (3) failing to ensure that merchants who offered PayPal Credit honored promotions or provided customers with at least the benefit of the offer as represented in the promotion.

9. With respect to the first category of violations, CW11 estimates that from June 2016 to September 2016, or over a year after the 2015 Consent Order was entered, one or two of every five or seven calls involved a customer who was unaware of having a PayPal Credit account, and did not recall giving consent to enroll in such an account.  CW14 also recalled speaking with customers who did not know that they had been enrolled in PayPal Credit, including those who used PayPal to fund educational expenses, but did not understand that the expenses would be funded with PayPal Credit.  Plaintiffs also received a document production from the CFPB showing that customers continued to complain to the CFPB about being enrolled in PayPal Credit without their consent, at least, until July 2018 or over 3 years after the Company entered into the 2015 Consent Order.

10. 9. TheAs for the second and third category of violations, the fact that PayPal Credit's terms and conditions on merchants' websites misled consumers during the Class Period cannot be the subject of reasonable dispute.  On July 17, 2020, the Student Borrower Protection Center ("SBPC"), a nonprofit organization focused on alleviating the burden of student debt, released a report entitled "Shadow Student Debt," in which it described how PayPal Credit was offered as a method of payment for tuition expenses at unaccredited schools that are otherwise ineligible for federal student loans.  Deferred interest promotions in fact spurred the CFPB to take action against the Company nearly six years ago, which resulted in the 2015 Consent Order.

11. 10. On August 21, 2020, the SBPC sent letters to the CFPB and Defendant Daniel H. Schulman ("Schulman"), the Chief Executive Officer ("CEO") of PayPal, explaining how

PayPal Credit was marketed to vulnerable students with misleading deferred interest promotions. These letters described how PayPal Credit was misleadingly promoted at 150 identified predatory for-profit educational institutions.  On the very same day, Defendants, in an attempt to blunt the impact of the letters and manage the decline in the Company's stock price, launched a media campaign to deflect attention away from the Company, including publicly committing to remove the misleading promotions, stating that PayPal had already started to remove them, and misleadingly distancing the Company from the underlying misconduct through claims that PayPal had "no direct relationship" with the predatory for-profit educational institutions.  The media campaign worked.  The price of the Company's common stock declined by less than 1% on August 21, 2020 as a direct result of the Defendants' misleading statements.

12.    11. PayPal's media campaign, however, was false and misleading.  The accounts of several CWs and Defendants' own statements confirm that merchants are vetted by PayPal and the Company's internal policies are designed to ensure that both it and its merchants comply with the law.  In particular, the 2015 Consent Order specifically requires PayPal to ensure that merchants provide promotional offers exactly as they are advertised even if that was not what the advertisement intended.  Lead Plaintiffs' own investigation, as fully detailed herein, shows that numerous for-profit educational institutions misleadingly promoted deferred interest loans through PayPal Credit to vulnerable students throughout the Class Period and many of them continue to do so even as of today after the Class Period despite PayPal's false assurances to remediate the problem in the summer of 2020 after the SBPC reported the Company to the CFPB.

13.    Defendants cannot deflect blame onto the merchants or avoid responsibility for the misleading promotions given how they chose to conduct PayPal Credit's business.  The 2015 Consent Order was, in part, spurred by no interest for 6 or 12 month offers provided by PayPal. The Company's own Acceptable Use policy states that PayPal monitors merchants and pre-approves transactions. CW4 states that merchants cannot advertise without PayPal's consent, and anytime a merchant put a PayPal link on its site, PayPal was required to review those links to make sure that they were designed correctly.  CW7 states that the Company conducted know-your-customer checks on merchants that used PayPal.  CW9 confirms that the Company had a tracking

tool that allowed PayPal to see whether a merchant had compliance related issues.  CW10 further confirms that the Company was not supposed to allow for-profit schools to offer credit, and that merchant category codes for them triggered alerts that required PayPal to disable the accounts, but PayPal failed to do so.  CW12 also confirms that the Company's Merchant Risk team analyzed models that flagged high risk merchants, and that these models should have flagged for-profit schools.

14.     The SAC now also contains new accounts from CW15, CW13 and CW16 showing that the Company used sophisticated website crawling tools to monitor merchant and customer activity that tracked keywords.  These tools were designed to ferret out inappropriate transactions on PayPal's platforms and ensure compliance with all laws and regulations. Specifically, CW13 confirms that these tools helped the Company ensure that the language used in promotions was approved by PayPal, including the specific wording of the promotions.

15.     ~~12.~~ Defendants' statements to investors concealed their violations.  In SEC filings, they falsely or misleadingly claimed that the Company was then "work[ing] to ensure compliance" with the 2015 Consent Order, was "monitor[ing]" laws "closely" to ensure compliance and that its interests were perfectly "aligned" with regulators.  During the Class Period, Defendants Schulman and John Rainey ("Rainey"), PayPal's Chief Financial Officer ("CFO"), also repeatedly touted PayPal's "world class" compliance regime that they claimed was a "role model" to others because the Company was laser-focused on compliance and was compliant with "any and all regulatory environments out there."  Defendant Doug Bland ("Bland"), the head of Global Credit and the senior executive in charge of PayPal Credit, made misleading statements about the transparency of PayPal Credit's terms and conditions long after the Company was put on notice about the continued violations of the 2015 Consent Order.  Defendants never stopped making such misleading statements even after Schulman knew about the SBPC's concerns, and sent PayPal representatives to personally discuss the letter with the SBPC, as a CW from the SBPC confirms ("CW2"), and, despite representing to the contrary, failed to remove all the misleading promotions that PayPal Credit offered to vulnerable students as confirmed herein.  At the very least, the risk of regulatory scrutiny and subsequent investigations had effectively materialized after the SBPC

reported PayPal to the CFPB, but Defendants never tempered their misleading statements at any point in time.

16. ~~13.~~ Defendants made their misleading statements with scienter.  The 2015 Consent Order expressly placed responsibility on PayPal's Board of Directors and the Individual Defendants, as members of PayPal senior management, to take specific steps to ensure that PayPal did not enroll customers in PayPal Credit without their consent or misrepresent the terms and conditions of any deferred interest offer and otherwise ensure that PayPal complied with the 2015 Consent Order and all federal consumer financial laws.  ~~Their~~ It required Schulman and Rainey, as senior management, to provide real time updates to the Board on how the Company was complying with the Consent Order or timely remedy any non-compliance as soon as they became aware of the violations.  Schulman was aware of the specific violations no later than August 2020 when he received a letter from the SBPC and dispatched executives to manage a response.  Yet, Defendants failed to stop making misleading statements about compliance after these events occurred.  The failure to ~~do so~~ fulfill the duties imposed by the 2015 Consent Order was, at least, reckless. Defendants touted PayPal's compliance program, which purportedly included the actions of its merchants, to investors, even as they had known about the violations since at least August 2020 when Schulman received a letter from the SBPC detailing the chronic failures in the Company's so-called "world class" compliance regime.

17. CW17 was an employee in the Risk Management Organization at PayPal during the Class Period.  CW17 worked and interacted with the Company's Chief Risk and Compliance Officer as well as Schulman and Rainey.  According to CW17, Schulman and Rainey received weekly or biweekly updates about the Company's remediations and progress in responding to the 2015 Consent Order with the CFPB.  CW17 also confirms that both Schulman and Rainey participated in specific meetings to discuss the Company's response to the 2015 Consent Order.

18. ~~14.~~ Instead of fulfilling their duty to disclose all material information or refrain from trading, during the Class Period, Defendants Schulman and Rainey took advantage of PayPal's artificially inflated stock price by selling nearly $168 million in stock.  In particular, Schulman sold over $53 million, and Rainey sold over $20.8 million of PayPal's common stock after the

1   SBPC Shadow Student Debt Report was released and after they knew about the federal consumer

2   financial law violations detailed herein.  These specific stock sales were dramatically out of line

3   with their prior trading activity over a comparable period in the past.

4   **B. Regulatory Problems with Interchange Fees, Including the SEC Investigation**

5   19.   15. In addition, during the Class Period, Defendants concealed regulatory problems

6   with interchange fees.   PayPal issued several debit cards and earned unreasonable and

7   disproportionate interchange fees in violation of Section 1075 of the Electronic Fund Transfer Act

8   of 1978 ("EFTA") (15 U.S.C. § 1693 *et seq.*), which was subsequently implemented by the Board

9   of Governors of the Federal Reserve System (the "Federal Reserve") pursuant to a federal

10  regulation on Debit Card Interchange Fees and Routing known as "Regulation II."  Regulation II

11  caps the amount of interchange fees that a financial entity can earn from debit card transactions,

12  but, as fully explained below, PayPal has circumvented or evaded this regulation by using Bancorp

13  as a conduit to keep virtually all the interchange fees for itself, which is, approximately twice the

14  amount allowed pursuant to the regulatory cap.  PayPal is either the issuer of the debit cards

15  themselves or, as its own debit card agreements admit, it holds the customer's account balances,

16  both of which mean that neither PayPal nor Bancorp is entitled to claim an exemption from the

17  requirements of Regulation II.

18  20.   16. Throughout the Class Period, PayPal repeatedly acknowledged in filings with

19  the SEC that it was aware of Regulation II and the regulatory cap and misleadingly claimed that

20  the amount of the interchange fee ***could*** decrease, and the fees collected ***may*** become the subject

21  of regulatory challenge.  However, the plain language of both the EFTA and Regulation II and its

22  accompanying commentary from the Federal Reserve make it clear that PayPal is not entitled to

23  an exemption and has set up a shadow banking arrangement to earn unreasonable and

24  disproportionate fees prohibited by federal law.  At the very least, Defendants knew or recklessly

25  disregarded the increased risk of regulatory scrutiny and subsequent investigations given the

26  intense focus on this issue from both the industry and regulators over the last decade.

27

28

**C. Investors React Negatively at the News that the Company's Risk of Regulatory Scrutiny Has Materialized**

21.     ~~17.~~ On October 23, 2020, the Clearing House Association LLC ("Clearing House Association"), a research and analysis organization focused on financial regulation, submitted a public comment to the Federal Reserve outlining how PayPal and other large fintech companies were evading or circumventing the regulatory cap on interchange fees imposed by Regulation II.

22.     ~~18.~~ On this partial disclosure or the materialization of the risks thereof, the price of PayPal's common stock declined by nearly 3% from its closing price of $203.04 that day, to close at $197.22 per share on October 26, 2020, the next trading day.

23.     ~~19.~~ On July 29, 2021, Bloomberg News reported that the price of PayPal's common stock declined that day upon news that the Company faced probes from both the CFPB and the SEC.  The article published in Bloomberg News noted that the price of the Company's common stock continued to fall in late trading in New York after news of the investigations emerged.  On the same day, PayPal also filed with the SEC its quarterly report on Form 10-Q for the second quarter of 2021 ("2Q21 10-Q"), in which it provided more details about the investigations.  The 2Q21 10-Q stated that PayPal had received a Civil Investigative Demand ("CID") from the CFPB "related to the marketing and use of PayPal Credit in connection with certain merchants that provide educational services.  The CID requested the production of documents, written reports, and answers to written questions."  The 2Q21 10-Q further stated that PayPal had responded to subpoenas and requests for information from the Division of Enforcement at the SEC concerning "whether the interchange rates paid to the bank that issues debit cards bearing our licensed brands were consistent with Regulation II of the Board of Governors of the Federal Reserve System, and the reporting of marketing fees earned from the Company's branded card program."

24.     ~~20.~~ The market reacted significantly and negatively to the announcement of these investigations.  On July 29, 2021, the price of the Company's common stock declined by over 6% from its previous day closing price of $301.98 to close at $283.17.

25.     ~~21.~~ On July 30, 2021, the price of the Company's common stock declined further by over 2.6% from its previous day closing price of $283.17 to close at $275.53 as the market

continued to absorb the news.  On July 30, 2021, Coinspeaker, a media outlet dedicated to the fintech industry, also published an article on the SEC investigation and stated that the price of the Company's stock declined upon the announcement of news of the investigations on the previous day, and continued to decline on the following day as investors absorbed news about the investigations.  On July 31, 2021, it declined another 1.6% from its previous day closing price of $275.53 to close at $270.99 on heavy trading volume.

26.  ~~22.~~As a result of the Defendants' wrongful acts and omissions, and the precipitous decline in the market value of PayPal's common stock upon the partial disclosures and/or materialization of the concealed risks thereof, Lead Plaintiffs and other Class members have suffered significant losses and damages.

## JURISDICTION AND VENUE

27.  ~~23.~~The claims asserted herein arise under Sections 10(b) and 20(a) of the Exchange Act (15 U.S.C. §§ 78j(b) and 78t(a)) and SEC Rule 10b-5 promulgated thereunder (17 C.F.R. § 240.10b-5).

28.  ~~24.~~This Court has jurisdiction over the subject matter of this Action pursuant to 28 U.S.C. § 1331 and Section 27 of the Exchange Act (15 U.S.C. § 78aa).

29.  ~~25.~~Venue is proper in this District pursuant to Section 27(a) of the Exchange Act (15 U.S.C. § 78aa(a)) and 28 U.S.C. § 1391(b) given that a significant portion of the Defendants' misconduct took place within this District.  PayPal is a corporation incorporated in Delaware with its principal place of business in San Jose, California, and Defendants Rainey and Schulman reside in or around the San Francisco Bay Area.

30.  ~~26.~~In connection with the acts, conduct and other wrongs alleged in this Second Amended Complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including but not limited to, the United States mail, interstate telephone communications and the facilities of a national securities exchange.

## PARTIES

31.  ~~27.~~Lead Plaintiffs, as set forth in their previously filed declarations (ECF No. 17-5 for Plaintiff Kang and ECF No. 21-3 for Plaintiff Flores), purchased PayPal common stock at

artificially inflated prices during the Class Period, and were damaged as a result of the federal securities law violations alleged herein.

32.   28. Defendant PayPal is a Delaware corporation with its principal executive offices located at 2211 North First Street, San Jose, CA 95131.  PayPal's shares trade on the NASDAQ Global Select Market ("NASDAQ") under the ticker symbol "PYPL."

33.   29. Defendant Schulman was, at all relevant times, PayPal's President, CEO and a member of the Company's Board of Directors.

34.   30. Defendant Rainey has served at PayPal as its Chief Financial Officer and Executive Vice President, Global Customer Operations since January 2018 until the end of the Class Period.  From September 2016 to January 2018, Rainey served as Executive Vice President, Chief Financial Officer.  From August 2015 to September 2016, he served as Senior Vice President, Chief Financial Officer.

35.   31. Defendant Bland was the Vice President and General Manager of PayPal Credit, Business Financing Solutions from September 2017 to March 2020; and has served as PayPal's Senior Vice President and General Manager of Global Credit since March 2020.

36.   32. Defendant Joseph Gallo ("Gallo") has served as Director of Communications at PayPal since July 2020 and had begun serving in senior communications roles at the Company since April 2017.

37.   33. Defendants Schulman, Rainey, Bland, and Gallo are sometimes referred to in this Second Amended Complaint as the "Individual Defendants."

## SUBSTANTIVE ALLEGATIONS

### A. Background

38.   34. Defendant PayPal is a digital payments company and technology platform that enables consumers and merchants to send and receive payments.  The Company's purported goal is to help merchants and consumers across numerous markets connect, transact and complete payments online or on mobile devices or through in-person transactions.  The Company was founded in 1998, went public in 2002, acquired by eBay Inc. in the same year, and spun off into a separate publicly traded company, which is its present form, in July 2015.

39.   35. The Company's proprietary Payments Platform consists of seven products and services, two of which are PayPal Credit and Venmo.  PayPal Credit is a consumer credit program offered by the Company pursuant to a partnership with Synchrony Bank.  It operates as an open-end, revolving credit line built into a PayPal account that gives the account holder the ability to pay over time for purchases once a credit application is approved.  PayPal Credit's core product is a special financing arrangement on purchases over $99 with no interest charged only if the balance is paid in full within six months of the purchase date.  Interest is automatically charged and compounded from the date of purchase if the account holder fails to pay any part of the full balance within the first six months, and also may incur late fees or other charges.

40.   36. The Company generates revenue from interest and fees associated with PayPal Credit.  CW3 was a Strategy Manager of Global Credit at PayPal from September 2017 to August 2021, and directly reported to Defendant Bland.  According to CW3, the Company considered PayPal Credit to be one of its most important divisions because it was a significant provider of revenues that produced extremely high margins.  CW3 states that the importance of PayPal Credit to PayPal's bottom line has increased in the last few years because of intense competition in the industry over Buy Now, Pay Later purchase options.  On September 19, 2019, Darrell Esch, the Senior Vice President of Global Credit at PayPal, attended an investor conference where he confirmed that revenue from deferred interest "is a big chunk of what drives" PayPal Credit "with more than half of the volume on this portfolio hit[ing] into that deferred interest."

41.   37. Venmo is a social payments service that enables consumers to make and share payments with friends, family and approved merchants.  Consumers can make payments on Venmo by linking a bank account, a debit or credit card, or by utilizing an existing Venmo balance.  Venmo LLC was founded in 2009 and acquired in 2012 by Braintree Payments ("Braintree"), a company that automates online payments for merchants by providing payment gateways and billing, storage and other payment related support.  In December 2013, PayPal acquired Braintree, and Venmo became part of PayPal.  In 2018, Venmo released a physical debit card that runs on the MasterCard network and offers ATM access and overdraft protection.  Because of its popularity with millennials and exponential growth, the revenues that PayPal derives from

Venmo-related transactions have skyrocketed from over $200 million in 2018 to nearly $1 billion in 2021.  Analysts estimate and expect that revenue from Venmo-related transactions may approach $2 billion in 2022.  Nearly 30% of the revenue from Venmo-related transactions is derived from excessive interchange fees that PayPal reaps from the Venmo debit card, and as a result, PayPal has received hundreds of millions of dollars in interchange fees from the Venmo debit card during the Class Period.  Given the significant rise in Venmo-related revenues in 2022 estimated by analysts, PayPal would reap $600 million in interchange fees from the Venmo debit card alone.  During the Class Period, PayPal also received interchange fees from the PayPal Business Mastercard, released in 2012, and the PayPal Cash Card, released in 2017.  The PayPal Cash Card allows users to access funds with a debit card linked to their PayPal account balance.

**B. PayPal Credit's Checkered History of CFPA Violations and the 2015 Consent Order**

42.  38.  On May 19, 2015, the CFPB filed a complaint and the 2015 Consent Order against PayPal for a litany of CFPA violations.  According to that complaint, PayPal deceptively advertised promotional benefits, misled consumers about deferred interest, enrolled customers in PayPal Credit without their consent or forced them to utilize PayPal Credit instead of their preferred payment method to purchase goods or services, engaged in illegal billing practices and mishandled customers' disputes about payments.

43.  39.  Of particular importance to this Action, the CFPB found that PayPal and its merchants deceptively "advertised promotional offers such as $5 or $10 back on a purchase or no interest of six or twelve months," but that "[i]n many instances, [PayPal] did not honor these promotional offers after consumers completed transactions through PayPal Credit."  *CFPB v. PayPal, Inc. and Bill Me Later, Inc.*, No. 1:15-cv-01426 (D. Md. May 19, 2015), ECF No. 1 ¶¶ 32-33 ("CFPB Complaint.").  As such, the CFPB alleged that PayPal engaged in deceptive acts or practices in violation of Section 5536(a)(1)(B) of the CFPA, 12 U.S.C. § 5536(a)(1)(B), which makes it unlawful for any covered person or service provider to engage in any unfair, deceptive or abusive act or practice.  With respect to Defendants' deferred interest offers, the CFPB also found that PayPal and its merchants did not provide customers with sufficient information to understand how payments were applied to existing balances and how much consumers needed to

pay to avoid deferred interest.  *Id*.  For example, customers did not understand how PayPal allocated payments for deferred interest promotional balances or believed that payments had been made to pay off balances related to expiring promotions, but PayPal allocated payments in a manner that resulted in customers incurring deferred interest.  CFPB Complaint ¶ 35.  As such, the CFPB alleged that PayPal engaged in an abusive deferred interest scheme that took "unreasonable advantage of . . . the inability of the consumer to protect the interests of the consumer in selecting or using a consumer financial product or service" in violation of Section 5531(d)(2)(B) of the CFPA, 12 U.S.C. § 5531(d)(2)(B).  As a result of these violations, the CFPB and PayPal entered into the 2015 Consent Order.

44.   40. In connection with the 2015 Consent Order, PayPal agreed to pay $15 million in redress to victims and an additional $10 million in civil penalties.  In addition, the 2015 Consent Order required Defendants in this Action to institute a comprehensive Compliance Plan designed to ensure that the offering or marketing of PayPal Credit complied with the 2015 Consent Order, and further required PayPal's Board of Directors to ensure compliance with the 2015 Consent Order and the CFPA, both of which are described in Paragraphs 39 through 41 of the 2015 Consent Order.

45.   41. CW1 was the Head of Compliance for U.S. Credit and U.S. Operations at PayPal during the Class Period until March 2018.  CW1 provided support for the crafting of, and was responsible for implementing the Compliance Plan that PayPal was required to institute pursuant to the 2015 Consent Order.  According to CW1, in 2015, the CFPB was laser-focused on the "potential customer confusion" as it related to PayPal's deferred interest promotions and whether the Company had provided enough information for consumers to understand that any failure to pay the full balance of the loan within the specified timeframe would result in full interest being charged.

46.   42. Paragraph 19 of the 2015 Consent Order enjoined and restrained the Defendants in this Action from misrepresenting any material aspect of PayPal Credit including (a) "***any*** benefits that a consumer will receive from using PayPal Credit, and (b) the terms and conditions of ***any*** promotional offer associated with PayPal Credit, such as ***deferred interest*** or money-back

offers."[1]     With respect to promotional offers made by merchants, Paragraph 20 of the 2015 Consent Order specifically required the Defendants in this Action to "ensure that consumers receive the benefit of the promotional offer by honoring the offer ***made through the*** merchant or providing other appropriate remediation such that the consumer receives at least the benefit of the promotional offer ***as represented by the merchant***."  Numerous other sections of the 2015 Consent Order required Defendants to disclose the terms and conditions of PayPal Credit clearly and prominently, and the CFPB emphasized that the required improvements to the disclosures also applied to "fees and deferred interest to ensure that consumers understand how their payments will be allocated."[2]

47.   ~~43.~~ The 2015 Consent Order has the force and effect of a federal consumer financial law pursuant to 12 U.S.C. § 5481(14) because it is an "order prescribed by the [CFPB]."  Thus, any misrepresentations or abusive acts or practices that violate the 2015 Consent Order also violate the CFPA.  12 U.S.C. § 5536(a)(1)(A).  The CFPB routinely brings enforcement actions against individuals or entities that continue to make misrepresentations in violation of a previously entered consent order.  For example, on September 8, 2021, the CFPB filed a Complaint against LendUp Loans LLC for continuing to make misrepresentations that were prohibited by a consent order entered in 2016.  The release provision of the 2015 Consent Order expressly allows the CFPB to use the practices alleged in 2015 in any future enforcement action against Defendants to establish a pattern or practice of violations or to calculate the amount of any penalty.

**C. Continued Violations of the 2015 Consent Order and Federal Consumer Financial Laws Significantly Increased the Likelihood of Regulatory Scrutiny and Investigations Throughout the Class Period**

48.   ~~44.~~ Despite the clear terms of the 2015 Consent Order, PayPal violated it throughout the Class Period by enabling merchants to misleadingly market "no interest" promotions in

---

[1] Unless stated otherwise, all emphasis is added herein.

[2] Press Release, CFPB, *CFPB Takes Action Against PayPal for Illegally Signing Up Consumers for Unwanted Online Credit* (May 19, 2015), https://www.consumerfinance.gov/about-us/newsroom/cfpb-takes-action-against-paypal-for-illegally-signing-up-consumers-for-unwanted-online-credit/.

violation of Sections 5531 and 5536 of the CFPA. Several merchants also deceptively advertised PayPal Credit in violation of the Truth in Lending Act, 15 U.S.C. § 1601, and its implementing Regulation Z.

1. **PayPal Credit's Deferred Interest Offerings Violated the CFPA's Prohibitions Against Deceptive, Unfair, and Abusive Practices Throughout the Class Period**

49. 45. The CFPA was signed into law in July 2010. As part of the package of reforms responding to the financial crisis of 2008, the principal purpose of the CFPA is to combat irresponsible lending and protect consumers. The CFPA created the CFPB, charging it with the responsibility to supervise providers of consumer financial products and services, and to protect consumers from unfair, deceptive, and abusive financial practices.[3]

50. 46. In November 2017, PayPal sold its consumer credit receivables portfolio to Synchrony Bank ("Synchrony"), but entered into a new partnership with Synchrony pursuant to which it still owns the "PayPal Credit" brand. PayPal is responsible for "[m]arketing, including maintaining and controlling the customer acquisition and checkout experiences," as well as "[s]upplemental risk management, model development and enhanced underwriting capabilities."[4] Merchants direct consumers to apply and enroll in PayPal Credit through PayPal's own platform. Both PayPal and Synchrony share data and are "[g]overned by a joint Strategic Operating Committee, with PayPal retaining decision-making authority on core PayPal matters, such as marketing, branding, and merchant selection." *Id.*

### i. PayPal is Subject to the CFPA

51. 47. Under the CFPA, the CFPB may "take any action authorized under subtitle E [12 U.S.C. § 5561 *et seq.*] to prevent a covered person *or* service provider from committing or

---

[3] *Building the CFPB*, CFPB, https://www.consumerfinance.gov/data-research/research-reports/building-the-cfpb/ (last visited Jan. 24, 2022).

[4] M&A Presentation Slides, *PayPal & Synchrony Financial Expanded Strategic Relationship*, Ex. 99.1, Synchrony SEC Form 8-K (Nov. 16, 2017), https://www.sec.gov/Archives/edgar/data/1601712/000160171217000160/paypalpresentation.htm.

1  engaging in an unfair, deceptive, or abusive act or practice under Federal law in connection with

2  any transaction with a consumer for a consumer financial product or service, or the offering of a

3  consumer financial product or service." 12 U.S.C. § 5531.

4      52.  48. PayPal is a "covered person" as that term is defined in the CFPA: "The term

5  'covered person' means--any person that engages in offering or providing a consumer financial

6  product or service." 12 U.S.C. § 5481(6)(a).  A financial product or service includes: "payment[ ]

7  . . . processing products or services to a consumer by any technological means, including processing

8  or storing financial or banking data for any payment instrument, or through any payments systems

9  or network used for processing payments data."  *Slawin v. Bank of Am. Merch. Servs.,* 491 F. Supp.

10  3d 1334, 1347 (N.D. Ga. 2020) (citing 12 U.S.C. § 5481(15)(A)(vii)).

11      53.  49. PayPal controls the consumer's checkout experience for PayPal Credit, and

12  processes payments from consumers.  It is therefore engaged in offering or providing a financial

13  product or service under the CFPA.  PayPal boasts that PayPal Credit is "one of the largest

14  providers of consumer financing."[5]  And, as Doug Bland, the Senior Vice President and General

15  Manager of Global Credit at PayPal clearly stated at the KBW Payments FinTech Conference on

16  February 23, 2021, "we offer PayPal Credit in the US."  PayPal, therefore, offers, as well as

17  provides, PayPal Credit and is thus a covered person under the CFPA.

18      54.  50. PayPal is also a "service provider" as defined under the CFPA, which "means

19  any person that provides a material service to a covered person in connection with the offering or

20  provision by such covered person of a consumer financial product or service, including a person

21  that-- (i) participates in designing, operating, or maintaining the consumer financial product or

22  service; or (ii) processes transactions relating to the consumer financial product or service (other

23  than unknowingly or incidentally transmitting or processing financial data in a manner that such

24  data is undifferentiated from other types of data of the same form as the person transmits or

25  processes)."  12 U.S.C. § 5481; *see also Consumer Fin. Prot. Bureau v. ITT Educ. Servs., Inc.*, 219

26

27  [5] *Consumer financing: The ultimate companion for your online travel business*,  PAYPAL,

28  https://www.paypal.com/us/brc/article/consumer-financing-for-travel-retailers (last visited Jan.
   24, 2022).

F. Supp. 3d 878, 907-12 (S.D. Ind. 2015) (finding that Defendant ITT Educational Services was both a covered person and a service provider).  The terms of PayPal Credit state that PayPal is "a payment service provider."[6]  Thus, PayPal, by its own description, falls within the definition of a "service provider."

55. 51. PayPal also designs, markets and brands PayPal Credit and selects merchants that can offer PayPal Credit as a purchase option.  It also controls the customer acquisition and checkout experiences and processes transactions, and offers purchase protection that refunds the full purchase price of the product or service.  PayPal Credit can only be used with merchants that accept PayPal.[7]

56. 52. Consistent with the plain language of the statute, the CFPB previously found that PayPal was a covered person because PayPal Credit engaged in extending consumer credit and servicing loans.  CFPB Complaint ¶ 7.

### ii. PayPal Engaged in Deceptive, Unfair, and Abusive Practices Throughout the Class Period in Violation of both the 2015 Consent Order and the CFPA

57. 53. "An act or practice is deceptive if: (1) there is a representation, omission, or practice that, (2) is likely to mislead consumers acting reasonably under the circumstances, and (3) the representation, omission, or practice is material." *Consumer Fin. Prot. Bureau v. Gordon*, 819 F.3d 1179, 1192 (9th Cir. 2016) (internal quotations omitted).  An act or practice is deemed unfair when: (1) it "causes or is likely to cause substantial injury to consumers"; (2) the injury is "not reasonably avoidable by consumers"; and (3) "the injury is not outweighed by countervailing benefits to consumers or to competition."  12 U.S.C. § 5531.

---

[6] *Get No Interest if paid in full in 6 months on purchases of $99 or more when you check out with PayPal Credit*, PAYPAL, https://www.paypal.com/ppcreditapply/da/us/lander?guid=GHT6LJ2KAI&assetId=TERMS&_ga=2.19294456.1968596749.1641502802-232458035.1638981804&_gac=1.60935518.1641578407.CjwKCAiA5t-OBhByEiwAhR-hm-Dv6tWw3wNO_QYkKtPAXANQ7nDRgZwY3HEz0uPBbeSV_Rf82f-0hxoC-9AQAvD_BwE (last visited Jan. 24, 2022).

[7] *PayPal Credit Basics*, PAYPAL, https://www.paypal.com/us/webapps/mpp/paypal-credit/faq (last visited Jan. 24, 2022).

58.   54. Instead of complying with its required obligations under the 2015 Consent Order and the CFPA's prohibitions on deceptive, unfair or abusive acts and practices, PayPal knowingly enabled for-profit and largely unaccredited institutions to deceptively market PayPal Credit's terms to students for educational programs.  PayPal Credit, through its selected merchants, advertises "no interest for six months" to these students who rely on PayPal Credit to pay for their educational programs.  PayPal's own acceptable use policies show that it monitors merchants and preapproves transactions and various industries that use its products.[8]  Several CWs further confirm that PayPal's internal policies required it to vet merchants, police their promotional materials, and ensure that the merchants provided products and services that complied with the terms of the 2015 Consent Order.

59.   55. CW4 worked at PayPal from May 2013 to 2017 as the Regulatory Compliance Lead Tester at PayPal Credit, a role that involved monitoring and testing to ensure the Company met compliance requirements.  CW4 worked out of PayPal's Timonium, Maryland office.  CW4 explained that all merchants, including for-profit, educational institutions, had to submit an application to the Company to be able to offer PayPal Credit, meet PayPal Credit's specific criteria and that merchants cannot randomly publish links directing consumers to PayPal's products without PayPal's knowledge.  CW4 further explained that anytime a merchant put a PayPal link on its site, PayPal was required to review those links to make sure that they were designed correctly, and worked properly. PayPal also reviewed the merchants' terms and conditions.  CW4 also states that PayPal transactions left a data trail that showed the number of hits per merchant and this data was housed within the Company's Merchant Services team.

60.   56. CW5 worked at PayPal's Maryland office as a Director in product marketing and management through most of the Class Period until November 2020.  CW5 managed and assessed requests for proposals on credit and installment features.  CW5 states that it was a mutual understanding between both sides (PayPal and merchant) that PayPal and the merchant were responsible for adhering to the language in the 2015 Consent Order.  According to CW5, PayPal's

---

[8] *Acceptable Use Policy*, PAYPAL, https://www.paypal.com/us/webapps/mpp/ua/acceptableuse-full?locale.x=en_US (last visited Jan. 24, 2022).

1  internal policy required it to remove merchants that did not comply with the terms of the 2015

2  Consent Order.

3      61.    57. CW6 worked at PayPal from March 2010 to July 2019.  CW6 most recently

4  served as a Mid-Market Account Manager who worked with merchants that used PayPal.  CW6

5  reported to the Merchant Group Leader, Amanda Drobny.  CW6 confirms that merchants who

6  offered PayPal Credit were required to provide to the Company business licenses, bank statements

7  and listed and verified business addresses.

8      62.    58. CW7 served as the Global Head of Product Marketing-Merchant Solutions at

9  PayPal from January 2019 to December 2020.  CW7 led the product marketing group that was

10  focused on the merchant business and defining value proposition messaging and positioning for

11  PayPal products.  CW7 states that its team worked to convince merchants to use PayPal instead of

12  Square or other competitors, and that a group, which consisted of employees from compliance and

13  legal, conducted "Know Your Customer" checks on individual merchants.[9]

14      63.    59. CW8 worked at PayPal's San Jose headquarters from August 2018 to May 2021.

15  CW8 served as the Senior Manager of Consumer Experiences and Platform.  CW8 worked on a

16  compliance project focused on meeting consumer communication requirements set by the CFPB

17  and FinCEN.  CW8 confirmed that merchants who seek to use PayPal Credit must first go through

18  an application process.  CW8 added that as part of the agreement with merchants, PayPal receives

19  merchant-specific data when consumers pay for merchants' services using PayPal Credit, which

20  the Company identified as "Merchant Category Codes."

21      64.    60. CW9 worked at PayPal from April 2006 to April 2018 first as a Resolution

22  Services/Business Support Agent, then as a Merchant Solutions Account Manager, then as an

23  Onboarding Account Manager, and then as the Corporate Sales Trainer for North America at the

24  end of CW9's tenure.  According to CW9, the Company provided merchants with customer support

25  

26  [9]  The "know your customer" guidelines in financial services "require that professionals make an
27  effort to verify the identity, suitability, and risks involved with maintaining a business
relationship."  *See Dan Ryan, FinCEN: Know Your Customer Requirements*, HARVARD LAW
28  SCHOOL   FORUM   ON   CORPORATE   GOVERNANCE   (Feb.   7,   2016),
https://corpgov.law.harvard.edu/2016/02/07/fincen-know-your-customer-requirements/.

1   services, assigned account managers to specific merchants, and provided codes to enable PayPal

2   Credit as a payment option on their respective websites.  CW9 states that an administrative tool

3   allowed PayPal to access detailed information about merchants, including transactional data

4   between merchants and their customers, and classified merchants by size and category with for-

5   profit schools falling in the subcategory of "training" or "learning" within the broader category of

6   "education."  CW9 further confirms that this administrative tool allowed PayPal to view whether

7   there was a compliance-related issue with a particular merchant.  According to CW9, even before

8   the Class Period began, the Company launched "upsell campaigns" to push merchants to add

9   PayPal Credit as a payment option for large purchases.

10          65.    61. CW10 worked at PayPal during the Class Period until November 2021.  CW10

11   was a Customer Success Manager, who served as the principal PayPal contact for 55 to 85 mid-

12   market merchants at a given time.  CW10 previously worked as a Risk Operations Merchant

13   Support Senior Specialist.  CW10 explained that merchants who sold high risk products were vetted

14   by a group within PayPal called either Merchant Risk Consulting (MRC) or Merchant Risk

15   Monitoring (MRM).   According to CW10, PayPal's internal policy did not allow educational

16   merchants that offered degrees or certificates to use PayPal Credit, and merchant category codes

17   triggered alerts at the Company regarding the improper use.  CW10 confirms that PayPal's internal

18   policies required it to provide warnings to educational merchants and disable their use of PayPal

19   Credit, but PayPal failed to do so.  CW10 advised that PayPal could disable the merchants' accounts

20   directly on the backend if it chose to.  CW10 further states that PayPal's compliance training

21   materials did not properly explain which merchants could not use PayPal Credit, and the Company

22   pressured employees to recruit as many merchants as possible instead without regard to whether

23   the merchants could use PayPal Credit.  CW10 also recalled that the compliance department did

24   not respond on multiple occasions when CW10 raised various concerns.

25          66.    CW15 worked out of Omaha, Nebraska from the beginning of the Class Period

26   through the Spring of 2021. CW15 most recently worked in PayPal's Executive Escalations

27   Department and reported to the manager of Executive Escalations. CW15 recalled that complaints

28   directed at executives regarding PayPal Credit and the company's collections efforts occurred

"relatively often."  CW15 also stated that PayPal's new changes to its user agreement related to "automatic technologies" such as "website crawling."  CW15 explained that website crawling tools are used to "track certain keywords" and monitor merchant or customer activity.  CW15 added that this tool was built by PayPal's developers to monitor the sale of prohibited items, such as cannabis, firearms or pornography.  CW15 explained that developers approached CW15 to review crawling tools and was asked to provide examples of words they could flag using the crawling tools.

67.    CW13 worked for PayPal from September 2013 to March 2021 and worked out of PayPal's office in Timonium, Maryland.  During the Class Period, CW13 worked as a General Manager for PayPal's Global Credit Business Operations in the U.S. from July 2017 to May 2019. In this role, CW13 served as Chief of Staff to Senior Vice President of Global Credit and Core Markets Mark, Britto. CW13 managed key products for Britto and ran the U.S. Consumer Credit group. CW13 then served as a Senior Director of Internal Controls, Global Credit Risk, Seller Risk and Collections at PayPal from May 2019 to March 2021.  In this role, CW13 managed First Line of Defense functions and helped test risk control tools.  CW13's team included product managers that were "lent out" to work on corrective measures in response to the Consent Order.  CW13 explained that the CFPB investigation occurred in 2014 and went back to issues that occurred with Bill Me Later.  CW13 added that the Consent Order involved "some things that were more confusing around sign-up" for PayPal Credit.  CW13 recalled that PayPal implemented website crawling tools in late 2017.  CW13 explained that the website crawling technology was used on the websites of merchants to help ensure they were following PayPal's directives and were using language that PayPal approved of around the "presentment of credit."  CW13 added that PayPal was most concerned about "wording" and how merchants "presented credit."

68.    CW16 was a former senior level employee in PayPal's Technology Group for the entirety of the Class Period.  CW16 stated that the Company's Global Data Science group developed web crawling tools to ensure that merchants were legitimate, and that PayPal's platforms were used in a manner that adhered to all laws and regulations. According to CW16, PayPal has used these web crawling tools for, at least, the last several years.

69.   62.  The systematic use of PayPal Credit by predatory for-profit educational institutions drew the attention of the SBPC, which conducted an investigation and released a report entitled "Shadow Student Debt" on July 17, 2020.  *Shadow Student Debt*, STUDENT BORROWER PROTECTION CENTER, July 2020, at 19 (hereafter the "SBPC Report").[10]  The SBPC is a nonprofit organization that focuses on solutions to alleviate the burden of student debt for millions of Americans.  The SBPC Report exposed a web of predatory and largely unaccredited schools and financial services firms, including Defendant PayPal, who enable these schools to "drive students to take on billions in risky, high-cost shadow student debt."  *Id.*  The SBPC Report specifically described how PayPal Credit is offered as a method of payment for tuition expenses at unaccredited schools that are otherwise ineligible for federal student loans.

70.   63.  The SBPC Report explained that financial products such as PayPal Credit harm students who use them to pay tuition at such schools by charging extremely high interest rates, usually more than four times the most expensive student loans, utilizing questionable underwriting practices, using misleading promotions to advertise the loans, including a lack of adequate and clear disclosure of deferred interest arrangements, and aiding in aggressive debt collection practices.  According to the SBPC Report, aggressive debt collection practices include withholding diplomas and copies of transcripts, and revoking professional certifications in the event a student defaults on a loan.  The SBPC Report observes that some students have reported hundreds of robocalls made to them to collect on student debts.

71.   64.  On August 21, 2020, the SBPC and three other civic organizations sent letters highlighting the misleading practices of PayPal Credit to Defendants PayPal and Schulman, and to the Director of the CFPB and the Acting Comptroller of the Currency (hereafter the "SBPC Letters").[11]  The SBPC Letters explained that PayPal Credit was marketed to vulnerable students

---

[10] *Shadow Student Debt* (July 2020), STUDENT BORROWER PROTECTION CENTER, https://protectborrowers.org/wp-content/uploads/2020/12/Shadow-Student-Debt.pdf.

[11] *Available at* Press Release, Student Borrower Protection Center, *PayPal's Partnerships With Over 150 For-Profit Schools Drive Students to Take on High-Cost Education Debt, Advocates Warn* (Aug. 21, 2020), https://protectborrowers.org/150-2/ (last visited Jan. 24, 2022).

with misleading deferred interest schemes.  In particular, the promotions that advertised PayPal Credit's core product and service—the free interest for six months loan—failed to properly explain and disclose that failing to pay off the entire balance within six months would result in retroactive interest charges from the date of purchase, and that the entire unpaid interest would be added to the total principal balance.

72.  65. The SBPC Letters also described how PayPal Credit charged an annual interest rate of 25.4%, which was more than four times the cost of some of the most expensive student loans, on top of other charges such as late fees.  The SBPC Letters also asserted that PayPal engaged in "aggressive collection practices that increase costs and compound the harm caused to borrowers in distress."  SBPC Letters at 5.  Specifically, according to the SBPC Letters, upon default, PayPal Credit "charges the borrower for any expenses associated with the collection of the borrower's debt." *Id.* (citing PayPal Credit Offer Details, captured at https://perma.cc/48VV-369W (captured July 17, 2020)).  Further, according to the SBPC Letters, upon death, PayPal "reserves the right to 'request payment of the full amount due right away' from the estate of the deceased borrower." SBPC Letters at 5 (citing PayPal Credit Offer Details).

73.  66. The SBPC Letters emphasized that "the immense expense" of the PayPal Credit product and the "precarious financial situations student borrowers are likely to face after graduating from these institutions make it unlikely that many borrowers will be able to avoid triggering this costly provision."  Indeed, default rates at for-profit schools, especially the types of for-profit trade schools that PayPal and its merchants specifically targeted, are notoriously high, and often exceed 40%.[12]  Hence, in vetting for-profit schools, PayPal knew or recklessly disregarded that students at those schools did not understand its cost and most likely would not be able to pay the loans back, yet allowed and enabled the schools to promote the misleading loans to students.  In the last few years alone, the interest rate for PayPal Credit has ranged from 19.99% to as high as 26.24%.  Given

---

[12] *See* Mike Brown, *Defaulting on student loans is an issue across the board, but new legislation could make colleges think twice before raising tuition*, BUSINESS INSIDER (Dec. 12, 2019), https://www.businessinsider.com/defaulted-student-loans-new-legislation-colleges-raise-tuition-2019-12.

1   the financially perilous situation of students at for-profit institutions, and the high rate of default

2   associated with these schools, PayPal knew that the risk of default was extremely high when it

3   offered and serviced these loans, yet failed to ensure that any terms and conditions of these loans

4   did not contain any misrepresentations or that students received the full benefit of the promotions

5   as represented by the for-profit schools.

6        74.   67.  "Appendix I" to the SBPC Letters identified over 150 colleges, career

7   academies, certificate programs, and other educational institutions that prominently advertised

8   PayPal Credit as a preferred option for students to finance tuition-related expenses.  Lead Plaintiffs

9   investigated the educational institutions identified in Appendix I, and found that PayPal Credit has

10  been misleadingly promoted as far back as 2013, three years before the Class Period began and two

11  years before the 2015 Consent Order was entered.[13]  For example, the Utah Academy of Emergency

12  Medicine offered PayPal Credit on February 12, 2013.  Several for-profit trade schools have

13  misleadingly promoted PayPal Credit's 6-month deferred-interest scheme since at least 2014.  For

14  example, EMT Utah promoted the following in 2014: "Pay with Pay Pal [sic] 'Bill me later' and

15  get up to 6 months to pay!"   Bill Me Later is the prior name of PayPal Credit.[14]

16       75.   68.  As of the date the SBPC Letters were released in August 2020, Lead Plaintiffs'

17  investigation found that numerous institutions identified by the SBPC still promoted interest-free

18  financing arrangements with PayPal Credit without clearly and prominently explaining that

19  interest would be charged from the date of purchase in the event that the student failed to pay off

20  the entire balance within six months.  For example, the Diversity Training University International

21  ("Diversity") offered a "no-interest payment option" through PayPal Credit to pay for tuition-

22  related expenses beginning, at the latest, April 12, 2015, or over one year before the Class Period

23

---

24  [13] Lead Plaintiffs discovered some of the misleading promotions through The Wayback Machine,

25  a digital archive available on the Internet that allows users to view the layout and content of a
    particular webpage in the past even if the webpage has changed or is later removed.

26

27  [14] *See* Devindra Hardawar, *PayPal rebrands Bill Me Later as PayPal Credit, businesses already
    borrowing over $150M*, VENTUREBEAT (July 30, 2014),

28  https://venturebeat.com/2014/07/30/paypal-rebrands-bill-me-later-as-paypal-credit-businesses-
    already-borrowing-over-150m/

began.  The following misleading promotion appeared on Diversity's webpage for, at least, five years starting on April 12, 2015:

- **Is there a payment plan option for paying the registration cost over time?** We are happy to announce that a payment plan is possible through our partnership with PayPal Credit. It allows you to pay in installments and even with a no interest charge option. Click on the link below by the NEW sign.

76. ~~69.~~ Numerous other institutions also misleadingly promoted PayPal Credit for multiple years during the Class Period.  For example, Healing Our Core Issues Institute, a program for training therapists, advertised without the requisite disclosures mandated by federal law from November 6, 2018, until no earlier than July 27, 2020: "We are pleased to offer **PayPal Credit** which provides you with six month no payments and no interest.  Please register and pay below."  Another institution identified in Appendix I, the Academy of Ancient Reflexology, which provided physical therapy training, promoted the following from October 27, 2018 to July 27, 2020: "you can apply to use the PayPal Credit Program if you are in the USA.  They give you six months to pay your tuition, interest free."   Similarly, the Emergency Training Academy misleadingly promoted the following from November 29, 2019 to November 27, 2020: "Need financial assistance, you can apply for PayPal Credit and take 6 months to pay for the course."

77. ~~70.~~ These and similar misleading promotions violate the CFPA and 2015 Consent Order because they omitted to clearly and prominently disclose that the loan would be subject to interest and other incidental fees from the date of purchase unless the total balance was paid in full within six months, and that, in the event of nonpayment, the accrued interest and other fees would be added to the principal balance of the loan.  The 2015 Consent Order specifically prohibited Defendants from making any misleading promotions about deferred interest, and as CW1 confirms, the CFPB was particularly concerned about the impact of misleading deferred interest promotions, and that the focus of the 2015 Consent Order was to make sure that consumers understood what the payment rules were.  Throughout the Class Period, Defendants enabled for-profit institutions' misleading promotions relating to PayPal Credit to students in violation of the 2015 Consent Order.  The 2015 Consent Order further specifically required Defendants to police

all merchants and ensure that the merchants provided the full benefit of the promotion exactly as they represented it.  These misleading promotions were represented as six months of free interest without any caveats when that was not actually the case.  As such, the promotions were not honored or received by consumers as represented by the merchants, in violation of the 2015 Consent Order.  At the very least, Defendants knew or recklessly disregarded that these misleading promotions increased the Company's regulatory risk and rendered their statements to investors concerning specific compliance with the 2015 Consent Order and numerous other compliance-related statements materially misleading when made.

78.  71. For the same reasons, the misleading promotions constitute unfair acts or practices under the CFPA because (1) they are likely to cause substantial injury that would harm the students' welfare, leading students to incur thousands of dollars in debt, (2) the injuries are not reasonably avoidable by consumers because the promotions failed to clearly and prominently disclose the terms and conditions of the offer, and (3) the injuries to consumers are not outweighed by benefits to consumers. 12 U.S.C. §§ 5531, 5536.

79.  72. As the SBPC's Report shows, enrolling in these for-profit trade schools and financing tuition-related expenses through PayPal Credit causes students to experience debt-to-income ratios "that make[] it impossible to attain any degree of economic security."  SBPC Report at 11.  Both the CFPB and the federal courts have found such lending schemes to be abusive under the CFPA.  In fact, the CFPB's Complaint against Defendant PayPal—which precipitated the 2015 Consent Order—noted that PayPal had then engaged in abusive deferred-interest acts or practices because consumers did not clearly understand how payments were applied to deferred-interest schemes or how PayPal allocated consumers' payments.  CFPB Complaint ¶¶ 35-39.  Federal courts have also sustained CFPA claims of similar abusive practices against lenders and schools that offered credit to students likely to default.  *See Consumer Fin. Prot. Bureau v. ITT Educ. Servs., Inc.*, 219 F. Supp. 3d 878, 918 (S.D. Ind. 2015); *Illinois v. Alta Colleges, Inc.*, No. 14 C 3786, 2014 WL 4377579, at *2 (N.D. Ill. Sept. 4, 2014).

80.  73. PayPal also violated the 2015 Consent Order in other ways.  One of the principal findings in the CFPB Complaint was that PayPal enrolled customers in PayPal Credit without their

1   knowledge or consent.  CFPB Complaint ¶ 3.  The 2015 Consent Order prohibits PayPal from

2   enrolling customers in PayPal Credit without their knowledge or consent in the future.  2015

3   Consent Order ¶ 17.  PayPal was also required to submit a Compliance Plan to ensure that

4   consumers would be informed before they were enrolled in PayPal Credit.  *Id.* ¶¶ 42-43.  Further,

5   the 2015 Consent Order's reporting obligations required PayPal to submit to the CFPB a written

6   progress report of how the Compliance Plan was being implemented within 90 days of the CFPB's

7   non-objection to a draft of the Compliance Plan, and again within one year after the submission

8   of the initial progress report.  *Id.*  ¶¶ 48-49.

9       81.   ~~74.~~ Still, PayPal continued to enroll customers in PayPal Credit without their

10  knowledge or consent long past these deadlines.  CW11 worked at PayPal from June 2016 to June

11  2018 as a Senior Operations Strategy Analyst.  CW11 reported to Shashank Rajadhyaksha, who

12  was the Director of Global Consumer/Seller Collections Strategy.  CW11 was a member of the

13  Collections Strategy team and was responsible for developing plans to optimize collections and

14  recoveries.   As a member of the Collections Strategy team, CW11 periodically listened to

15  recordings of PayPal's outbound collection calls.  CW11 noted that some of these calls involved

16  instances where customers explained that they were not aware that they had a PayPal Credit

17  account, nor did they recall giving their consent to enroll in such an account.  CW11 estimated

18  that, during the first four or five months of his tenure, that one or two out of every five or seven

19  calls involved customers who did not know that they had a Pay Credit account.

20      82.   CW18 worked for PayPal as an Executive Escalations Legal Analyst from April

21  2018 to August 2019, and Executive Escalations Legal Specialist from October 2005 to April 2018

22  at the Company's office in Omaha, Nebraska.  CW18 was a member of the PayPal team that

23  helped form the Company's original relationship with the CFPB.  CW18 explained that the

24  handling of the CFPB was moved from the legal side to the complaint department of the

25  escalations department around the time the Company agreed to the Consent Order in 2015.  CW18

26  recalled that the 2015 Consent Order with the CFPB related to consumers of Bill Me Later

27  complaining of having been enrolled in that product without their consent.  CW18 advised that

28  Bill Me Later eventually became PayPal Credit.

83.     CW19 worked as an executive escalations specialist from 2007 to 2019, whose job duties included responding to regulatory complaints and customer complaints addressed to the CEO.  CW19 recalled customers commonly complained through the CFPB about PayPal enrolling customers in PayPal Credit without their consent.  CW19 explained that this likely occurred between 2016 and 2017.  CW19 attended meetings with management about customers being enrolled in PayPal Credit without their consent, and noted that this issue was known throughout the company.  CW19 reported that customers needed to uncheck a box that automatically enrolled them in PayPal Credit, meaning enrolling in PayPal Credit was done automatically unless customers opted out.  CW19 reported that it continued to receive complaints about this issue after it had supposedly been fixed, and that management was aware of the continuing complaints after the issue had reportedly been fixed.  CW19 noted that management's response to the reports were that the issue was in fact fixed and that any ongoing issues must have been due to customer error.

84.     CW20 worked at PayPal out of PayPal's Omaha, Nebraska office from September 2013 to August 2022 as a Debit Cart Specialist, Merchant Services Support Specialist, Executive Escalations Consultant, Customer Success Manager and Deal Desk Manager.  CW20 recalled an "urgent messenger" message PayPal sent out to inform employees about the Consent Order, which explained that the Consent Order was about customers being enrolled in PayPal Credit without their consent or knowledge.  From September 2015 through July 2016, CW20 worked as an Executive Escalations Consultant.  In CW20's role as an Executive Escalations Consultant, CW20 reviewed complaints that were forwarded from CEO Dan Schulman and CFO John Rainey along with other PayPal executives, or that were forwarded by their executive assistants on their behalf.  CW20's team would work on the complaints forwarded from the CEO and CFO or other PayPal executives, or their executive assistants, and provide a "complete overview of the complaint" and very specific details on the resolution of those complaints were then sent back to Schulman and Rainey.  CW20 added that these complete overviews and details resolutions were "100% sent to him," meaning Schulman, as a response if it was forwarded from him or his executive assistant.

85.     CW14 worked for PayPal from May 2010 through July 2018 as a Collections Support Agent, Sell Risk Appeals Agent and as a Merchant Reactive Risk Analyst out of PayPal's

1    Chandler, Arizona office.  From May 2010 to June 2012, CW14 worked with Bill Me Later

2    customers to obtain payments, as well as inform them about payment options.  From February

3    2013 to July 2018, CW14 held the role of Merchant Reactive Risk Analyst.  CW14 explained that

4    PayPal making customers use PayPal Credit for purchases instead of their preferred payment

5    methods was a longstanding issue dating back to when PayPal Credit was still Bill Me Later.

6    While working in Collections, CW14 recalled that customers would unknowingly sign up for

7    PayPal Credit automatically if they clicked an on-screen option of no payments for six months or

8    no interest for six months.  CW14 explained that PayPal checkout offers had been deemed unclear

9    for customers, leading to the 2015 CFPB Consent Order.  CW14 recalled speaking with customers

10   who clicked the no interest for six months option did not know they were enrolling in PayPal

11   Credit.  CW14 spoke with multiple customers who used Bill Me Later to fund education.  CW14

12   recalled customers mistakenly believing that they had taken loans from the school, and that Bill

13   Me Later had allowed for tuition to be paid using that service.  CW14 explained that PayPal's

14   Acceptable Use Policy existed as its own division.

15        86.     In addition, Plaintiffs received documents from the CFPB, pursuant to a FOIA

16   request, in which consumers, after the Consent Order had been entered, complained that they had

17   been signed up for PayPal Credit without their consent.  CW14's description of PayPal customers

18   unknowingly signing up for PayPal Credit is consistent with these complaints.  The following

19   example illustrates that the CFPB continued to receive complaints from customers, who were

20   enrolled in PayPal Credit without their consent, until, at least, July 2018:

21

22

23

24

25

26

27

28

From:        (b)(6)    (b)(6)
To:          Betts, Kristina (CFPB)
Sent:        7/8/2018 6:45:04 AM
Subject:     Paypal Credit without my consent

I contacted Paypal regarding receiving both online and written billing statement that I owed a payment to Paypal Credit.  I did not enroll in their credit program.  My payments either are paid thru my Paypal balance or thru my bank (b)(6)         The charge they are billing me for is just a small amount, $26.74, and I suppose I should just go ahead and pay it, especially to avoid the hassle.  I have excellent credit  history and I don't want a bad review or decrease in my credit score.  On the bill, neither online nor in the bill I rec'd in the mail, there is no explanation for the charge.  I contacted Paypal and objected to this billing, and they apologized, saying they take great care in helping customers, but I received another bill today from Paypal credit for same amount.

87.  ~~75.~~ PayPal was not in compliance with the 2015 Consent Order because it continued to enroll customers in PayPal Credit without their knowledge or consent after it was entered.

### 2. The Misleading Promotions to Students Offering PayPal Credit Violated Regulation Z Throughout the Class Period

88.  ~~76.~~ The Truth in Lending Act (TILA) of 1968 aims to promote the informed use of consumer credit.  Regulation Z, its implementing federal regulation, became effective on July 1, 1969.  According to the CFPB, the purpose of TILA and Regulation Z is:

> to ensure that credit terms are disclosed in a meaningful way so consumers can compare credit terms more readily and knowledgeably. Before its enactment, consumers were faced with a bewildering array of credit terms and rates. It was difficult to compare loans because they were seldom presented in the same format. Now, all creditors must use the same credit terminology and expressions of rates.[15]

89.  ~~77.~~ TILA requires disclosures about both the terms and the cost of loans in order to standardize how borrowing costs are calculated and disclosed.  The regulatory responsibility to enforce TILA was transferred to the CFPB from the Federal Reserve with the passage of the CFPA on July 30, 2011.

---

[15] *Truth in Lending Act (TILA) examination procedures* (updated Oct. 22, 2021), CFPB, https://www.consumerfinance.gov/compliance/supervision-examinations/truth-in-lending-act-tila-examination-procedures/ (last visited Jan. 24, 2022).

90. 78. Regulation Z requires specific disclosures for advertisements offering deferred-interest financing.  Under Regulation Z, an "[a]dvertisement means a commercial message in any medium that promotes, directly or indirectly, a credit transaction." 12 C.F.R. § 1026.2.  Regulation Z applies to businesses and persons "that offer[] or extend[] credit" when four conditions are met: "(i) The credit is offered or extended to consumers; (ii) The offering or extension of credit is done regularly; (iii) The credit is subject to a finance charge or is payable by a written agreement in more than four installments; and (iv) The credit is primarily for personal, family, or household purposes." 12 C.F.R. § 1026.1.  Here, PayPal Credit offers and extends credit to millions of consumers each year, the loan is payable in more than four installments, and the loan is used for personal, family, and household purposes, such as educational expenses.  PayPal therefore "offers" and "extends" credit and is subject to Regulation Z.

91. 79. Furthermore, Regulation Z requires *all persons*, not just actual creditors or those directly marketing the products or services, to comply with the advertisement provisions under 12 C.F.R. § 1026.16.  *See* CFPB Official Interpretation to 12 C.F.R. § 1026.2. ("All *persons* must comply with the advertising provisions in §§ 1026.16 and 1026.24, not just those that meet the definition of creditor in § 1026.2(a)(17)") (emphasis original).  Pursuant to Regulation Z, "[i]f a deferred interest offer is advertised, the deferred interest period must be stated in a clear and conspicuous manner in the advertisement."  12 C.F.R. § 1026.16(h)(3).  It emphasizes that "*[i]f the phrase 'no interest' or similar term regarding the possible avoidance of interest obligations under the deferred interest program is stated, the term 'if paid in full' must also be stated in a clear and conspicuous manner preceding the disclosure of the deferred interest period in the advertisement.*" *Id*.  It requires further that the statement "**if paid in full**" be stated in "immediate proximity to each statement of 'no interest,' 'no payments,' 'deferred interest,' 'same as cash,' or similar term regarding interest or payments during the deferred interest period."  *Id*. Because this provision has been in effect since December 30, 2011, there is no doubt that PayPal was on notice that advertisements could not simply state "no interest" without the accompanying disclaimers.

92. 80. The CFPB has released an Interpretation of this Regulation, stating:

> For written or electronic advertisements, information required to be disclosed in § 1026.16(h)(4)(i) and (ii) that is in the same paragraph as the first statement of "no

interest," "no payments," "deferred interest," or "same as cash" or similar term regarding interest or payments during the deferred interest period is deemed to be in a prominent location closely proximate to the statement. ***Information disclosed in a footnote is not considered in a prominent location closely proximate to the statement.***

93. ~~81.~~ The Interpretation also explains that examples of "disclosures that could be used to comply with the requirements of § 1026.16(h)(3) include: 'no interest if paid in full within 6 months' and 'no interest if paid in full by December 31, 2010.'"

94. ~~82.~~ The misleading promotions identified by the SBPC, including those investigated by Lead Plaintiffs, did not comply with Regulation Z.  As explained above, numerous institutions identified by the SBPC, and that were brought to the attention of Defendant Schulman, failed to clearly and prominently disclose in immediate proximity to the promotion as required by Regulation Z that interest would not be charged only if the entire balance was paid off in full within six months, and the failure to do so would result in accrued interest from the date of purchase, all incidental fees and all unpaid interest being added to the total principal balance.

95. ~~83.~~ To illustrate, on July 27, 2020, the Academy of Real Estate & Mortgage's webpage contained the following misleading promotion expressly highlighting the PayPal Credit product, employing the PayPal logo, and linking to PayPal's website pursuant to the terms of its contracts with PayPal, all in violation of Regulation Z:

---

6 Months Same as Cash Available Now Through PayPal Credit



Use PayPal Credit's digital, reusable credit line to shop our courses, and get 0% interest for 6 months on purchases of $99+ every time you shop. Get a credit decision in seconds with a quick application.

PayPal Credit gives you the flexibility to pay for your purchases right away or pay over time. It's easy to apply, easy to use, and it's there whenever you need it. **PayPal Credit is subject to credit approval.**

To learn more about PayPal Credit, visit their PayPal Credit page.

---

96. ~~84.~~ During the Class Period, promotions offered by the Academy of Real Estate & Mortgage and other for-profit schools failed to include the required "if paid in full" language in a clear and conspicuous manner, and in close proximity to the terms and conditions promoting the specifics of the offer.  By engaging in misleading advertising in partnership with its merchants

and not preventing its merchants from advertising PayPal's services in a misleading manner, PayPal violated Regulation Z.

      **3.**    **PayPal Continues to Violate Federal Statutes and Regulations Despite Misleading, Public Assurances that it Would Stop**

    97.  85. In response to the SBPC Letters, PayPal's authorized spokesperson, Defendant Gallo told a reporter from the Washington Post that the Company took the SBPC's claims "very seriously."  According to an article published in the Washington Post on August 21, 2020, Gallo said that PayPal "adheres to all state and federal regulations to ensure clear, easy to understand information about credit products" and misleadingly claimed that PayPal has "no direct relationship" with the career training schools referenced in the SPBC Letters.  Gallo did say, however, that "[i]f an organization is found to be using inaccurate or misleading messaging or characterization about PayPal Credit products without our prior knowledge or consent, we will quickly move to terminate the use of our services."[16]  On August 27, 2020, Yahoo Finance published an article, in which Gallo misleadingly stated that: "We have already begun taking action against some of the entities mentioned in the letter that have been found to be using inaccurate or misleading messaging/characterization of our products."[17]  These statements were materially misleading when made, as fully explained in Paragraphs 136148 through 139151.

---

[16] Danielle Douglas-Garbriel, *Consumer groups alarmed by PayPal's role in education finance want regulators to investigate*, WASH. POST (Aug. 21, 2020), https://www.washingtonpost.com/education/2020/08/21/consumer-groups-alarmed-by-paypals-role-education-finance-want-regulators-investigate/.

[17] Aarthi Swaminathan, PayPal cracks down on for-profit 'schools' misrepresenting PayPal Credit, YAHOO FINANCE (Aug. 27, 2020), https://www.yahoo.com/now/pay-pal-credit-for-profit-schools-213858404.html.

98.   86. After the SBPC Letters were sent in August 2020, several of the misleading promotions found by Lead Plaintiffs were taken down, indicating that PayPal knew or recklessly disregarded that they were misleading.  However, numerous misleading promotions remained online despite Defendants' false assurances to have them removed.  For example, the Academy of Real Estate & Mortgage continued to misleadingly promote interest-free offers in the name of PayPal Credit, linking to PayPal itself as of October 28, 2020, in violation of Regulation Z, the CFPA and the 2015 Consent Order:

> **6 Months Same as Cash Available Now Through PayPal Credit**
>
> Use PayPal Credit's digital, reusable credit line to shop our courses, and get 0% interest for 6 months on purchases of $99+ every time you shop. Get a credit decision in seconds with a quick application.
>
> PayPal Credit gives you the flexibility to pay for your purchases right away or pay over time. It's easy to apply, easy to use, and it's there whenever you need it. **PayPal Credit is subject to credit approval.**
>
> To learn more about PayPal Credit, visit their PayPal Credit page.

99.   87. Starting since at least, July 26, 2020, the Academy of Makeup Artistry Cammua has advertised: "You can then apply for PayPal credit. With PayPal you get 6 months no payment and no interest." In violation of Regulation Z, it does not clearly and prominently disclose that interest is deferred only "if paid in full" in close proximity to the advertisement.  This misleading promotion remains remained online as of January 25, 2022.  Similarly, "LearnBuildEarn," an online course on developing online businesses, advertises: "PAYPAL CREDIT ($2497): No Payments Or Interest For 6 Months," without complying with Regulation Z.  This misleading promotion went online no later than July 27, 2020, and it remains remained online as of January 25, 2022.  The Stroia School of Driving has advertised the following since July 27, 2020: "we offer several payment options, including a $350 discount and 6 months interest free financing with full payment upfront (through PayPal Credit - restrictions apply)."   As with the others, these misleading promotions do not contain the required clear and prominent disclosure that interest is only free if the PayPal Credit balance is paid in full within six months.

100.   88. At least eight for-profit schools identified in the SBPC Letters are were still misleadingly promoting no-interest financing arrangements through PayPal Credit as of January

25, 2022, in direct violation of Regulation Z.  By continuing to not stop or prevent, and/or failing to monitor this conduct despite taking the onus to do so and despite false, public assurances of compliance, PayPal's representations concerning compliance with the law generally and compliance with the 2015 Consent Order specifically were rendered misleading.

**D.  PayPal's Participation in a Shadow Banking Scheme that Circumvents and Evades Federal Regulations Substantially Increased the Risk of Regulatory Scrutiny and Investigations Throughout the Class Period**

101.  89. During the Class Period, the Company issued several debit cards by using Bancorp as a conduit to evade and circumvent the EFTA and Regulation II's restrictions on excessive and disproportionate interchange fees, most of which went directly to the Company with a sliver of the fees handed to Bancorp and other parties to maintain the facade.

102.  90. A debit transaction results in the transfer of funds from a consumer's bank account into a merchant's bank account using the consumer's bank account credentials.  The merchant's bank is known as the "acquiring bank" or the "acquirer" and the bank or entity that holds the consumer's account is known as the "issuing bank" or the "issuer."  When a transaction is authorized by the issuer, debit networks such as Visa or Mastercard guarantee the funds to the merchant.  Debit networks contract with the acquiring bank and the issuer.  The acquiring bank and the issuer, in turn, contract with merchants and consumers respectively.  Merchants are typically charged two types of fees by the debit networks.  Network fees are owed to the debit networks such as Visa, Mastercard or American Express to process the transactions and "interchange" fees are paid to the issuer that holds the consumer's account.  The following illustration breaks down how a payment transaction works and how various aspects of the transactional fees and costs are split between all the relevant entities:

1

2



Figure 1. How a payment transaction works¹

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19      103.   ~~91.~~ At Senator Richard J. Durbin of Illinois's insistence, Section 1075 of the Dodd-

20  Frank Wall Street Reform and Consumer Protection Act amended the EFTA (15 U.S.C. § 1693 *et*

21  *seq.*) to add a new section that prohibits excessive interchange fees charged to debit card

22  transactions, and seeks to prevent monopolization by forbidding issuers and debit networks from

23  requiring exclusivity or restricting the number of unaffiliated networks that process debit card

24  transactions.  This new provision is known as the "Durbin Amendment," 15 U.S.C. § 1693o-2,

25  and it was subsequently implemented by the Federal Reserve pursuant to a federal regulation on

26  Debit Card Interchange Fees and Routing known as "Regulation II."   12 C.F.R. Part 235.

27  Regulation II became effective on October 1, 2011.

28

104. 92. Regulation II implemented the Durbin Amendment's limitation that interchange fees must be reasonable and proportional to the actual cost incurred by the issuer with respect to a debit card transaction. 15 U.S.C. § 1693o-2(a)(2). Pursuant to Section 253.3(b) of Regulation II, interchange fees to the issuer must not exceed 21 cents plus 0.05% multiplied by the total value of each transaction. 12 C.F.R. § 235.3(b). Prior to the implementation of Regulation II, banks reaped an average of 40 cents per transaction, nearly twice the average amount allowed today.

105. 93. Section 235.5 of Regulation II, however, contains an exemption for small issuers, so long as the smaller issuers actually hold the account that is debited, and their assets, together with their affiliates, do not exceed $10 billion as of the end of the year preceding the date of the debit transaction. 12 C.F.R. § 235.5(a)(1)(i)-(ii). Defendant PayPal exploits this loophole even though it does not qualify as a small issuer by partnering with a small bank and claiming on the basis of the size of its partner bank that it is not bound by the interchange caps of Regulation II. Today, issuers like PayPal that claim to be exempt from Regulation II charge higher, pre-Durbin Amendment interchange rates of 0.80% to 1.05% plus 15 to 20 cents on top as a transaction fee.

106. 94. Data from the Federal Reserve shows that Defendant PayPal and others claiming to be exempt from interchange caps earn an average of 44 cents per debit transaction, twice the amount earned by banks that comply with the regulatory cap imposed by Regulation II.[18]

107. 95. PayPal has partnered with Bancorp, a bank with less than the $10 billion asset threshold specified in Regulation II, to issue debit cards bearing the name of PayPal's brands, including the Venmo debit card, the PayPal Business Mastercard, and the PayPal Cash Card. Bancorp has total assets of less than $7 billion. Similarly, Block Inc., formerly known as Square Inc. ("Square"), has partnered with the Sutton Bank ("Sutton") of Ohio to issue debit cards bearing the name of its own brands.

108. 96. Analysts and the market know that PayPal splits the interchange fees with Bancorp, but PayPal has concealed the exact nature of its sharing agreement with Bancorp and has

---

[18] Tanay Jaipuria, *Fintech and Regulatory Arbitrage: Understanding the Durbin Amendment*, SUBSTACK (May 24, 2021) https://tanay.substack.com/p/fintech-and-regulatory-arbitrage.

1    not disclosed what percentage of the interchange fees it keeps for itself.[19]   However, Plaintiffs are

2    informed and believe that PayPal keeps the overwhelming majority of the interchange fees for

3    itself.  Plaintiffs base their belief on recent disclosures of similar splits involving Square, PayPal's

4    direct competitor, Marqeta Inc. ("Marqeta"), and Sutton Bank.   Marqeta, a card issuing platform

5    that creates customized debit cards for Square and derives most of its revenues principally from

6    interchange fees, recently went public in June 2021.  Its Prospectus filed with the SEC disclosed

7    that virtually all the interchange fees are pocketed by Square.  Sutton Bank is merely being used

8    as a conduit to violate or evade the regulatory cap on interchange fees imposed by Regulation II:



Note: assumes unregulated debit interchange. 2020 financials from Marqeta S-1

21           109.   ~~97.~~ Besides using Bancorp as a mere conduit, PayPal is also an issuer of the Venmo

22    debit card, the PayPal Business Mastercard, and the PayPal Cash Card as that term is defined in

---

[19] Timothy Chiodo, CFA, et al., *PayPal: Pay with Venmo: Q3 2020 expanded rollout & Honey integration to bolster consumer network & engagement (flywheel)*, CREDIT SUISSE EQUITY RESEARCH, (June 29, 2020),
https://research-doc.credit-suisse.com/docView?language=ENG&format=PDF&sourceid=csplusresearchcp&document_id=1082668641&serialid=DaCyy58s6vW063zYJzAjXKhqbvknmFHXjulPoBeoSws%3D&cspId=null.

1  both the EFTA and Regulation II.  Section 1693o-2(c)(9) of the EFTA defines an issuer as "any
2  person who issues a debit card, or credit card, or the agent of such person with respect to such
3  card."  15 U.S.C. § 1693o-2(c)(9).  Pursuant to Section 1693o-2(a)(6)(B) of the EFTA, the
4  definition of an issuer under the exemption for small issuers is limited to the person that holds the
5  asset account to be debited.  The PayPal Cash Card's user agreement explicitly states that Bancorp
6  does not hold the customer's PayPal balance account funds.  Similarly, the Venmo debit card's
7  user agreement states that debit purchases of the customer are funded by the customer's Venmo
8  balance held by Venmo.  Likewise, PayPal Business Mastercard payments are debited from the
9  customer's PayPal balance.  The definition of an "issuer" in Regulation II is also extremely broad
10 and is not limited to bank holding companies.  Under Section 235.2(k) of Regulation II, an issuer
11 is defined as "any person that authorizes the use of a debit card to perform an electronic debit
12 transaction," 12 C.F.R. § 235.2(k), and the definition of a person includes natural persons such as
13 the Individual Defendants or corporations such as Defendant PayPal, 12 C.F.R. § 235.2(n).
14 Because PayPal is the issuer of the Venmo debit card, the PayPal Business Mastercard, and the
15 PayPal Cash Card that holds the customers' funds, it is not exempt from Regulation II because its
16 total assets of over $74 billion exceed by sevenfold the threshold for Regulation II's $10 billion
17 exemption.

18 110. 98. The Federal Reserve's Official Board Commentary on Regulation II also
19 includes PayPal in its definition of issuer: "A person issues a debit card by authorizing the use of
20 debit card by a cardholder to perform electronic debit transactions.  That person may provide the
21 card directly to the cardholder or *indirectly by using a third party* (such as a processor, or a
22 telephone network or manufacturer) to provide the card, or other payment code or device, to the
23 cardholder."[20]  The Federal Reserve's responses to public comments during the agency rulemaking
24 process make clear that Defendant PayPal cannot indirectly provide debit cards by using third
25 parties such as Bancorp to flout the letter and spirit of Regulation II and keep most of the
26 interchange fees for itself.  For instance, in response to a public comment expressing concern that

27 ────────────────

28 [20] *See* App. A to 12 C.F.R. pt. 235.

large banks would use smaller banks as conduits to evade Regulation II and reap higher interchange fees, the Federal Reserve stated that "*as a matter of law, agents are held to the same restrictions with respect to the agency relationships as their principals . . . [f]or example, if an issuer uses a third-party processor to authorize, clear, or settle transactions on its behalf, the third party processor may not receive interchange fees in excess of the issuer's permissible amount*." 77 Fed. Reg. 43,394, 43,413.  As the issuer of the Venmo debit card, the PayPal Business Mastercard, and the PayPal Cash Card that holds the balances of a customer's Venmo and PayPal accounts, respectively, PayPal has violated Regulation II's explicit prohibition of circumvention or evasion, which states that "[n]o person shall circumvent or evade the interchange transaction fee restrictions in §§ 235.3 and 235.4." 12 C.F.R. § 235.6(a).

111. 99. On October 23, 2020, the Clearing House Association, a research and analysis organization focused on financial regulation, submitted a public comment to the Federal Reserve expressing its concerns that PayPal and other large fintech companies were evading or circumventing the regulatory cap on interchange fees imposed by Regulation II.  In addition to raising some of the same concerns described in Paragraphs 92104 through 98110, the Clearing House Association observed in its letter to the Federal Reserve that large fintech companies such as PayPal regularly place only a small fraction of the funds accessible through debit cards on deposit with small banks like Bancorp.  As such, even if PayPal is not considered the issuer of a debit card, it operates a decoupled debit arrangement for which the small issuer exemption is categorically prohibited.

112. 100. According to the Federal Reserve's Official Board Commentary on Regulation II, "[i]n a decoupled debit card arrangement, transactions that are authorized by the card issuer settle against the cardholder's account held by an entity other than" the issuing bank.[21]  The Federal Reserve's Official Commentary on Regulation II further states that the bank issuing a decoupled debit card is not entitled to the small issuer exemption even if its total assets, together with its affiliates, are less than $10 billion because it is not the holder of the account to be debited.

---

[21] *See supra* n.20.

113.   101. Thus, neither PayPal nor Bancorp qualified for the exemption they exploited to generate the excess interchange fee revenues that PayPal reported to investors, which were twice Regulation II's limit.  PayPal did not disclose to investors that revenues from the interchange fees (that already exceed hundreds of millions of dollars and would increase proportionally with Venmo's explosive growth) were derived from circumventing Regulation II's cap on interchange fees in violation of federal law.

114.   102. On October 9, 2019, Bancorp received a subpoena from the SEC seeking records related to its debit card activity.  Bancorp has disclosed the receipt of this subpoena in its SEC filings and further disclosed that it has received and complied with additional subpoenas from the SEC.

115.   103. After receiving documents and other information from Bancorp, which revealed specific details about the gross dollar volume data related to the debit cards marketed with the PayPal and Venmo brands, the SEC subpoenaed PayPal itself.  PayPal did not disclose that it had received a subpoena from the SEC seeking information about whether the interchange rates paid in connection with the issuance of debit cards bearing its own licensed brands are compliant with Regulation II, until July 29, 2021, or 21 months after Bancorp was first subpoenaed by the SEC.  Plaintiffs are informed and believe that the PayPal subpoena signals the opening of a formal SEC enforcement action targeting PayPal, because SEC rules require a formal enforcement action to be opened before a subpoena is issued, and Bancorp has publicly maintained that the SEC has not accused it of wrongdoing despite having its documents since 2019.  On July 29, 2021, an article published on Bloomberg News also stated that PayPal faced an SEC probe related to the interchange fees associated with its debit cards.

116.   104. Further, as of December 16, 2021, the CFPB also ordered PayPal to produce information on buy now, pay later arrangements because the agency is concerned about merchants paying a percentage of the purchase price to PayPal, which is similar to interchange fees, and taking improper advantage of consumers with subprime credit history.[22]

---

[22] Press Release, CFPB, *Consumer Financial Protection Bureau Opens Inquiry into "Buy Now, Pay Later" Credit* (Dec. 16, 2021), https://www.consumerfinance.gov/about-

**PAYPAL AND THE INDIVIDUAL DEFENDANTS MADE FALSE OR
MISLEADING STATEMENTS DURING THE CLASS PERIOD**

117.    105. The Class Period begins on April 27, 2016, when PayPal held a conference call to announce the financial results for the first quarter of 2016.  At this conference call, Defendant Schulman made the following materially false and misleading statements concerning the strength of PayPal's "compliance infrastructure" particularly as it related to PayPal Credit and misleadingly claimed that the Company's regulatory interests were aligned with the interests of regulators:

**Daniel Schulman**

*****

Being a leading global payments provider requires exceptional effort and continued investment in our risk and compliance functions across all of our markets and all of our product areas. There are many reasons to do this. We live in a time where global terrorism and cybercrime are on the rise and as a result, increasing our focus on compliance is obviously the right thing to do.

***But we are also investing in these areas because we know that a strong risk and compliance infrastructure is a deep competitive advantage. And the more advanced our capabilities in these areas, the greater the trust our customers will have in PayPal and in our ever-expanding value proposition. A great example of this is the relationship we have built with our regulators as it relates to our PayPal Credit offerings. We have seen our Net Promoter Score for PayPal Credit jump to over 70% in March, a clear demonstration that what regulators want and what we want are truly aligned around delighting and protecting our customers.***

*****

118.    106. The statements identified in Paragraph 105117 were materially false and misleading when made because they omitted to disclose that before this statement was made: (a) PayPal continued to enroll customers in PayPal Credit without their knowledge or consent and offered or extended PayPal Credit to students at for-profit educational institutions through misleading promotions in violation of both the 2015 Consent Order and federal consumer financial laws as particularized in Paragraphs 3842 through 88100, (b) PayPal violated the 2015 Consent Order by failing to ensure that the terms and conditions of any ***deferred-interest*** offer did not contain ***any*** misrepresentations and that customers received, at least, the benefit of the promotions

---

us/newsroom/consumer-financial-protection-bureau-opens-inquiry-into-buy-now-pay-later-credit/.

1   *as represented by the merchant*, (c) Defendants knew or recklessly disregarded that enrolling

2   customers without their consent or offering or extending credit to vulnerable students at predatory

3   educational institutions would, at least, invite regulatory scrutiny given the clear terms of the 2015

4   Consent Order, and as a result, (d) PayPal's interests were not "aligned" with the regulators

5   "around delighting and protecting" customers because PayPal's credit practices put the Company

6   on the radar of regulators, as it was then violating the 2015 Consent Order by engaging in unfair,

7   deceptive and abusive acts and practices in violation of both its specific obligations enumerated

8   in that Order as well as the CFPA.

9   119. ~~107.~~ On April 28, 2016, PayPal also filed with the SEC its quarterly financial report

10  for the first quarter of 2016 on Form 10-Q.  In this quarterly report, PayPal misleadingly claimed

11  that non-compliance with laws and regulations could adversely impact its business, but assured

12  investors that it closely monitored the relevant landscape to ensure compliance:

> We operate globally and in a rapidly evolving regulatory environment characterized
> by a heightened regulatory focus on all aspects of the payments industry. ***That focus
> continues to become even more heightened as regulators on a global basis focus
> on such important issues as countering terrorist financing, anti-money
> laundering, privacy and consumer protection.*** Some of the laws and regulations to
> which we are subject were enacted recently and the laws and regulations applicable
> to us, including those enacted prior to the advent of digital and mobile payments, are
> continuing to evolve through legislative and regulatory action and judicial
> interpretation. ***Non-compliance with laws and regulations, increased penalties and
> enforcement actions related to non-compliance, changes in laws and regulations
> or their interpretation, and the enactment of new laws and regulations applicable
> to us could have a material adverse impact on our business, results of operations
> and financial condition. Therefore, we monitor these areas closely to ensure
> compliant solutions for our customers who depend on us.***

22  120. ~~108.~~ The statements identified in Paragraph ~~107~~119 were materially false and

23  misleading when made for the same reasons identified in Paragraph ~~106~~118.  In addition, the

24  statements identified in Paragraph ~~107~~119 were materially false and misleading when made

25  because they omitted to disclose that: (a) PayPal Credit was offered through misleading promotions

26  in violation of the 2015 Consent Order, the CFPA, Regulation Z and other federal consumer

27  financial laws, to students who needed money to pay tuition-related expenses at for-profit

28  educational institutions such as the Diversity Training University International  since, at least, 12

1   months before this misleading statement was made, (b) PayPal earned unreasonable and

2   disproportionate interchange fees from debit card transactions in violation of Regulation II, (c)

3   PayPal Credit's misleading promotions to students and PayPal's deliberate use of Bancorp as a

4   conduit to evade or circumvent the plain language of both the EFTA and Regulation II would, at

5   the very least, substantially increase the likelihood of intense regulatory scrutiny, (d) PayPal

6   Credit's own history of consumer fraud and ongoing violations of the 2015 Consent Order

7   significantly increased the risk of regulatory investigations before this statement was made, and as

8   a result (e) the failure to comply with the law was not merely a possible, generic risk faced by any

9   other company in the fintech industry, but ***would*** negatively impact the Company's business, results

10  of operations and financial condition and yet,  PayPal was not closely monitoring consumer

11  protection laws or financial regulations to ensure compliance.

12      121.   ~~109.~~ On July 26, 2016, PayPal filed with the SEC its quarterly financial report for

13  the second quarter of 2016 on Form 10-Q.  The quarterly report for the second quarter of 2016

14  contained the following misleading statements specifically about compliance with the 2015

15  Consent Order:

16      In May 2015, we entered into a Stipulated Final Judgment and Consent Order
        ("Consent Order") with the CFPB in which we settled regulatory claims arising from
17      PayPal Credit practices between 2011 and 2015. The Consent Order included
        obligations on PayPal to pay $15 million in redress to consumers and a $10 million
18      civil monetary penalty, and required PayPal to make various changes to the PayPal
        Credit disclosures and related business practices. ***We continue to cooperate and***
19      ***engage with the CFPB and work to ensure compliance with the Consent Order,***
        ***which may result in us incurring additional costs associated with compliance or***
20      ***redress.***

21

22      122.   ~~110.~~ The statements identified in Paragraph ~~109~~121 were materially false and

23  misleading when made for the same reasons identified in Paragraph ~~106~~118.  In addition, and more

24  specifically, PayPal was not "work[ing] to ensure compliance with the Consent Order," and

25  instead knew or recklessly disregarded the high risk of regulatory scrutiny and investigations

26  because: (a) PayPal Credit was offered to students in violation of the CFPA, TILA and Regulation

27  Z even though the 2015 Consent Order prohibits making any misrepresentations about the terms

28  and conditions of a deferred-interest promotion, (b) PayPal did not take the necessary steps to

1  ensure that merchants honored the promotions or offered the benefits to consumers, at least, as the

2  promotions were advertised as required by the 2015 Consent Order, or provide appropriate

3  remediation, and (c) PayPal continued to enroll customers in PayPal Credit without their

4  knowledge or consent before this statement was made.

5      123.   111. The quarterly financial report for the second quarter of 2016 contained the

6  following misleading statements about the mere potential reduction in interchange fees earned

7  from PayPal's debit cards:

8      *Changes in how consumers fund their PayPal transactions could harm our business.*

9      *\*\*\*\*\**

10     In addition, in some jurisdictions, governments have required Visa and MasterCard
       to reduce interchange fees, or have opened investigations as to whether Visa's or
11     MasterCard's interchange fees and practices violate antitrust law. In the United
       States, the Federal Reserve Board issued a final rule capping debit card interchange
12     fees at significantly lower rates than Visa or MasterCard previously charged. In the
       European Union, the Multilateral Interchange Fee Regulation limits credit and debit
13     interchange fees for payments and imposes business rules on card processing
14     services. ***Any material reduction in credit or debit card interchange rates in the
       United States or other markets could adversely affect our competitive position
15     against traditional credit and debit card service providers, and may subject us to
       pricing pressure, although it would also lower our costs. Future changes to those
16     regulations could potentially adversely affect our business.***

17

18     124.   112. The statements identified in Paragraph 111123 were materially false and

19  misleading when made because they omitted to disclose that there was already a high risk of

20  increased regulatory scrutiny or a reduction in the interchange fees that PayPal earned from its debit

21  cards because: (a) PayPal was the issuer of the debit cards under the plain language of Regulation

22  II and it did not meet the small issuer exemption because its assets exceeded $10 billion at that

23  time, (b) PayPal used Bancorp as a conduit to circumvent and evade the requirements of Regulation

24  II, and (c) whether or not the issuer, PayPal was categorically prohibited from exploiting the small

25  issuer exemption for its decoupled debit card arrangement with Bancorp.

26     125.   113. The quarterly financial report for the second quarter of 2016 also contained the

27  same misleading statements concerning PayPal's attempt to monitor the regulatory landscape to

28  ensure compliance with all laws that are identified in Paragraph 107119. These statements were

materially false and misleading when made for the same reasons identified in Paragraphs ~~106~~118 and ~~108~~120.

126.   ~~114.~~ On October 25, 2016, PayPal filed with the SEC its quarterly financial report for the third quarter of 2016 on Form 10-Q.  The quarterly report for the third quarter of 2016 contained substantially the same materially false and misleading statements identified in Paragraphs ~~107~~119, ~~109~~121 and ~~111~~123.  These statements were materially false and misleading when made for the same reasons identified in Paragraphs ~~106~~118, ~~108~~120, ~~110~~122 and ~~112~~124.

127.   ~~115.~~ On January 26, 2017, PayPal held a conference call to announce the financial results for the fourth quarter of 2016.  At this conference call, Defendant Schulman made the following materially false and misleading statements about "the regulatory environment":

**Q  -  James Cakmak, Analyst**

Thanks. Just two quick ones. Just on the regulatory environment, anything you can provide on how you're thinking about it this year look as you look at Durbin, CFPB, so forth. And then just on mobile, I know it's up 53% this quarter and we saw the step-up in 2016 versus 2015. I guess as we anniversary One Touch and I guess Xoom next year, what's the magnitude of the step-down that we should expect? Thanks a lot.

*****

**A  -  Daniel Schulman**

Good point. Let me talk a little bit about the change in administration and how we think about it in terms of impacting our business. I'll start off, of course, it's incredibly early days and there's a lot of talk about different things, but we've yet to see specifics around that. So, let's just talk about a couple of them because I know they're on your mind.

***From a regulatory perspective, obviously, people are talking about changes in Dodd- Frank, changes in potentially how the CFPB is managed. Look, the first and most important thing is we are completely focused on being compliant with any and all regulatory environments that are out there. We believe that what regulators want, what we want are completely aligned and we are investing a tremendous amount of resource. But from a development of platform, human resource perspective, to assure that we are as compliant as we possibly can be regardless about the regulatory environment shifts. That's not just here in the US. It's obviously across the world.***

128.   ~~116.~~ The statements identified in Paragraph ~~115~~127 were materially false and misleading when made because they omitted to disclose that: (a) PayPal violated the 2015 Consent

1   Order because of the misleading deferred-interest promotions offered or extended to students

2   through PayPal Credit, (b) PayPal issued debit cards in violation of Regulation II or otherwise used

3   Bancorp as a conduit to circumvent or evade Regulation II, (c) the regulatory problems described

4   in (a) and (b) of this Paragraph substantially increased the risk of regulatory scrutiny or

5   investigations into PayPal's practices, and as a result, (d) PayPal's interests were not "aligned," but

6   diverged from the actual interests of regulators since PayPal was not "completely focused on being

7   compliant with any and all regulatory environments that are out there."

8       129.    117. On February 8, 2017, PayPal filed with the SEC its Annual Report for the fiscal

9   year 2016 on Form 10-K (hereafter "the 2016 10-K").  The 2016 10-K contained substantially the

10  same materially false and misleading statements identified in Paragraphs 107119, 109121 and

11  111123.  These statements were materially false and misleading for the same reasons identified in

12  Paragraphs 106118, 108120, 110122 and 112124.   In addition, the 2016 10-K contained the

13  following materially false and misleading statements about the mere potential risk of regulatory

14  challenges to the interchange fees earned by PayPal:

15      *Interchange Fees*. Interchange fees associated with four-party payments systems
        are being reviewed or challenged in various jurisdictions. For example, in the
16      European Union, the Multilateral Interchange Fee ("MIF") Regulation (which
        became effective in December 2015) caps credit and debit interchange fees for
17      cards payments and provides for business rules to be complied with by any
        company dealing with card transactions, including PayPal. ***As a result, the fees that***
18      ***we collect in certain jurisdictions may become the subject of regulatory***
        ***challenge***.
19

20      130.    118. The statements identified in Paragraph 117129 were materially false and

21  misleading when made for the same reasons identified in Paragraph 112124.

22      131.    119. On April 27, 2017, PayPal filed with the SEC its quarterly financial report for

23  the first quarter of 2017 on Form 10-Q.  In this quarterly report, PayPal made substantially the same

24  materially false and misleading statements concerning the steps it took to ensure compliance with

25  the 2015 Consent Order identified in Paragraph 109121.  These statements were materially false

26  and misleading when made for the same reasons identified in Paragraphs 106118 and 110122.

27

28

132.   120.   On May 22, 2017, Defendant Rainey attended the J.P. Morgan Global Technology, Media and Telecom Conference, and made the following materially false and misleading statements:

**Q - Tien-Tsin Huang, Analyst**

Got you. So interchange is one of the elements of transaction expense, and I've been asking this question, so I'll ask you this to you as well, just around Durbin, if that is repealed, which, by the way, Visa and Mastercard seem to think it's not likely to happen. But if it were to be repealed, I mean, how would you approach that? Would you simply reprice, John, or are there some other things you could do?

**A - John D. Rainey**

*Well, it's important to first understand that what regulators want and what we want are very much aligned. We want a transparent and compelling value proposition for our customers, and I tend to also agree with the comments from Visa and Mastercard about the likelihood of that.*

*****

133.   121.   The statements identified in Paragraph 120132 were materially false and misleading when made for the same reasons identified in Paragraph 116128.  As such, PayPal's interests were not "aligned," but diverged from the actual interests of regulators, and PayPal Credit was then failing to provide a "transparent" "value proposition" for customers.

134.   122.   On July 27, 2017, PayPal filed with the SEC its quarterly financial report for the second quarter of 2017 on Form 10-Q.  In this quarterly report, PayPal made substantially the same materially false and misleading statements about complying with the 2015 Consent Order identified in Paragraph 109121.  These statements were materially false and misleading when made for the same reasons identified in Paragraphs 106118 and 110122.

135.   123.   On October 27, 2017, PayPal filed with the SEC its quarterly financial report for the third quarter of 2017 on Form 10-Q.  In this quarterly report, PayPal made substantially the same materially false and misleading statements about monitoring regulations and complying with the 2015 Consent Order identified in Paragraphs 107119 and 109121.  These statements were false and misleading when made for the same reasons identified in Paragraphs 106118, 108121 and 110122.

136.   124. On February 7, 2018, PayPal filed with the SEC its Annual Report for the fiscal year 2017 on Form 10-K (hereafter "the 2017 10-K").  The 2017 10-K contained substantially the same false statements identified in Paragraphs 107119, 109121, 111123 and 117129.   These statements were false and misleading when made for the same reasons identified in Paragraphs 106118, 108120, 110122 and 112124.

137.   125. On May 24, 2018, PayPal held an Investor Day.  At this event, Defendant Rainey made the following materially misleading statements in his opening remarks:

**John D. Rainey**

*****

 The last area, not as interesting, but a very important one is G&A. And I want to spend a moment just so that you understand what's happened here. So if you look at 2015 to '16, I think it's very important to understand, this was the time period where we were really coming out of another company, we did an IPO and a lot of the G&A functions, we needed to prop up. So we spent a lot of money on this area in the early quarters. ***We also spend a lot of money in compliance. Compliance was probably our single largest investment that we made in the last year, but we view that as a competitive advantage as we look at what it takes to rollout product across the world and Sri talked about reg-tech. This is something that gives us an advantage versus our competitors and this is an investment that will pay off for years***. But very, very significantly, we don't have to continue to do that. These cost as a percentage of revenue, we expect will come down over time.

*****

138.   126. The statements identified in Paragraph 125137 were materially misleading when made because they omitted to disclose the substantially increased risk of regulatory scrutiny resulting from the violations of the CFPA, TILA and Regulations Z and II as particularized in Paragraphs 3842 through 104116, and hence PayPal did not then have a superior compliance program that gave it an "advantage" compared to its competitors or a benefit of "pay off[s] for years."

139.   127. On February 7, 2019, PayPal filed with the SEC its Annual Report for the fiscal year 2018 on Form 10-K (hereafter "the 2018 10-K").  The 2018 10-K contained substantially the same materially false and misleading statements identified in Paragraphs 107119, 109121, 111123

and ~~117~~129.   These statements were false and misleading when made for the same reasons identified in Paragraphs ~~106~~118, ~~108~~120, ~~110~~122 and ~~112~~124.

140.   ~~128.~~ On April 25, 2019, PayPal filed with the SEC its quarterly financial report for the first quarter of 2019 on Form 10-Q.  In this quarterly report, PayPal made substantially the same materially false and misleading statements about monitoring regulations and complying with the 2015 Consent Order identified in Paragraphs ~~107~~119 and ~~109~~121.   These statements were materially false and misleading when made for the same reasons identified in Paragraphs ~~106~~118, ~~108~~120 and ~~110~~122.

141.   ~~129.~~ On July 25, 2019, PayPal filed with the SEC its quarterly financial report for the second quarter of 2019 on Form 10-Q.  In this quarterly report, PayPal made substantially the same materially false and misleading statements about monitoring regulations and complying with the 2015 Consent Order identified in Paragraphs ~~107~~119 and ~~109~~121.   These statements were materially false and misleading when made for the same reasons identified in Paragraphs ~~106~~118, ~~108~~120 and ~~110~~122.

142.   ~~130.~~ On October 24, 2019, PayPal filed with the SEC its quarterly financial report for the third quarter of 2019 on Form 10-Q.  In this quarterly report, PayPal made substantially the same materially false and misleading statements about monitoring regulations and complying with the 2015 Consent Order identified in Paragraphs ~~107~~119 and ~~109~~121.   These statements were materially false and misleading when made for the same reasons identified in Paragraphs ~~106~~118, ~~108~~120 and ~~110~~122.

143.   ~~131.~~ On February 6, 2020, PayPal filed with the SEC its Annual Report for the fiscal year 2019 on Form 10-K (hereafter "the 2019 10-K").  The 2019 10-K contained substantially the same materially false and misleading statements identified in Paragraphs ~~107~~119, ~~109~~121, ~~111~~123 and ~~117~~129.   These statements were materially false and misleading when made for the same reasons identified in Paragraphs ~~106~~118, ~~108~~120, ~~110~~122 and ~~112~~124.

144.   ~~132.~~ On May 7, 2020, PayPal filed with the SEC its quarterly financial report for the first quarter of 2020 on Form 10-Q.  In this quarterly report, PayPal made substantially the same materially false and misleading statements about monitoring regulations identified in Paragraph

107119.  These statements were materially false and misleading when made for the same reasons identified in Paragraphs 106118 and 108120.

145.   133.  On May 28, 2020, Defendant Schulman attended Bernstein's 36th Annual Strategic Decisions Virtual Conference.  There, an analyst asked Schulman about the competitive environment and PayPal's competitive risk.  In response, Schulman misleadingly touted the resources allegedly plugged into PayPal's compliance program.  While he conceded that compliance was foundational to the success of the business, he left investors with the impression that PayPal was already "execut[ing]" on compliance requirements:

**Q  - Harshita Rawat, Analyst**

And Dan, we are running out of time. So my last question for you is, one of the most frequently asked questions I get on PayPal, which is the flip side on the strategic opportunity, which is the competitive risk. So there, core button still drive a sizable portion of your revenue and profits. So how do you see the competitive environment evolving for PayPal over the next two to three years?

**A  - Daniel Schulman**

….Our products and services have never been more important and more relevant. We've never had more opportunity to actually invest behind that, and I'm probably more energized, focused. My team might say relentless and demanding, but it's energizing for everybody in terms of the opportunity in front of us. This is all we do. This isn't a sideshow to us.

***Digital payments isn't part of what we do. It is what we do. And I think if we can execute against the three to five things that are most important, and we've had the fortune, that opportunity to have been investing hundreds of millions of dollars into risk and compliance in our platform. Like these are foundational. Without it, you can't do the other things.***

***Those are closing in on, like, I hold them up to almost anybody has maybe not world class because I never want to say that, but that's certainly what we are aspiring to in all of those pieces of it. But now we can build on those, and we've got wherewithal and the demand for it. So I think that's what we're focused on right now, how do we move into more parts of that addressable market, and how do we become even more a daily part of our customer's lives.***

146.   134.  The statements identified in Paragraph 133145 were materially false or misleading when made for the same reasons identified in Paragraph 126138.  In addition, the statements were materially false and misleading when made because by this time, (a) PayPal

1   Credit was offered with misleading promotions by numerous for-profit educational institutions in

2   violation of the 2015 Consent Order, the CFPA, TILA and Regulation Z as identified and

3   particularized in Paragraphs 38<u>42</u> through 88<u>100</u> and (b) PayPal earned even more income from

4   the Venmo debit card that was introduced in 2018 in violation of Regulation II, and as a result, (c)

5   instead of "execut[ing]" on risk and compliance on its platform, PayPal faced increased risk of

6   regulatory scrutiny and investigations.

7       <u>147.</u>   135. On July 30, 2020, PayPal filed with the SEC its quarterly financial report for

8   the second quarter of 2020 on Form 10-Q.  In this quarterly report, PayPal made substantially the

9   same materially false and misleading statements about monitoring regulations and complying with

10  the 2015 Consent Order identified in Paragraphs 107<u>119</u> and 109<u>121</u>.   These statements were

11  materially false and misleading when made for the same reasons identified in Paragraphs 106<u>118</u>,

12  108<u>120</u> and 110<u>122</u>.

13      <u>148.</u>   136. In immediate reaction to the SBPC Letters sent to Defendant Schulman and

14  CFPB on August 21, 2020, an article providing the Company's position about shadow student debt

15  was published in the Washington Post that same day.  Through the article, Defendants tried to blunt

16  the impact of the SBPC Letters with false statements in an attempt to manage the decline in the

17  price of PayPal's common stock and avert scrutiny and criticism of the Company. Specifically,

18  Defendant Gallo claimed to take the SBPC's Letters "very seriously," stated that PayPal "adheres

19  to all state and federal regulations to ensure clear, easy to understand information about products,"

20  and alleged that PayPal has "no direct relationship" with the career training schools mentioned in

21  the SBPC Letters.  Gallo also claimed in a written statement submitted to the Washington Post that

22  "[i]f an organization is found to be using inaccurate or misleading messaging or characterization

23  about PayPal Credit products without our prior knowledge or consent, we will quickly move to

24  terminate the use of our services."  Gallo affirmatively said that, in fact, PayPal had already acted

25  against the schools named in the SBPC Letters.

26      <u>149.</u>   137. The statements identified in Paragraph 136<u>148</u> were materially false and

27  misleading when made because: (a) PayPal Credit's deferred interest promotions were not provided

28  with clear or easily understood terms, but instead repeatedly violated the CFPA, TILA and

Regulation Z, (b) PayPal's attempt to distance itself from the career training schools was misleading because PayPal itself took the responsibility to ensure that merchants complied with both the 2015 Consent Order and the law generally as described in Paragraphs ~~38~~42 through ~~43~~47, and the 2015 Consent Order **required** PayPal to ensure that for-profit schools provided the promotions exactly as advertised by the for-profit schools, (c) the true nature of PayPal's so-called "world-class" compliance program is riddled with such chronic problems that several misleading promotions identified in the SBPC Letters remain on the Internet ~~even today~~after the Class Period despite PayPal's false assurances to the contrary, as demonstrated by the particularized allegations contained in Paragraphs ~~85~~97 through ~~88~~100.

150.   ~~138.~~ On August 27, 2020, Yahoo Finance published an article entitled "PayPal cracks down on for-profit 'schools' misrepresenting PayPal Credit." In this article, Gallo was again quoted as stating on behalf of PayPal: "We have already begun taking action against some of the entities mentioned in the letter that have been found to be using inaccurate or misleading messaging/characterization of our products." Gallo again misrepresented that "PayPal is focused on ensuring that our services are used for intended purposes and we take the claims outlined in this letter very seriously. PayPal does not market PayPal Credit directly to for-profit educational institutions or other associated entities and the company has no direct relationship with entities in question regarding PayPal Credit."

151.   ~~139.~~ The statements identified in Paragraph ~~138~~150 were materially false and misleading when made for the same reasons identified in Paragraph ~~137~~149.

152.   ~~140.~~ On November 3, 2020, PayPal filed with the SEC its quarterly financial report for the third quarter of 2020 on Form 10-Q. In this quarterly report, PayPal made substantially the same materially false and misleading statements about monitoring regulations and complying with the 2015 Consent Order identified in Paragraphs ~~107~~119 and ~~109~~121. These statements were materially false and misleading when made for the same reasons identified in Paragraphs ~~106~~118, ~~108~~120 and ~~110~~122.

153.   ~~141.~~ On February 5, 2021, PayPal filed with the SEC its Annual Report for the fiscal year 2020 on Form 10-K (hereafter "the 2020 10-K"). The 2020 10-K contained substantially the

same materially false and misleading statements concerning monitoring regulations and interchange fees identified in Paragraphs ~~107~~119, ~~111~~123 and ~~117~~129.  These statements were materially false and misleading when made for the same reasons identified in Paragraphs ~~106~~118, ~~108~~120 and ~~112~~122.

154.   ~~142.~~ On February 11, 2021, PayPal held another Investor Day.   At this event, Defendant Schulman misleadingly touted PayPal's "world class" compliance program as a "competitive advantage" and a "foundational" element behind the Company's increased pace of product development and success:

*****

**Daniel Schulman**

The reason that that's been happening and the reason we've had such dramatic increases in the past five years and expect even more going forward is the breadth of our product portfolio. When we were together five years ago at our very first Investor Meeting and I showed our product portfolio, it basically consisted of PayPal Checkout and our P2P capabilities, our peer-to-peer capabilities. Five years later, due to the tremendous performance of our product teams and our engineering teams, as well as all the acquisitions we've made, we have a robust portfolio of products and services across our consumer and merchant portfolios. And this is just the beginning. We introduced more products than ever before in 2020. We intend to increase that pace in 2021. ***And part of the reason why we can increase the pace of our product development is that we've invested in foundational capabilities. Our risk management and our compliance teams are now world class.***

***When I first came to PayPal some six and a half years ago, we had only a couple of hundred people in our risk management and compliance functions. Today, we have almost 4,000 people in our risk management and compliance functions and I consider that investment to be a competitive advantage. If you look at some of these headlines, you can see the things that we've been able to accomplish. And we are now able to work hand-in-hand with our product teams, our risk teams, our compliance teams to rapidly deploy products and capabilities, working hand-in-hand with regulators across the world.***

*****

155.   ~~143.~~ The statements identified in Paragraph ~~142~~154 were materially false and misleading because before these statements were made: (a) PayPal continued to violate the 2015 Consent Order and federal consumer financial laws, (b) PayPal failed to remove the misleading promotions, including, at least, eight promotions identified in the SBPC Letters that violate the

CFPA, TILA and Regulation Z and remain on the Internet even though Defendants PayPal and Schulman had actual knowledge of the SBPC Report and the SBPC Letters and PayPal had made false assurances to have the misleading promotions removed, and as a result (c) PayPal's compliance team was neither "world class" nor a "competitive advantage" that "rapidly deploy[ed] products and capabilities, working hand-in-hand with regulators across the world."

156.   144. On February 23, 2021, Defendant Bland, the Senior Vice President and General Manager of Global Credit, attended the KBW Payments FinTech Conference and made the following materially false and misleading statements in response to pointed analyst questions about the changing "regulatory backdrop":

**Q  - Sanjay Sakhrani, Analyst**

Yeah. It's really interesting. I guess you guys are coming in as a relatively newer player even though you've been doing in other geographies in the US. And I had an opportunity to meet with the Synchrony team too and they were definitely saying Buy Now Pay Later is definitely something that's going to be here to stay and they might enter in some capacity. So you're going to have a lot of different players coming in and out of the market. How do you view that from a competitive standpoint for PayPal? And then maybe you could even tie in the fact that the regulatory backdrop is changing with the new administration and sort of how you feel that they might weigh in on the industry?

**A  - Doug Bland**

Yeah. Great questions. And we operate in a competitive environment across all of our products. So we're going to continue to focus on doing what we always do, which is serving our buyers and sellers to the best of our abilities within the network. *We're going to focus on delivering great products, great experiences and a commitment to doing what is right for our customers through transparency to make sure people understand what these products are, which is a form of a credit product, which brings me to the question that you have around regulation.* And we think regulators are rightfully working to ensure that buyers and sellers are protected with the rise of BNPL products, and ensure that they are informed regarding the risks of an installment transaction.

*So we will continue to work with regulators to ensure our products are responsibly used that they're serving the purpose to provide buyers with increased flexibility and control. And as you've heard me talk earlier, it's all about flexibility and choice and the ability to better manage how they're able to make purchases.*

157.   145. The statements identified in Paragraph 144156 were materially false and misleading when made for the same reasons identified in Paragraph 143155. As such, PayPal did

not provide customers with "transparency" or ensure that customers clearly and prominently understood PayPal Credit's terms and conditions.  Nor did PayPal ensure that PayPal Credit was used responsibly "to provide buyers with increased flexibility and control."

158.   146. On May 6, 2021, PayPal filed with the SEC its quarterly financial report for the first quarter of 2021 on Form 10-Q.  In this quarterly report, PayPal made substantially the same materially false and misleading statements about monitoring regulations identified in Paragraph 107119.  These statements were materially false and misleading when made for the same reasons identified in Paragraphs 106118 and 108120.

159.   147. Further, Defendants knew, or at the very least were reckless in not knowing that a number of for-profit institutions—those explicitly listed in the SBPC's Letters—were still issuing misleading promotions related to PayPal Credit at the time the materially false and misleading statements were made as described in Paragraphs 6774 through 88100.

**LOSS CAUSATION**

160.   148. On August 21, 2020, the SBPC and other non-profit organizations announced in a press release that they had sent letters to Defendant Schulman and the CFPB concerning PayPal Credit's direct role in propping up the for-profit school industry with risky, high-cost loans through deceptive promotions and abusive deferred interest schemes.  The market's reaction to this news was muted because of Gallo's misleading statements on behalf of the Company in response to the SBPC Letters.  The Company's attempt to distance itself from the for-profit schools' misleading promotions successfully blunted the negative impact on the Company's stock price.  As a result, the price of PayPal's common stock declined by less than 1% to close at $196.79 on August 21, 2020 from its previous day closing price of $198.18 on August 20, 2020.

161.   149. On October 23, 2020, the Clearing House Association submitted a public comment to the Board of Governors at the Federal Reserve, Director of the Division of Reserve Bank Operations and Payments Systems, that detailed how companies in the fintech industry, including PayPal, evaded and circumvented the requirements of Regulation II.

162.   150. This partial disclosure or the materialization of the risks thereof caused the price of the Company's stock to decline by nearly 3% to close at $197.22 on October 26, 2020 from its previous trading day closing price of $203.04 on October 23, 2020.

163.   151. On July 29, 2021, Bloomberg News reported that the price of PayPal's common stock declined that day upon news that the Company faced probes from both the CFPB and the SEC.  The article published in Bloomberg News noted that the price of the Company's common stock continued to fall in late trading in New York after news of the investigations emerged.  On the same day, PayPal filed with the SEC its 2Q21 10-Q.  In this quarterly report, PayPal provided more details about the investigations, including that it had received a CID from the CFPB "related to the marketing and use of PayPal Credit in connection with certain merchants that provide educational services.  The CID requested the production of documents, written reports, and answers to written questions."  The 2Q21 10-Q further stated that PayPal had responded to subpoenas and requests for information from the Division of Enforcement at the SEC concerning "whether the interchange rates paid to the bank that issues debit cards bearing our licensed brands were consistent with Regulation II of the Board of Governors of the Federal Reserve System, and the reporting of marketing fees earned from the Company's branded card program."  The fact that the SEC is focused on how PayPal, not its conduits, reports to investors earns fees from the debit cards further supports the inference that PayPal is at the center of regulatory scrutiny.

164.   152. News of the CFPB and SEC investigations into PayPal's conduct caused the price of the Company's common stock to decline significantly over the next three days on extremely heavy trading volume.  On July 29, 2021, the price of the Company's common stock declined by over 6% from its previous day closing price of $301.98 to close at $283.17.  On July 30, 2021, Coinspeaker, a media outlet dedicated to the fintech industry, also published an article on the SEC investigation and stated that the price of the Company's common stock declined upon the announcement of news of the investigations on the previous day, and continued to decline on the following day as investors absorbed news about the investigations.  On July 30, 2021, the price of the Company's common stock declined further by over 2.6% from its previous day closing price of $283.17 to close at $275.53 as the market continued to absorb the news.  On July 31, 2021, it

again declined by 1.6% from its previous day closing price of $275.53 to close at $270.99 on heavy trading volume.

165.   153. These significant and repeated declines in the price of the common stock demonstrate that investors specifically and negatively reacted to the seriousness of regulatory scrutiny from multiple regulators.   The market's far more negative reaction to these announcements, as opposed to the less than 1% decline in the price of the Company's common stock in August 2020, alerted investors to the materialization of serious regulatory scrutiny, including the fact that the CFPB would discover violations of the 2015 Consent Order as particularized herein.  The news of regulatory scrutiny from the CFPB and the market's reaction to it demonstrates that investors understood that Gallo's previous misleading attempt to downplay the misleading promotions and distance the Company from predatory for-profit schools was false. News of regulatory scrutiny from the SEC further put nearly 30% of Venmo's revenue—the fastest growing of PayPal's seven core products—at serious risk.   The announcement of the SEC investigation into whether the issuance of PayPal's debit cards violated Regulation II further alerted investors to the fact that PayPal may have collected hundreds of millions of dollars in interchange fees each year for the past decade that it was not entitled to receive in the first place.

## ADDITIONAL ALLEGATIONS OF SCIENTER

### A. The Individual Responsibilities Imposed by the 2015 Consent Order on PayPal's Board of Directors and Senior Management Raise a Strong Inference of Scienter

166.   154. Since 2015, Defendant Schulman has served as a member of the Company's Board of Directors.  The 2015 Consent Order imposes a specific obligation on PayPal's Board to ensure that the Company complied with its terms and any federal consumer financial law in the future.  For each specific provision of the 2015 Consent Order, including the injunction to refrain from making any misleading promotions either directly or through approved merchants as fully described in Paragraphs 38 42 through 43 47, the 2015 Consent Order required the Board to (a) "[a]uthorize whatever actions are necessary for Defendants to fully comply with the Order," (b) "[r]equire timely reporting by management to the Board on the status of compliance obligations," and (c) "[r]equire timely and appropriate corrective action to remedy any material non-compliance

1  with any failures to comply with Board directives related to this Section."  2015 Consent Order ¶

2  41.

3  167.  155.  As senior members of PayPal's management, the Individual Defendants were

4  bound by law to take necessary steps to ensure that PayPal complied with the 2015 Consent Order

5  and take all necessary corrective measures to ensure that the Board did not breach its direct

6  responsibility to comply with the 2015 Consent Order and all federal consumer financial laws.  In

7  fact, the 2015 Consent Order further imposed an obligation to prepare and submit to the CFPB a

8  detailed Compliance Plan designed to prevent the offering, marketing and providing of PayPal

9  Credit in a misleading way, including a written description of procedures "to ensure that

10  consumers receive promotions advertised, ***including promotions advertised through merchants***."

11  2015 Consent Order ¶ 43.  The 2015 Consent Order required that the Compliance Plan impose

12  specific timeframes and deadlines for implementation of steps taken by the Company to prevent

13  any future harm to consumers.  The 2015 Consent Order's reporting obligations also required

14  PayPal to submit to the CFPB a written progress report of how the Compliance Plan was being

15  implemented within 90 days of the CFPB's non-objection to a draft of the Compliance Plan and

16  again within one year after the submission of the initial progress report.

17  168.  156. CW12 in fact, confirms that Defendants knew both about the seriousness of the

18  2015 Consent Order's obligations and the consequences of violating it.  CW12 was employed at

19  PayPal from April 2015 to July 2020.  Starting in January 2018, CW12 served as the Senior

20  Product Manager of Business Financial Solutions.  CW12 attended an all-hands meeting in 2015

21  before the Consent Order was entered where senior leaders of PayPal Credit, including Gary

22  Marino, the Senior Vice President of Global Credit for the Americas, discussed the "who, what,

23  when, where, how and why" of the 2015 Consent Order, including why complying with all of its

24  terms was critical to the Company's business and failing to comply with its terms would result in

25  detrimental consequences.  CW12 also stated that the Company created an internal "CFPB team"

26  within PayPal Credit's Project Management Office.  CW12 attended weekly or biweekly meetings

27  with the CFPB team where updates were provided on the steps taken to comply with the 2015

28  Consent Order and the risks that still remained.  CW12 also confirms that a Merchant Risk team

at PayPal was responsible for analyzing models that flagged high-risk merchants, and states that these models should have flagged predatory for-profit educational institutions.

169.    CW17 worked at PayPal during the Class Period as an employee in the Risk Management Organization, a role that involved participating in status updates pertaining to regulatory matters.  CW17 worked and interacted with Senior Vice President – Chief Risk and Compliance Officer Fiachre O'Neill, CFO John Rainey and CEO Dan Schulman.   CW17 confirmed that Defendants Schulman and Rainey received weekly or biweekly updates pertaining to regulatory matters impacting PayPal and the company's remediations and progress related to the 2015 Consent Order with the CFPB.  Specifically, CW17 stated, "The response is taken all the way up to Dan, Dan does review the response for everything having to do with the response to the Consent Order."  CW17 elaborated, stating that Defendants Schulman and Rainey "would get weekly updates" on PayPal's progress in responding to the Consent Order, noting: "Every response, every regulatory matter, John and Dan are required to know.  That's just part of the process."  CW17 added that Defendants Schulman and Rainey received regulatory updates from the heads of PayPal's various Lines of Businesses "as they were working through the remediations."  CW17 explained that the updates to Defendants Schulman and Rainey came in the form of a "CFPB Weekly Updates" report.  In addition, CW17 noted that Defendants Schulman and Rainey also received updates about the Consent Order as part of "blended documents" involving other matters.   According to CW17, Defendant Schulman and PayPal's Board of Directors received a "biweekly" report related to the Company's response to the Consent Order, while Chief Risk and Compliance Officer O'Neill "would receive them weekly" and Defendant Rainey "would get them monthly."  CW17 added that Defendants Schulman and Rainey were also present during "the required meetings" to discuss the Company's response to the Consent Order.

170.    Further, CW18 stated that the data from Executive Escalations was considered important at PayPal because of the potential for customer complaints to be taken to regulatory agencies.  CW18 explained that it took quite a bit of effort for the customers who did get their complaints through and/or around the normal complaint department and process to the executives, and that PayPal considered it as if these customers were willing to put that much effort into getting

their complaints to PayPal executives, that they would be willing to escalate it to a regulatory agency, such as the CFPB.  CW18 added that PayPal's internal concern for this potential escalation to regulatory agencies was important enough for the CEO and CFO to at least be made aware of the types of complaints that the Company was receiving.  CW18 also suggested that it was important to PayPal because the CEO and CFO were most likely made aware about the complaints to one degree or another, and especially anything that potentially fell under a Consent Order.

171. 157. Given Defendants' specific responsibilities to (1) create a Compliance Plan that prevents misleading promotions or other harm to consumers in the future, (2) arm themselves with specific knowledge to report on the status of compliance to the Board, including through information received from the CFPB and Merchant Risk teams, and (3) take immediate, corrective actions to prevent the Board from failing to ensure that the Company complied with the 2015 Consent Order and any federal consumer financial law, Defendants either knew about the misleading promotions offered by for-profit schools throughout the Class Period or recklessly disregarded them.  In fact, any attempt to disclaim knowledge of the widespread and continuing illicit practices would raise a strong inference that Defendants submitted a deficient Compliance Plan, falsely reported to the CFPB that adequate steps had already been taken to comply with the specifications of the 2015 Consent Order, and that the Board, including Defendant Schulman, failed to meet their specific obligations under the 2015 Consent Order.  These failures would constitute independent breaches of the 2015 Consent Order.

**B. The Individual Defendants Knew About the SBPC's Findings yet Failed to Take Appropriate, Corrective Actions Despite False Assurances to the Contrary**

172. 158. PayPal and Schulman knew about the SBPC's Report and the SBPC's Letters. One of the SBPC Letters was sent to Schulman personally.  CW2 is a Senior Policy Advisor and the Head of Investigations at the SBPC, who investigated PayPal and contributed to the SBPC's Report.  CW2 confirms that PayPal responded to the SBPC Letters by sending representatives from its Global Government Relations ("GGR") group to meet with the SBPC on at least two different occasions.

**C. Defendants' Own Statements Support an Inference of Scienter**

173.   159. ForThroughout the last five yearsClass Period, senior executives at PayPal, including Schulman and Rainey, have repeatedly held themselves out as knowledgeable about the Company's compliance with regulations, including compliance of the merchants with which PayPal contracted, and have acknowledged the importance of that issue to the Company. Specifically, they told investors that: (1) they and the Company understood that compliance with the law is foundational to the Company's success without which the Company could not compete or survive, (2) the Company's compliance program is a world class role model that Schulman himself has invested time and resources to support and improve, and (3) the Company's electronic platforms and other means of support are designed to ensure that ***merchants***, who use PayPal's products, are also complying with the law.

174.   160. For example, on an earnings conference call held on July 21, 2016, Defendant Rainey told investors that "since we've become an independent company, we've really tried to establish ourselves as at least aspiring to be best in class when it comes to compliance.  We think that, that's really important for us.  It's part of being a customer champion.  And so we've taken steps across every aspect of our business to improve our compliance."  In the same vein, even after the Class Period, at an investor conference held on September 23, 2021, Schulman continued to tout the state of PayPal's compliance regime and traced its history in this way: "I mean when I came in, there was something like 120 people inside PayPal focused on compliance, AML, financial crimes, and today we have over 4,000.  Just to give you an idea of how heavily I've invested on that front because it's foundational.  Just simple as that.  It is foundational."  At an investor conference held on May 28, 2020, during the Class Period, Schulman underscored the "foundational" nature of PayPal's compliance program: "we've had the fortune, that opportunity to have been investing hundreds of millions of dollars into risk and compliance in our platform. Like these are foundational.  Without it, you can't do the other things."

175.   161. Schulman's statements were parroted by other PayPal executives at numerous public events, who all acknowledged that PayPal was required to work with merchants to ensure compliance with all applicable laws and regulations.  At an investor conference held on November 10, 2016, Bill Ready, PayPal's Chief Operating Officer at the time, emphasized PayPal's purported

strength in ensuring that merchants comply with regulations: "And as part of the value we deliver to our customers is that when our merchants say, oh, my gosh, what's all this regulatory change mean? And we can say, don't worry; we got you, because we're just taking care of it. Those will be opportunities for us to go deliver value."  At an investor conference held on June 14, 2018, Juan Benitez, the General Manager of Braintree at PayPal, touted PayPal's strengths in compliance and told investors that those advantages placed PayPal in a unique position to ensure that merchants complied with the law too: "fulfilling our own responsibility that we have, which is well above what regulators would ask us to do, give us a unique position to be able to help others go do that and be an even greater partner for our merchants and consumers or for our merchants and platforms, unlike anyone else."  At an investor conference held on December 2, 2020, Dan Liberman, PayPal's President for Small Business, also underscored that PayPal had an active obligation to ensure merchant compliance with the law: "We're not just a pipe on the back end of that, we're engaging with the customer, we're helping platforms and marketplaces assess risk, do compliance reviews and other types of things to make sure that regardless of where the customers are coming from in the various sources of funnel and acquisition that we have a really consistent understanding of the needs."  Liberman continued: "We have a consistent understanding of the products that are relevant to them and we can get them activated quickly with all of the careful compliance and underwriting requirements that we all have in order to get there."

176.   ~~162.~~ Even more egregious are the statements Gallo made in response to the SBPC Letters.  On August 21, 2020, in response to the SBPC Letters, Gallo told a reporter from the Washington Post that "[i]f an organization is found to be using inaccurate or misleading messaging or characterization about PayPal Credit products without our prior knowledge or consent, we will quickly move to terminate the use of our services."[23]   The authorized PayPal representative also told the reporter from the Washington Post that the Company had already taken action against the for-profit schools that used inaccurate or misleading statements.  On August 27, 2020, PayPal's authorized representative similarly told Yahoo Finance that the Company took the SBPC Report

[23] *See supra* n.16.

"very seriously" and had already taken steps to remove misleading promotions offered by for-profit educational institutions.

177.   ~~163.~~ As fully explained in Paragraphs ~~136~~148 through ~~139~~151, these representations were materially false and misleading when made.  These undeniable facts reveal that, at least, as of August 2020, the Defendants knew about the misleading promotions, falsely assured investors and the public that they would remove them, yet failed to exercise the most basic diligence to fulfill that commitment because of chronic deficiencies in compliance despite contradictory statements made to investors throughout the Class Period as detailed in Paragraphs ~~105~~117 through ~~146~~159.

178.   ~~164.~~ Given Defendants' own statements, it is inconceivable that Defendants would not know, or did not recklessly disregard, that the misleading promotions offered by for-profit educational institutions violated the 2015 Consent Order and federal consumer financial laws, and that Defendants' misleading statements throughout the Class Period misled investors.

### D. Any Assumption Regarding Defendants' Lack of Knowledge that PayPal's Debit Cards Skirted Regulation II is Absurd

179.   ~~165.~~ Federal and State regulatory scrutiny regarding the high transactional costs and lack of competition that helps inflate interchange fees has been intense for over a decade since the Durbin Amendment was passed into law.  Recently, the Federal Reserve has again considered proposed rules to increase competition and limit fees reaped by financial services firms and debit networks, and the Department of Justice is currently investigating whether Visa has engaged in an anti-trust conspiracy to rig the debit card market.  PayPal's banking partner, Bancorp, was subpoenaed by the SEC in October 2019 with specific information requests concerning the issuance of debit cards and transaction volumes.  On October 23, 2020, the Clearing House Association submitted a public comment to the Federal Reserve describing how PayPal and other fintech companies that issued debit cards circumvented Regulation II, and PayPal's stock price declined as a result.  Given Defendants' statements about the importance of regulatory compliance and the time and resources that Schulman repeatedly claimed that he was personally devoting to compliance, it is not conceivable that Defendants did not know or did not recklessly disregard that,

at least, there was a serious risk that the issuance of debit cards circumvented or evaded Regulation II and that the Company would face an investigation and sanctions from the SEC as a result.

**E. Schulman's and Rainey's Stock Sales Enhance an Inference of Scienter**

180. ~~166.~~ During the Class Period, Schulman and Rainey took advantage of PayPal's artificially inflated stock price and collectively sold almost $168 million in insider sales. Schulman and Rainey did not sell any stock prior to the Class Period. These windfalls from stock sales dwarf Schulman's and Rainey's salaries, which were $1,000,000 and $750,000 for the year 2020. However, in violation of their duty to disclose all material information or refrain from trading after the SBPC Report was released in July 2020, and while both Defendants knew that PayPal was violating the 2015 Consent Order and federal consumer financial laws or, at the very least, knew that such facts would substantially increase regulatory scrutiny or spur regulatory investigations into the Company's conduct, Schulman and Rainey continued to sell stock in a manner that was out of line with their prior trading history over a comparable period in the past.

181. ~~167.~~ After the SBPC Report was released on July 17, 2020, Schulman sold over $53.6 million of PayPal's common stock, and Rainey sold over $20.8 million of PayPal's common stock:

**Schulman's Stock Sales[24] from July 17, 2020, to July 31, 2021**:

| Date | Shares Disposed | Price | Proceeds |
|---|---|---|---|
| 8/3/2020 | 25,000 | $196.8887 | $4,922,217 |
| 8/24/2020 | 25,000 | $198.2314 | $4,955,786 |
| 9/16/2020 | 25,000 | $183.8151 | $4,595,376 |
| 10/29/2020 | 25,000 | $195.4754 | $4,886,885 |
| 11/17/2020 | 25,000 | $193.1102 | $4,827,756 |
| 12/1/2020 | 25,000 | $217.7049 | $5,442,622 |
| 12/11/2020 | 25,000 | $212.6459 | $5,316,148 |
| 2/5/2021 | 10,000 | $267.7626 | $2,677,626 |
| 2/16/2021 | 10,000 | $304.3239 | $3,043,239 |
| 3/10/2021 | 10,000 | $244.2876 | $2,442,876 |
| 4/30/2021 | 10,000 | $263.1074 | $2,631,074 |
| 5/18/2021 | 10,000 | $245.5538 | $2,455,538 |
| 6/10/2021 | 10,000 | $267.7672 | $2,677,672 |

[24] Excluded from these charts are proceeds from shares withheld by PayPal in order to cover tax withholding obligations.

| | | | |
|---|---|---|---|
| 7/30/2021 | 10,000 | $276.8092 | $2,768,092 |
| **Total:** | **245,000** | | **$53,642,907** |

**Rainey's Stock Sales from July 17, 2020, to July 31, 2021**:

| Date | Shares Disposed | Price | Proceeds |
|---|---|---|---|
| 2/17/2021 | 5,377 | $298.0000 | $1,602,346 |
| 3/3/2021 | 73,758 | $261.1836 | $19,264,378 |
| **Total:** | **79,135** | | **$20,866,724** |

182. ~~168.~~ These sales were out of line with their prior trading history between July 2, 2019, and July 16, 2020.  In that specific period, Schulman sold $15,612,463 less than what he reaped from insider sales after the SBPC Report was released, and Rainey sold $9,390,782 less than what he reaped after the SBPC Report was released.

**Schulman's Stock Sales from July 2, 2019, to July 16, 2020:**

| Date | Shares Disposed | Price | Proceeds |
|---|---|---|---|
| 7/29/2019 | 30,000 | $111.9584 | $3,358,752 |
| 8/8/2019 | 30,000 | $107.0940 | $3,212,821 |
| 8/22/2019 | 30,000 | $108.6163 | $3,258,489 |
| 9/5/2019 | 30,000 | $110.8687 | $3,326,061 |
| 10/31/2019 | 30,000 | $104.0964 | $3,122,892 |
| 11/18/2019 | 30,000 | $103.4882 | $3,104,646 |
| 12/5/2019 | 25,719 | $104.7269 | $2,693,471 |
| 2/7/2020 | 25,000 | $119.0077 | $2,975,191 |
| 3/17/2020 | 25,000 | $96.6329 | $2,415,821 |
| 5/4/2020 | 25,000 | $122.6728 | $3,066,820 |
| 5/15/2020 | 25,000 | $144.1487 | $3,603,718 |
| 6/15/2020 | 25,000 | $155.6705 | $3,891,762 |
| **Total:** | **330,719** | | **$38,030,444** |

**Rainey's Stock Sales from July 2, 2019, to July 16, 2020:**

| Date | Shares Disposed | Price | Proceeds |
|---|---|---|---|
| 8/26/2019 | 7,283 | $107.2280 | $780,942 |
| 10/25/2019 | 5,507 | $104.4600 | $575,261 |
| 2/19/2020 | 5,460 | $122.6300 | $669,560 |
| 3/2/2020 | 87,925 | $107.4800 | $9,450,179 |
| **Total:** | **106,175** | | **$11,475,942** |

## **LEAD PLAINTIFFS' CLASS ACTION ALLEGATIONS**

183.   169. Lead Plaintiffs bring this Action as a class action pursuant to Federal Rule of Civil Procedure 23(b)(3) on behalf of all persons or entities that purchased or otherwise acquired PayPal's publicly traded stock during the period from April 27, 2016 through July 28, 2021, both dates inclusive.  Excluded from the Class are: the Defendants; the officers and directors of PayPal during the Class Period; any entity in which any of the Defendants have or had a controlling interest; and the affiliates, immediate family members, legal representatives, heirs, successors or assigns of any of the above.

184.   170. The Class is so numerous that joinder of all members is impracticable. Throughout the Class Period, PayPal common stock was actively traded on the NASDAQ under the ticker symbol "PYPL."  PayPal acknowledged in its Form 10-K filed February 6, 2020 that "[a]s of January 31, 2020, there were 3,553 holders of record of our common stock," and typically many more are held in street name.  Potential Class members may be identified from records maintained by PayPal, its transfer agents, and brokers and banks that hold shares beneficially for investors in street name, and may be notified of the pendency of this Action by mail, using the form of notice similar to that customarily used in securities class actions.

185.   171. Lead Plaintiffs' claims are typical of the claims of those of the Class, as all Class members were similarly affected by Defendants' wrongful conduct in violation of the federal laws complained of herein.

186.   172. Lead Plaintiffs will fairly and adequately protect the interests of the members of the Class and have retained counsel competent and experienced in class action and securities litigation.

187.   173. Common questions of law and fact exist as to all Class members and predominate over any questions solely affecting individual Class members.  Among the questions of law and fact common to the Class are:

- whether PayPal and the Individual Defendants made false and misleading statements or failed to disclose material information that rendered their Class Period statements false and misleading;

- whether certain Individual Defendants are control persons of PayPal for

purposes of Section 20(a) of the Exchange Act;

- whether PayPal and the Individual Defendants made the false and misleading statements or omissions with scienter;

- whether the federal securities laws were violated by Defendants' acts as alleged herein;

- whether the prices of PayPal's securities during the Class Period were artificially inflated because of the Defendants' misconduct complained of herein; and

- whether the Class has sustained damages claims and, if so, what is the proper measure of damages.

188. ~~174.~~ A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable. Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for Class members to individually redress the wrongs done to them. There will be no difficulty in the management of this Action as a class action.

189. ~~175.~~ With respect to the violations of the securities laws alleged herein, Lead Plaintiffs will rely, in part, upon the presumption of reliance established by the fraud-on-the-market doctrine in that:

- Defendants made public false and misleading statements or failed to disclose material facts, the omission of which rendered their statements misleading, during the Class Period;

- the omissions and misrepresentations were material;

- PayPal's common stock traded in an efficient market;

- the Company's common stock was liquid and traded with moderate to heavy volume during the Class Period;

- the Company traded on the NASDAQ and was covered by numerous analysts;

- the false and misleading statements and omissions alleged would tend to induce a reasonable investor to misjudge the value of the Company's common stock; and

- Lead Plaintiffs and other Class members purchased or otherwise acquired PayPal's common stock between the time that the Defendants failed to disclose

or misrepresented material facts, and the time that the true facts began to be disclosed or materialized, without knowledge of the specific, omitted or misrepresented facts.

190. ~~176.~~ Based upon the foregoing, Lead Plaintiffs and other Class members are entitled to a presumption of reliance upon the integrity of the market.

191. ~~177.~~ Alternatively, Lead Plaintiffs and the Class members are entitled to the presumption of reliance established by the Supreme Court in *Affiliated Ute Citizens of the State of Utah v. United States*, 406 U.S. 128 (1972), as Defendants omitted material information in violation of a duty to disclose such information, as detailed above.

## COUNT I

**(Against Defendants PayPal, Schulman, Rainey, Bland, and Gallo for Violations of Section 10(b) and Rule 10b-5(b))**

192. ~~178.~~ Lead Plaintiffs repeat and reallege each and every allegation contained above as if fully set forth herein.

193. ~~179.~~ This Count is asserted against PayPal and each of the Individual Defendants for violations of Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5(b) promulgated thereunder by the SEC.

194. ~~180.~~ During the Class Period, Defendants made various untrue statements of material fact and omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading in connection with the purchase and sale of securities.  Such statements were intended to, and throughout the Class Period, did: (i) deceive the investing public, including the Lead Plaintiffs and other Class members, as alleged herein; (ii) artificially inflate and maintain the market price of PayPal common stock; and (iii) cause Lead Plaintiffs and other members of the Class to purchase or otherwise acquire PayPal common stock at artificially inflated prices.

195. ~~181.~~ Specifically, PayPal and the Individual Defendants made material misrepresentations and omitted to disclose material information that rendered their statements misleading as particularized in Paragraphs ~~105~~117 to ~~146~~159.

196.   182. The Individual Defendants either had actual knowledge of the materially false and misleading statements and material omissions alleged herein and intended thereby to deceive the Lead Plaintiffs and the other members of the Class, or, in the alternative, acted with reckless disregard for the truth in that they failed or refused to ascertain and disclose such facts as would reveal the materially false and misleading nature of the statements made, although such facts were readily available to PayPal and the Individual Defendants.  In addition to the facts alleged herein demonstrating a strong inference of scienter, certain information showing that Defendants acted knowingly or with reckless disregard for the truth is peculiarly within these Defendants' knowledge and control.  As the senior managers of PayPal, the Individual Defendants had knowledge of the details of PayPal's internal affairs that were inconsistent with their public statements.

197.   183. As officers and directors of a publicly-held company, the Individual Defendants had a duty to disseminate timely, accurate, and truthful information regarding PayPal's business, operations, and purported compliance regime.  As a result of the dissemination of the aforementioned false and misleading statements, the market price of PayPal common stock was artificially inflated throughout the Class Period.  Additionally, as sellers of PayPal common stock during the Class Period, the Individual Defendants had an affirmative duty to disclose or refrain from trading on PayPal's artificially inflated stock price.

198.   184. In ignorance of the adverse facts concerning PayPal's business, operations and purported compliance regime, which were concealed by the misrepresentations and omissions alleged herein, Lead Plaintiffs and the other members of the Class purchased or otherwise acquired PayPal common stock at artificially inflated prices and relied upon the price of the common stock, the integrity of the market for the common stock or upon statements disseminated by Defendants, and were damaged thereby.

199.   185. During the Class Period, PayPal's common stock was traded on an active and efficient market.  Lead Plaintiffs and the other members of the Class, directly relying on the materially false and misleading statements described herein, or relying upon the integrity of the market, purchased or otherwise acquired shares of PayPal at prices artificially inflated by

Defendants' wrongful conduct.  Had Lead Plaintiffs and the other members of the Class known the truth, they would not have purchased or otherwise acquired said common stock or would not have purchased or otherwise acquired it at the inflated prices that were paid.  At the time of the purchases or acquisitions by Lead Plaintiffs and the Class, the true value of PayPal's common stock was substantially lower than the prices paid by Lead Plaintiffs and the other members of the Class.  The market price of PayPal's common stock declined sharply upon the public disclosure of the facts or materialization of the risks concealed from and to the injury of Lead Plaintiffs and other Class members.

200. 186. By reason of the conduct alleged herein, PayPal and the Individual Defendants knowingly or recklessly violated Section 10(b) of the Exchange Act and Rule 10b-5(b) promulgated thereunder.

201. 187. As a direct and proximate result of these Defendants' wrongful conduct, Lead Plaintiffs and the other Class members suffered damages in connection with their respective purchases of the Company's common stock during the Class Period when the risk of Defendants' wrongdoing materialized or upon the disclosure thereof, causing the price of PayPal common stock to decline.  PayPal and the Individual Defendants are thus liable for damages in connection with these losses under Section 10(b) of the Exchange Act and Rule 10b-5(b) promulgated thereunder.

## **COUNT II**

**(Against Defendants PayPal, Schulman, Rainey, Bland, and Gallo for Violations of Section 10(b) of the Exchange Act and Rule 10b-5(a) & (c))**

202. 188. Lead Plaintiffs repeat and reallege each and every allegation contained above as if fully set forth herein.

203. 189. During the Class Period, Defendants carried out a plan, scheme and course of conduct which was intended to, and throughout the Class Period: (a) deceived the investing public, including Lead Plaintiffs and other Class members, as alleged herein; and (b) caused Lead Plaintiffs and other members of the Class to purchase PayPal stock at artificially inflated prices.

1   In furtherance of this unlawful scheme, plan and course of conduct, Defendants made the false

2   statements and engaged in other unlawful acts as alleged herein.

3       204.   190. Defendants, directly and indirectly, by the use, means or instrumentalities of

4   interstate commerce and/or of the mails, engaged and participated in a continuous course of

5   conduct to conceal adverse material information about the business, operations and future

6   prospects of PayPal as specified herein.

7       205.   191. Defendants employed devices, schemes and artifices to defraud while in

8   possession of material adverse non-public information and engaged in acts, practices and a course

9   of conduct, as alleged herein, in an effort to reassure investors that the Company was in compliance

10  with all applicable laws, carefully monitored all laws applicable to its business, and operated a

11  "world class" compliance regime.   As alleged more particularly herein, these acts included

12  enabling misleading promotions for predatory for-profit schools throughout the Class Period in

13  violation of the 2015 Consent Order, launching a deliberate media campaign to cover up the

14  violations with false assurances that the misleading promotions had been removed when they had

15  not been removed and the Company's violations persist to this day.   Defendants also engaged in

16  a shadow banking scheme in violation of Regulation II to reap unreasonable and disproportionate

17  interchange fees by using Bancorp as a mere conduit to evade and circumvent federal law.   These

18  specific acts and the underlying violations of federal law rendered Defendants' Class Period

19  statements materially misleading when made, and operated as a fraud and deceit upon the

20  purchasers of PayPal's common stock during the Class Period.

21      206.   192. As a result of the Defendants' fraudulent scheme and failure to disclose

22  material facts, as set forth above, the market price for PayPal's securities was artificially inflated

23  during the Class Period.

24      207.   193. In ignorance of the fact that market prices of PayPal's publicly traded securities

25  were artificially inflated, and relying directly or indirectly on the false and misleading statements

26  disseminated by Defendants, or upon the integrity of the market in which the Company's securities

27  trade, and/or on the absence of material adverse information that was known to or recklessly

28  disregarded by Defendants, but not disclosed by Defendants during the Class Period, Lead

Plaintiffs and the other members of the Class acquired PayPal's common stock during the Class Period at artificially high prices and were damaged thereby.

208. 194. At the time these misrepresentations and omissions were made as part of Defendants' fraudulent scheme, Lead Plaintiffs and other members of the Class were ignorant of their falsity and believed them to be true. Had Lead Plaintiffs and the other members of the Class and the marketplace known the truth regarding PayPal, Lead Plaintiffs and other members of the Class would not have purchased or otherwise acquired PayPal common stock, or, if they had acquired such securities during the Class Period, they would not have done so at the artificially inflated prices at which they did.

209. 195. As a direct and proximate result of the wrongful conduct of Defendants, Lead Plaintiffs and the other members of the Class suffered damages in connection with their respective purchases and sales of the Company's securities during the Class Period.

210. 196. By virtue of the foregoing, Defendants violated Section 10(b) of the Exchange Act, and Rule 10b-5(a) & (c) promulgated thereunder and are liable to Lead Plaintiffs and the Class members who have been damaged as a result of such violations.

## **COUNT III**

### **(Against Defendants Schulman and Rainey for Violations of Section 20(a) of the Exchange Act)**

211. 197. Lead Plaintiffs repeat and reallege each and every allegation contained above as if fully set forth herein.

212. 198. During the Class Period, Schulman and Rainey participated in the operation and management of PayPal, and conducted and participated, directly and indirectly, in the conduct of PayPal's business affairs. Because of their senior positions as CEO and CFO respectively, the specific obligations imposed on them by the 2015 Consent Order and their own statements about the time and energy they devoted to PayPal's compliance programs, they knew the adverse non-public information that rendered PayPal's public statements false and misleading.

213. 199. As the most senior officers and directors of a publicly owned company, Schulman and Rainey had a duty to disseminate accurate and truthful information with respect to

1  PayPal's inability or unwillingness to comply with existing law, and to correct promptly any public

2  statements issued by PayPal, which had become materially false and misleading.

3  214. 200. Because of their positions of control and authority as senior officers, the

4  specific obligations imposed on them by the 2015 Consent Order and their own statements about

5  the time and energy they devoted to PayPal's compliance programs, Schulman and Rainey were

6  able to, and did, control the Company's statements, which PayPal disseminated in the marketplace

7  during the Class Period concerning PayPal's purported compliance with laws and regulations, its

8  existing compliance programs and systems, and its efforts to comply with the CFPB's Consent

9  Order and Regulation II.  Schulman and Rainey exercised their power and authority to cause

10  PayPal to engage in the wrongful acts complained of herein.  Schulman and Rainey, therefore,

11  were "controlling persons" of PayPal within the meaning of Section 20(a) of the Exchange Act.

12  In this capacity, they participated in the unlawful conduct alleged which artificially inflated the

13  market price of PayPal common stock.

14  215. 201. Schulman and Rainey, therefore, acted as controlling persons of PayPal.  By

15  reason of their senior management positions at PayPal, Schulman and Rainey had the power to

16  direct the actions of, and exercised the same to cause, PayPal to engage in the unlawful acts and

17  conduct complained of herein.  Schulman and Rainey exercised control over the general operations

18  of PayPal and possessed the power to control the specific activities, which comprise the primary

19  violations about which Lead Plaintiffs, and the other members of the Class, complain.

20  216. 202. As control persons, Schulman, and Rainey are liable pursuant to Section 20(a)

21  of the Exchange Act for the primary violations of the Exchange Act committed by PayPal.

22  **PRAYER FOR RELIEF**

23  **WHEREFORE**, Lead Plaintiffs demand judgment against Defendants as follows:

24  A.  Determining that the instant Action may be maintained as a class action under Rule

25  23 of the Federal Rules of Civil Procedure, and certifying Lead Plaintiffs as the Class

26  Representatives;

27  B.  Requiring Defendants to pay damages sustained by the Lead Plaintiffs and the Class

28  by reason of the acts and transactions alleged herein;

C.     Awarding Lead Plaintiffs and the other members of the Class prejudgment and post-judgment interest, as well as their reasonable attorneys' fees, expert fees and other costs; and

D.     Awarding such other and further relief as this Court may deem just and proper.

## DEMAND FOR TRIAL BY JURY

Lead Plaintiffs hereby demand a trial by jury.

Dated: ~~January 25~~September 16, 2022,                    **POMERANTZ LLP**

By:  /s/ *Omar Jafri*

Joshua B. Silverman
Omar Jafri
Brian P. O'Connell (SBN 314318)
Ten South LaSalle Street, Suite 3505
Chicago, Illinois 60603
Telephone: (312) 377-1181
Facsimile: (312) 377-1184
E-mail: jbsilverman@pomlaw.com
        ojafri@pomlaw.com
        boconnell@pomlaw.com

-and-

Jennifer Pafiti (SBN 282790)
1100 Glendon Avenue, 15th Floor
Los Angeles, California 90024
Telephone: (310) 405-7190
E-mail: jpafiti@pomlaw.com

-and-

Jeremy A. Lieberman
J. Alexander Hood II
600 Third Avenue, 20th Floor
New York, New York 10016
Telephone: (212) 661-1100
Facsimile: (212) 661-8665
Email: jalieberman@pomlaw.com
Email: ahood@pomlaw.com

-and-

**LABATON SUCHAROW LLP**

Michael P. Canty (admitted *pro hac vice*)
Thomas G. Hoffman, Jr. (admitted *pro hac vice*)
David J. Schwartz (admitted *pro hac vice*)
Charles J. Stiene (admitted *pro hac vice*)

140 Broadway
New York, NY 10005
Telephone: (212) 907-0700
Facsimile: (212) 818-0477
E-mail: mcanty@labaton.com
       thoffman@labaton.com
       dschwartz@labaton.com
       cstiene@labaton.com

*Co-Lead Counsel for Lead Plaintiffs and the Class*

-and-

**THE ROSEN LAW FIRM, P.A.**

Jacob Goldberg
Leah Heifetz-Li
101 Greenwood Avenue, Suite 440
Jenkintown, PA 19046
Telephone: (215) 600-2817
Facsimile: (212) 202-3827
E-mail:  jgoldberg@rosenlegal.com
       lheifetz@rosenlegal.com

-and-

**ROCHE FREEDMAN LLP**

Ivy T. Ngo (SBN 249860)
1 SE 3rd Avenue, Suite 1240
Miami, FL 33131
Telephone: (786)-924-2900
Email: ingo@rochefreedman.com

*Additional Counsel for Lead Plaintiffs*

**CERTIFICATE OF SERVICE**

I hereby certify that on ~~January 25~~September 16, 2022, a copy of the foregoing was filed electronically via the Court's CM/ECF system.  Notice of this filing will be sent by e-mail to all parties by operation of the Court's electronic filing system.  Parties may access this filing through the Court's CM/ECF System.

Dated:  ~~January 25~~September 16, 2022

**POMERANTZ LLP**

By: _/s/ Omar Jafri_____
Omar Jafri

*Co-Lead Counsel*

Document comparison by Workshare Compare on Friday, September 16, 2022 9:07:35 PM

| Input: | |
|---|---|
| Document 1 ID | file://H:\WP Folder\FAC.docx |
| Description | FAC |
| Document 2 ID | file://H:\WP Folder\PayPal - FINAL Second Amended Complaint (9.16.2022) (clean).docx |
| Description | PayPal - FINAL Second Amended Complaint (9.16.2022) (clean) |
| Rendering set | standard |

| Legend: | |
|---|---|
| Insertion | |
| Deletion | |
| Moved from | |
| Moved to | |
| Style change | |
| Format change | |
| Moved deletion | |
| Inserted cell | |
| Deleted cell | |
| Moved cell | |
| Split/Merged cell | |
| Padding cell | |

| Statistics: | |
|---|---|
| | Count |
| Insertions | 436 |
| Deletions | 391 |
| Moved from | 0 |
| Moved to | 0 |
| Style changes | 0 |
| Format changes | 0 |
| Total changes | 827 |